**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

JUN 0 7 2024

RECEIVED

BIU, LLC,

       Petitioner,

v.

FEDERAL COMMUNICATIONS
COMMISSION

       and

UNITED STATES OF AMERICA,

       Respondents.

No. 24-1189

---

## PETITION FOR REVIEW

Pursuant to Section 402(a) of the Communications Act of 1934, as amended, 47 U.S.C. § 402(a), 28 U.S.C. § 2344, and Federal Rule of Appellate Procedure 15, Petitioner BIU, LLC ("Petitioner" or "BIU") hereby petitions this Court for review of the April 11, 2024 Memorandum Opinion and Order (the "Order") of Respondent Federal Communications Commission (the "Commission" or "FCC") in IB Docket No. 20-399 entitled "*In the Matter of Spectrum Five LLC Petition for Enforcement of Operational Limits and for Expedited Proceedings to Revoke Satellite Licenses.*" A copy of the Order (the "Order") for which Petitioner seeks review is attached hereto as **Exhibit A**.

1



The Order dismissed and alternatively denied Petitioner's Application for Review ("AFR") seeking review of the November 13, 2023 decision of the FCC Enforcement Bureau to dismiss and alternatively deny Petitioner's request to reinstate the Petition for Enforcement of Operational Limits and for Expedited Proceedings to Revoke Satellite Licenses (the "Petition") filed by Spectrum Five LLC ("Spectrum Five") on November 6, 2020. A copy of the Order of Dismissal of the Petition is attached as **Exhibit B**. The Petition should be reinstated because it was dismissed at the instruction of R. David Wilson, who had no right, power, or authority to give that instruction. BIU had the exclusive right to determine whether to dismiss the Petition and did not wish the Petition to be dismissed. Wilson concealed from BIU that he intended to dismiss the Petition and failed to notify BIU that the Petition had been dismissed. Thus, the dismissal was fraudulent and the Petition should be reinstated.

A copy of the AFR is attached hereto as **Exhibit C**. A copy of the underlying letter to Loyaan A. Egal, Chief of the Commission's Enforcement Bureau, asking that the Commission reinstate the Petition (the "Request for Reinstatement") is attached hereto as **Exhibit D**.

## NATURE OF THE PROCEEDING BEFORE THE FCC

The proceeding before the FCC (the "FCC Proceeding") is related to Spectrum Five's Petition, which asked that the Commission, among other things,

issue an order directing Intelsat License LLC ("Intelsat") to come into compliance with the terms of its license.

Beginning in 2014, Intelsat started taking a series of actions that have deprived Spectrum Five of its rights to operate in the slot at 95° W.L. Intelsat secured licenses for S2887 (Intelsat 30) and S2924 (Intelsat 31), located at 95.05° West Longitude from the Commission, which required Intelsat to obtain, through the FCC's International Bureau ("IB"), rights to operate new space stations from the International Telecommunication Union ("ITU") in accordance with ITU rules.

Intelsat never submitted an ITU application for a satellite network reflecting the operation of Intelsat 30 and 31. Instead, it applied for a new ITU satellite network that was junior to Spectrum Five's network and began operating at higher power levels than it was permitted to use. Intelsat's actions have prevented Spectrum Five from exploiting the rights conveyed to it and have even caused Spectrum Five to lose the rights to lease its satellite.

As set forth in paragraphs 4-15 of the AFR, it appears that the International Bureau's Satellite Division was complicit in Intelsat's actions. The Division Chief of the International Bureau's Satellite Division at that time was Jose Albuquerque, who had previously been a long-time employee of Intelsat.

In response to Intelsat's violations, Spectrum Five filed the Petition on November 6, 2020. The Petition asked the Commission to, among other things,

3

exercise its supervisory obligations and direct Intelsat to come into compliance with its licenses.

## BIU IS A PARTY-IN-INTEREST

BIU has an interest in the FCC Proceeding because it is Spectrum Five's attorney-in-fact.

Spectrum Five and BIU are parties to that certain Loan Agreement dated September 6, 2018, as supplemented and amended by that certain Amended and Restated Loan Agreement dated August 28, 2019, as further supplemented and amended by that certain Second Amended and Restated Loan Agreement dated December 30, 2019, and as further supplemented and amended by that certain Third Amended and Restated Loan Agreement dated January 31, 2020. (Request for Reinstatement (Ex. B), Att. B through E) (the "Loan Agreement"); the Security Agreement dated September 6, 2018 (the "Security Agreement") (*id.*, Att. F); the UCC Security Agreement dated August 28, 2019 (the "UCC Agreement") (*id.*, Att. G); the Pledge Agreement dated September 2018 (the "Pledge Agreement") (*id.*, Att. H); the Letter Agreement entered into as of September 5, 2020 (*id.*, Att. I); and the Letter Agreement entered into as of February 15, 2021 (the "2021 Letter Agreement") (*id.*, at Att. J) (collectively referred to herein and, together with any additional documents related hereto, as the "Loan Documents").

The Loan Documents reflect the agreements between BIU, as Lender, on one hand, and Spectrum Five, on the other, in connection with loans by BIU to Spectrum Five (the "BIU Loan"). Pursuant to Section 4 of the 2021 Letter Agreement, the BIU Loan is in default as it was not paid by August 1, 2021. Therefore, BIU is entitled to exercise all rights and remedies under the Loan Documents. Those rights include, without limitation, the rights under Section 3.4 of the Security Agreement and Section 6 of the Pledge Agreement, pursuant to which Spectrum Five has irrevocably designated, made, constituted, and appointed BIU as Spectrum Five's true and lawful attorney-in-fact.[1]

## JURISDICTION AND VENUE

Jurisdiction and venue are proper in this circuit of the United States Court of Appeals. The United States Courts of Appeal have exclusive jurisdiction over all final orders of the respondent, FCC. Under the applicable provisions of Title 28, venue is proper in the United States Court of Appeals for the District of Columbia Circuit. 28 U.S.C. § 2343.

## GROUNDS UPON WHICH RELIEF IS SOUGHT

As previewed, BIU is Spectrum Five's true and lawful attorney-in-fact, including for the purposes of the FCC Proceeding. On April 12, 2023, through its counsel Jenner & Block LLP, Spectrum Five filed with the FCC a notice to withdraw

---

[1] BIU did not assume operational control of Spectrum Five.

the Petition.   On April 24, 2023, the Commission issued the Order, stating in

pertinent part:

> the Petition of Spectrum Five for Enforcement of
> Operational Limits and for Expedited Proceedings to
> Revoke Satellite Licenses **IS DISMISSED WITH
> PREJUDICE** to the filing of any future petition,
> complaint, or other request for relief by Spectrum Five
> regarding (1) the claims set forth in the Spectrum 5
> Petition or (2) any claims arising from the same set of
> facts, and that this proceeding **IS TERMINATED** and
> the docket is closed.

Ex. B (emphasis in original).

On June 6, 2023, Scott Crawford, one of the Managing Members of BIU,

learned that Spectrum Five had asked the Commission to withdraw the Petition and

that a staff-level order had accepted the withdrawal.  Request for Reinstatement (Ex.

D), Scott Crawford Declaration ("Crawford Decl.") ¶ 2, Att. L.  BIU was unaware

that Spectrum Five had retained Jenner & Block to prosecute the Petition and, of

course, was completely unaware that the Petition had been withdrawn.  Crawford

Decl. ¶ 3.  The following day, June 7, 2023, BIU's counsel sent a letter to Jenner &

Block informing them that they were not authorized to withdraw the Petition.

Request for Reinstatement (Ex. D), Att. M.  On June 8, 2023, Jenner & Block

responded that they were directed by Mr. Wilson, whom they believed to have the

authority to direct them to withdraw the Petition, and that "[i]n light of the apparent

disagreement between BIU and Mr. Wilson, Jenner & Block is not currently in a

position, as your letter requests, to take any action at the FCC to seek to reinstate the Petition. Of course, BIU is free to engage other counsel to seek that relief." *Id.*, Att. A.

The next day, BIU submitted the Request for Reinstatement asking "that the Petition be reinstated and the docket be reopened so, at a minimum, the issue whether the Petition was validly withdrawn can be reviewed by the full Commission." Ex. D at 1.

On November 13, 2023, the Commission's Enforcement Bureau issued a Memorandum Opinion and Order to dismiss and alternatively deny Petitioner's Request for Reinstatement.[2]

Petitioner then filed the AFR, which was dismissed and alternatively denied by the Order attached as **Exhibit A.** This Court should order the Commission to vacate the Order and to reinstate the Petition. First, such reinstatement is in line with the Commission's own precedent. For example, in *Champion Communications Services, Inc.*, 15 FCC Rcd. 12832 ¶¶ 2-4 (WTB 2000), Sagra Farms, Inc. ("Sagra Farms") assigned a license to Champion Communication Services, Inc. ("Champion"), but the person who signed the assignment application "had no

---

[2] While the Request for Reinstatement was pending before the Enforcement Bureau, Petition filed a previous petition for review before this Court (Case No. 23-1163. That petition was dismissed as premature on October 19, 2023. (Doc. No. 2022717).

authority to do so." Based on this, the Commission determined that it was appropriate to reinstate the license to Sagra Farms. See *id.* ¶¶ 3, 4.

Second, the unauthorized withdrawal of the Petition amounts to a fraud on the Commission itself. *See American Industrial Door, Inc.*, 16 FCC Rcd. 16300 ¶ 5 & n.10. "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for ... fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party." Fed. R. Civ. Proc. 60(b)(3); *see also Dausuel v. Dausuel*, 195 F.2d 774, 775 (D.C. Cir. 1952) ("A court may at any time set aside a judgment for after-discovered fraud upon the court"); *In re Bressman*, 874 F.3d 142, 150 (3d Cir. 2017) (district court did not abuse its discretion vacating judgment based on failure to disclose information about settlement agreement); *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 561 (7th Cir. 1999) ("an order procured by fraud, can be attacked at any time, in any court, either directly or collaterally, provided that the party is properly before the court."); Fed. R. Civ. Proc. 60(b)(3). Fraud on the Commission includes, as here, where "the attorney fraudulently or without authority assumes to represent a party and connives at his defeat." *Luttrell v. United States*, 644 F.2d 1274, 1276 (9th Cir. 1980).

Fraud on the Commission is fraud that "subvert[s] the integrity of the" Commission. *See Synanon Church v. United States*, 579 F. Supp. 967, 974 (D.D.C.

1984), aff'd, 820 F.2d 421 (D.C. Cir. 1987); *see also Davis v. U.S. Dep't of Health & Hum. Servs.*, 968 F.Supp.2d 176, 184 (D.D.C. 2013), aff'd, No. 1:12-CV-01246-JDB, 2014 WL 2178705 (D.C. Cir. Apr. 25, 2014) ("Fraud on the court is fraud which is directed to the judicial machinery itself") (quoting *Baltia Air Lines, Inc. v. Transaction Mgmt., Inc.*, 98 F.3d 640, 642–43 (D.C. Cir.1996)).

Here, Jenner & Block had no authority to withdraw the Petition on behalf of Spectrum Five. It did so at the direction of Mr. Wilson, who also lacked authority to cause Spectrum Five to withdraw the Petition. He also did this without providing any notice to BIU that he was going to make the request and without notifying Jenner & Block that he had no authority to make that request.

While in its Order the FCC labeled the matter as a "private contractual dispute" that should be adjudicated in court, there is no adequate forum in this case that can timely and effectively resolve the issue in such a manner as to reinstate the Petition that was fraudulently dismissed. In *Listeners' Guild, Inc. v. F.C.C.*, 813 F.2d 465, 469 (D.C. Cir. 1987), the court held that it was reasonable for the FCC to adopt a "wait and see" posture where there was ongoing litigation in state court and the FCC expressly observed that the license renewal application remained subject to and without prejudice to whatever action may be appropriate after the resolution of the state court case. That case stands in contrast to the instant case in which the

Petition was dismissed with prejudice on a fraudulent basis and there is no other forum that will effectively decide the matter.

Apart from the erroneous denial on the merits, the Order dismissed the AFR as untimely because it was filed 60 days after the decision of the Enforcement Bureau rather than the 30 days permitted under 47 CFR § 1.115(d). The FCC recognized that the AFR was erroneously filed under 47 CFR §§ 54.719 and 54.720. This was not a jurisdictional deadline, there was no prejudice from the brief delay, and the Commission should have waived and forgiven the error and determined the matter on the merits, particularly given that the AFR and the fraudulent dismissal of the Petition raise serious issues concerning the integrity of the Commission's procedures. See *In the Matter of Application for Review of Liability of MTD, Inc.,* 6 FCC Rcd. 34, 1991 WL 637194 at *1, fn. 2 (Jan. 7, 1991) (time limit is established solely by rule and can be waived, with waiver appropriate in absence of prejudice); *In re Noble Syndications Inc.,* 74 F.C.C.2d 124, 1979 WL 43971 at *3 (Oct. 11, 1979) (FCC waiver of untimeliness under section 1.115(d) where no prejudice).

**PRAYER FOR RELIEF**

BIU respectfully requests that this Court direct the Commission to vacate the

Order and to reinstate the Petition, reopen the docket, and provide such additional

relief as may be proper.

Respectfully submitted,

Alan A. Greenberg
GREENBERG GROSS LLP
1980 Festival Plaza Drive, Suite 730
Las Vegas, Nevada 89135
Telephone: (702) 777-0888
Facsimile: (702) 777-0801
Email: agreenberg@ggtriallaw.com
*Attorneys for Petitioner BIU, LLC*

Dated:    June 7, 2024

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

BIU, LLC

      Petitioner,

v.

FEDERAL COMMUNICATIONS
COMMISSION

      Respondent.

No. **24-1189**

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, Petitioner BIU LLC (BIU) states that BIU is a limited liability company and has no affiliation with any public companies. BIU is an investment group formed to "Bring Into Use" a satellite at 95WL to perfect rights to utilize that location in accordance with International Telecommunication Union regulations.

Alan A. Greenberg
GREENBERG GROSS LLP
1980 Festival Plaza Drive, Suite 730
Las Vegas, Nevada 89135
Telephone: (702) 777-0888
Facsimile: (702) 777-0801
Email: agreenberg@ggtriallaw.com
*Attorneys for Petitioner BIU, LLC*

Dated:     June 7, 2024

12

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 7th day of June 2024, copies of the

foregoing Petition for Review were served on the following by UPS Next Day Air

to:

Federal Communications Commission
c/o P. Michele Ellison, General Counsel
Office of General Counsel
45 L Street NE
Washington, DC 20554
michele.ellison@fcc.gov

R. David Wilson
Spectrum Five LLC
2445 California Street NW
Washington, D.C. 20008
rdw@spectrumfive.com

Jennifer D. Hindin
Henry Gola
Sara M. Baxenberg
Garriott Boyd
Wiley Rein LLP
1776 K Street NW
Washington, D.C. 20006
JHindin@wiley.law
HGola@wiley.law
SBaxenberg@wiley.law
BGarriott@wiley.law
*Counsel for IntelSat*

Francisco R. Montero
Seth Williams
Fletcher Heald & Hildreth, PLC
1300 North 17th St., 11th Fl.
Arlington, VA 22209
montero@fhhlaw.com
williams@fhhlaw.com
*Counsel for Spectrum Five, LLC*

Samuel L. Feder                           Michelle Bryan
Jenner & Block                            Susan H. Crandall
1099 New York Avenue, NW, Suite 900       Cynthia J. Grady
Washington, D.C. 20001-4412               Intelsat US LLC
SFeder@jenner.com                         7900 Tysons One Place
*Counsel for Spectrum Five, LLC*          McLean, VA 22102
                                          michelle.bryan@intelsat.com
                                          susan.crandall@intelsat.com
                                          cynthia.grady@intelsat.com
                                          *General Counsel*


Alan A. Greenberg

# EXHIBIT A

Federal Communications Commission                        FCC 24-39

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Spectrum Five LLC | )     IB Docket No. 20-399 |
| | ) |
| Petition for Enforcement of Operational Limits and | ) |
| for Expedited Proceedings to Revoke Satellite | ) |
| Licenses | ) |

**MEMORANDUM OPINION AND ORDER**

Adopted: April 10, 2024                               Released:  April 11, 2024

By the Commission:

**I.      INTRODUCTION**

        1.      We have before us an Application for Review (AFR) filed on January 12, 2024, by BIU, LLC (BIU),[1] seeking review of the Enforcement Bureau's (Bureau) November 13, 2023 decision[2] to dismiss and, on alternative and independent grounds, deny BIU's request to reinstate[3] the above-captioned Petition filed by Spectrum Five LLC (Spectrum Five).[4]  As discussed below, we dismiss BIU's AFR because it was filed late, in violation of section 1.115(d) of the Commission's rules.[5]  On alternative and independent grounds, we deny the AFR and affirm the Bureau's decision that this matter presents a private contractual dispute between Spectrum Five and BIU that is justiciable, if at all, in a court of competent jurisdiction and not by the Commission.

**II.     BACKGROUND**

        2.      On November 6, 2020, Spectrum Five filed the above-captioned Petition asking the Commission to require Intelsat License LLC (Intelsat) to come into compliance with the terms of its licenses for the Intelsat 30 and Intelsat 31 satellites.[6]  On April 12, 2023, Spectrum Five's outside counsel

---

[1] *See* BIU, LLC, Application for Review, IB Docket No. 20-399 (filed Jan. 12, 2024) (AFR).

[2] *See* Spectrum Five LLC, Memorandum Opinion and Order, DA 23-1067, 2023 WL 8603170 (EB 2023) (*EB MO&O*).

[3] Letter from Michael H. Strub, Jr., Counsel for BIU, LLC, to Loyaan A. Egal, Chief, Enforcement Bureau, FCC, IB Docket No. 20-399 (filed June 9, 2023) (BIU Reconsideration Letter).

[4] Petition of Spectrum Five for Enforcement of Operational Limits and for Expedited Proceedings to Revoke Satellite Licenses, IB Docket No. 20-399 (filed Nov. 6, 2020) (Spectrum Five Petition or Petition).

[5] 47 CFR § 1.115(d).

[6] *See* Spectrum Five Petition.

Federal Communications Commission                                FCC 24-39

submitted a letter stating that Spectrum Five withdrew its Petition.[7]  In response, on April 24, 2023, the Bureau publicly released an Order dismissing the Spectrum Five Petition with prejudice.[8]

3.        On June 9, 2023, BIU filed a letter in the above-captioned proceeding alleging that the withdrawal of the Petition was "procured by fraud" at the direction of R. David Wilson, Chairman and CEO of Spectrum Five.[9]  BIU alleged that BIU and Spectrum Five are parties to certain loan agreements on which Spectrum Five defaulted.  According to BIU, under the terms of the loan agreement, upon Spectrum Five's default BIU would be appointed as Spectrum Five's exclusive attorney-in-fact, with the sole authority to authorize the dismissal of the Spectrum Five Petition.[10]  BIU asked the Bureau to reinstate the Spectrum Five Petition and reopen the docket.[11]  On August 11, 2023, the Bureau sent a letter of inquiry to Spectrum Five and its counsel asking them to respond to the allegations in the BIU Reconsideration Letter.[12]  On August 25, 2023, Spectrum Five, represented by Mr. Wilson, responded to the BIU Reconsideration Letter, contending that BIU has no right to claim it represents Spectrum Five.[13]  As an initial matter, Spectrum Five disputed that it is in default on its loan with BIU.[14]  And, even assuming it was then in default, Spectrum Five claimed that the contractual provisions of the loan agreements cited by BIU related only to BIU's authority to perform specified ministerial functions on Spectrum Five's behalf, such as signing of tax filings.[15]  On September 5, 2023, BIU responded to Spectrum Five, claiming that specified terms of the loan agreements appointed BIU as Spectrum Five's attorney-in-fact.[16]

4.        On November 13, 2023, the Enforcement Bureau released a decision dismissing and, on alternative and independent grounds, denying the BIU Reconsideration Letter.[17]  The Bureau dismissed the BIU Reconsideration Letter because it was filed over two weeks after the statutory deadline for seeking reconsideration.[18]  On alternative and independent grounds, the Bureau denied the BIU Reconsideration Letter explaining that, while the Commission has previously considered procedurally

---

[7] See Letter from Samuel L. Feder, Counsel for Spectrum Five, LLC, to Marlene H. Dortch, Secretary, FCC, IB Docket No. 20-399 (filed Apr. 12, 2023) ("Spectrum Five LLC respectfully withdraws its petition for Enforcement of Operational Limits and for Expedited Proceedings to Revoke Satellite Licenses.").

[8] See Spectrum Five LLC, Order, DA 23-345, 2023 WL 3152002 (EB 2023) (EB Dismissal Order).  On June 23, 2023, BIU filed a Petition for Review of the EB Dismissal Order with the United States Court of Appeals for the D.C. Circuit.  See Petition for Review of Petitioner BIU, LLC, BIU, LLC v. FCC, No. 23-1163 (D.C. Cir. June 23, 2023).  On August 14, 2023, the Commission filed a Motion to Dismiss the BIU Petition for Review.  See Motion to Dismiss of Respondent Federal Communications Commission, BIU, LLC v. FCC, No. 23-1163 (D.C. Cir. Aug. 14, 2023).  On October 19, 2023, the D.C. Circuit granted the Motion to Dismiss.  See Order, BIU, LLC v. FCC, No. 23-1163 (D.C. Cir. Oct. 19, 2023).

[9] See BIU Reconsideration Letter at 1.

[10] Id.

[11] Id. at 5.

[12] See Letter from Loyaan A. Egal, Chief, Enforcement Bureau, to, Samuel L. Feder, Counsel for Spectrum Five, LLC, FCC, IB Docket No. 20-399 (August 11, 2023).

[13] See Letter from R. David Wilson, Spectrum Five, LLC, to Loyaan A. Egal, Chief, Enforcement Bureau, FCC, IB Docket No. 20-399, at 2-3 (filed Aug. 25, 2023) (Spectrum Five Reply).

[14] See id. at 3 n.12.

[15] Id. (stating that "neither the Security Agreement nor the Pledge Agreement confers exclusive powers or sole authority to BIU to make decisions on Spectrum Five's behalf").

[16] See Letter from Michael H. Strub, Jr., Counsel for BIU, LLC, to Loyaan A. Egal, Chief, Enforcement Bureau, FCC, IB Docket No. 20-399, at 1 (filed Sept. 5, 2023) (BIU Response).

[17] See EB MO&O.

[18] See id. at para. 6 (citing 47 U.S.C. § 405).

2

improper petitions for reconsideration where there was undisputed evidence of fraud, the present case involved at most a private contractual dispute that is justiciable, if at all, in a court of competent jurisdiction and not by the Commission.[19]

     5.      On January 12, 2024, BIU filed an AFR of the Bureau's decision, again claiming that Mr. Wilson did not have authority to withdraw the Petition pursuant to Spectrum Five's contractual arrangements with BIU.[20]  BIU asks the Commission to set aside the Bureau's decision, reinstate the Petition, and reopen the docket.[21]

## III.    DISCUSSION

     6.      Pursuant to section 1.115(d) of the Commission's rules, an application for review must be filed within 30 days from the date of public notice of the Commission action.[22]  Public notice of the Bureau's decision to dismiss and, on alternative and independent grounds, deny the BIU Reconsideration Letter was given on November 13, 2023, when the *EB MO&O* was released to the public.[23]  Pursuant to section 1.4 of the Commission's rules, the first day to be counted in computing the 30-day period was November 14, 2023, resulting in the last day for filing an application for review of December 13, 2023.[24]  BIU filed its AFR on January 12, 2024, approximately one month after the deadline.[25]  BIU offered no explanation for its late filing nor did it seek a waiver.[26]  Accordingly, we dismiss BIU's AFR as untimely.[27]

     7.      On alternative and independent grounds, we deny the AFR because BIU has failed to demonstrate that the Bureau erred in dismissing and, on alternative and independent grounds, denying the BIU Reconsideration Letter.  As an initial matter, the Bureau properly concluded that, without justification, BIU filed the BIU Reconsideration Letter over two weeks after the statutory deadline for seeking reconsideration.[28]  In the AFR, BIU does not dispute that it filed the BIU Reconsideration Letter late.  Although the Bureau recognized that the Commission has previously considered procedurally improper petitions for reconsideration where there was undisputed evidence of fraud on the

---

[19] *See id.* at para. 7.

[20] AFR at 5.

[21] *Id.* at 22.

[22] 47 CFR § 1.115(d).

[23] 47 CFR § 1.4(b)(2) (providing that "for non-rulemaking documents released by the Commission or staff" the date of public notice is "the release date").

[24] 47 CFR § 1.4(c)-(d).

[25] *See supra* note 4.

[26] BIU claims without explanation that its AFR of the *EB MO&O* was filed pursuant to Sections 54.719 and 54.720 of the Commission's rules.  AFR at 16 (citing 47 CFR §§ 54.719 and 54.720).  These rules provide for a 60-day period for a party to seek Commission review of a decision made by the Universal Service Administrative Company.  *See* 47 CFR § 54.720; *see also* 47 CFR § 54.5 (defining "Administrator" as the Universal Service Administrative Company).  The decision to dismiss or deny the BIU Reconsideration Letter in the *EB MO&O* was made by the Enforcement Bureau on delegated authority, not by the Universal Service Administrative Company, thus the deadline for seeking Commission review was 30 days after release of the *EB MO&O* pursuant to Section 1.115 of the Commission's Rules.  *See EB MO&O* at para. 8 n.24; *see also* 47 CFR § 1.115(a), (d).

[27] 47 CFR § 1.115(d).

[28] *See EB MO&O* at para. 6 (explaining that the Bureau's public release of the *EB Dismissal Order* on April 24, 2023, provided BIU with constructive notice of the decision) (citing *K. Rupert Murdoch (Transferor) and Fox Entm't Group (Transferee)*, Memorandum Opinion and Order on Reconsideration, 24 FCC Rcd 5824, 5827, para. 11 (2009) ("public notice constitutes constructive notice"); *Holy Family Oratory of St. Philip Neri*, Memorandum Opinion and Order, 29 FCC Rcd 13273, 13274, para. 5 (2014) (unawareness of public notice of decision insufficient basis for consideration of late-filed reconsideration petition)).

Commission's processes,[29] the Bureau correctly explained that the matter here is a private contractual dispute between BIU and Spectrum Five as to whether Mr. Wilson had authority to withdraw the Petition based on competing interpretations of contractual language in their loan agreements.[30]

8.    In its AFR, BIU presents new arguments in an attempt to support its claim that the Spectrum Five Petition should be reinstated. As an initial matter, we dismiss these new arguments because they were not presented to the Bureau.[31] On alternative and independent grounds, we reject these arguments on the merits. First, BIU cites *Roy M. Speer*, claiming that the Commission has previously considered matters that involve a "private dispute."[32] But, in *Roy M. Speer*, the Commission did not resolve a dispute between private parties on how to interpret the terms of their contract. Rather, the Commission considered allegations that a third party had assumed *de facto* control of a broadcast licensee, which is a matter that squarely fits within the Commission's expertise and jurisdiction under Section 310(d) of the Act.[33] The present matter, however, does not involve a claim of *de facto* control. Indeed, BIU filed a letter on June 13, 2023, in this proceeding stating that "BIU did not suggest, nor intend to suggest, that BIU has assumed operational control of Spectrum Five."[34] Rather, the basic allegation raised by BIU here—that the terms of a loan agreement did not authorize Mr. Wilson on behalf of Spectrum Five to withdraw the Spectrum Five Petition—is purely a matter of contractual interpretation

---

[29] *See id.* at para. 7 (citing *Champion Communications Services, Inc.,* Order, 15 FCC Rcd 12832, 12832, para. 3 (WTB 2000) (both assignee and assignor agreed that assignment application was signed by unauthorized person); *Comtex Communications, Inc.,* Order, 15 FCC Rcd 11730, 11731, para. 6 (WTB 2000) (undisputed showing that assignor never authorized the assignment of its license)). BIU argues that the present case is not different from *Champion,* where the Wireless Bureau sought to reinstate a former licensee after the assignee revealed the assignment application was not authorized by the assignor. *See* AFR at 20-21. Unlike the present case, however, there was no contractual dispute between the assignor and the assignee in *Champion* that required resolution. Rather, both the assignee and the assignor in *Champion* agreed that the assignment application was signed by an unauthorized person. *Champion,* 15 FCC Rcd at 12832, paras. 3-4 (referring to an "undisputed showing" that the assignee never authorized the assignment of its license). Similarly, BIU relies on *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944), but in that case there was no factual dispute. *Id.* at 243 (referring to "[i]ndisputable proof of the foregoing facts"). *See* AFR at 19.

[30] *See id.*

[31] 47 CFR § 1.115(c) ("No application for review will be granted if it relies on questions of fact or law upon which the designated authority has been afforded no opportunity to pass."); *id.* at Note to Section 1.115(c) ("Subject to the requirements of § 1.106, new questions of fact or law may be presented to the designated authority in a petition for reconsideration.").

[32] AFR at 18-19 (citing *Applications of Roy M. Speer, (Transferor) & Silver Mgmt. Co., (Transferee)*, 11 FCC Rcd 14684 (1996)).

[33] 47 U.S.C. § 310(d) (stating that a license shall not be "transferred, assigned, or disposed of in any manner . . . or by transfer of control of any corporation holding such [] license, to any person except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby"). In addition, when the Commission in a subsequent decision pertaining to *Roy M. Speer* addressed the transfer of control allegation, it explained it would not "attempt to arbitrate contract interpretation" but instead its "objective [was] to determine the locus of control of" the station. *Applications of Roy M. Speer, (Transferor) & Silver Mgmt. Co., (Transferee)*, 11 FCC Rcd 18393, para. 51 (1996); *see also Applications of Roy M. Speer, (Transferor) & Silver Mgmt. Co., (Transferee)*, 13 FCC Rcd 19911, para. 17 (1998) ("[T]he Commission generally does not adjudicate disputes related to private contractual matters. In reaching our decision, we assumed the validity of the Option Agreement, and ruled only on whether it comported with our regulations and policies.").

[34] *See* Letter from Michael H. Strub, Jr., Counsel for BIU, LLC, to Loyaan A. Egal, Chief, Enforcement Bureau, FCC, IB Docket No. 20-399, at 1 (filed June 13, 2023). BIU stated the same in its filings with the United States Court of Appeals for the D.C. Circuit. *See* Petition for Review of Petitioner BIU, LLC, *BIU, LLC v. FCC*, No. 23-1163 (D.C. Cir. June 23, 2023), at 4 n.2 ("BIU did not assume operational control of Spectrum Five").

where the two parties to the contract have opposing views over how their contract should be interpreted and for which the Commission is not the proper forum for adjudication.[35]

9.       BIU's attempt to distinguish the cases cited by the Bureau holding that the Commission does not adjudicate private contract law questions is unavailing.[36] While BIU claims these cases did not involve the integrity of proceedings before the Commission or the Commission's exclusive jurisdiction over licensing,[37] the cases in fact specifically recognize that the Commission "does not possess the resources, expertise, or jurisdiction to adjudicate" private contractual disputes and that the Commission's approach is to defer to judicial determinations regarding the interpretation and enforcement of contracts in order to preserve its "exclusive authority to make public interest determinations on licensing matters while recognizing the role of state and local courts in adjudicating private contractual disputes."[38]

10.      Finally, while we take seriously the need to ensure the integrity of our processes, the Bureau properly concluded that the facts here reveal, at most, a private contractual dispute between Spectrum Five and BIU whether the terms of their loan agreement prohibited Spectrum Five from withdrawing the Petition.[39] Accordingly, on alternative and independent grounds, we affirm the Bureau's denial of the Spectrum Five Petition.

## IV.    ORDERING CLAUSES

11.      Accordingly, **IT IS ORDERED** that, pursuant to section 5(c)(5) of the Communications Act of 1934, as amended, 47 U.S.C. § 155(c)(5), and section 1.115 of the Commission's rules, 47 CFR § 1.115, the Application for Review filed by BIU, LLC on January 12, 2024, is DISMISSED and, in the alternative, is DENIED.

12.      **IT IS FURTHER ORDERED** that a copy of this Memorandum Opinion and Order shall be sent by first class mail and certified mail, return receipt requested, to Counsel for BIU, LLC, Michael H. Strub Jr., Esq., Greenberg Gross LLP, 650 Town Center Drive, Suite 1700, Costa Mesa, California 92626.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

---

[35] *See EB MO&O* at para. 7.

[36] AFR at 21-22.

[37] *Id.*

[38] *Arecibo Radio Corp.*, Memorandum Opinion and Order, 101 FCC 2d 545, 548 (1985). *See Applications of Cellco Partnership d/b/a Verizon Wireless and Atlantis Holdings LLC,* Memorandum Opinion and Order and Declaratory Ruling, 23 FCC Rcd 17444, 17538, para. 214 (2008) ("private contractual disputes . . . are best resolved by a local court of competent jurisdiction"); *see also Listeners' Guild, Inc. v. FCC*, 813 F.2d 465, 469 (D.C. Cir. 1987) (referring to the "Commission's longstanding policy of refusing to adjudicate private contract law questions for which a forum exists in the state courts"); *Environmentel, LLC v. FCC*, 661 F.3d 80, 84-86 (D.C. Cir. 2011) (affirming Commission decision permitting withdrawal of assignment application, rejecting proposed assignee's consummation notification, and declining to examine the validity of the parties' contracts).

[39] BIU's claim that BIU cannot bring a civil action to require the Commission to restore the Petition misses the point. *See* AFR at 20. BIU could pursue a civil action in a court of competent jurisdiction alleging that Spectrum Five breached its contract with BIU or otherwise acted without authority when Mr. Wilson on behalf of Spectrum Five withdrew the Petition.

# EXHIBIT B

Federal Communications Commission                                   DA 23-345

**Before the
Federal Communications Commission
Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Spectrum Five LLC | )      IB Docket No. 20-399 |
| | ) |
| Petition for Enforcement of Operational Limits and | ) |
| for Expedited Proceedings to Revoke Satellite | ) |
| Licenses | ) |

**ORDER**

**Adopted: April 24, 2023**                                    **Released: April 24, 2023**

By the Chief, Enforcement Bureau:

    1.     On November 6, 2020, Spectrum Five LLC (Spectrum Five) filed the above-captioned Petition asking the Commission to require Intelsat License LLC (Intelsat) to come into compliance with the terms of its licenses for the Intelsat 30 (Call Sign S2887) and Intelsat 31 (Call Sign S2924) satellites located at the 95 degrees west longitude (95° W.L.) orbital location.[1] On April 12, 2023, Spectrum Five withdrew its Petition.[2] We have reviewed the request to withdraw and find that it raises no substantial or material question of fact.

    2.     Accordingly, **IT IS ORDERED** that, pursuant to section 4(i) of the Communications Act of 1934, as amended, 47 U.S.C. § 154(i), the Petition of Spectrum Five for Enforcement of Operational Limits and for Expedited Proceedings to Revoke Satellite Licenses **IS DISMISSED WITH PREJUDICE** to the filing of any future petition, complaint, or other request for relief by Spectrum Five regarding (1) the claims set forth in the Spectrum 5 Petition or (2) any claims arising from the same set of facts, and that this proceeding **IS TERMINATED** and the docket is closed.

    3.     This action is taken pursuant to authority delegated by sections 0.111 and 0.311 of the Commission's rules.[3]

FEDERAL COMMUNICATIONS COMMISSION

Loyaan A. Egal
Chief
Enforcement Bureau

---

[1] *See* Petition of Spectrum Five for Enforcement of Operational Limits and for Expedited Proceedings to Revoke Satellite Licenses, IB Docket No. 20-399 (filed Nov. 6, 2020) (Spectrum Five Petition).

[2] *See* Letter from Samuel L. Feder, Counsel for Spectrum Five, LLC, to Marlene H. Dortch, Secretary, FCC, IB Docket No. 20-399 (April 12, 2023).

[3] 47 CFR §§ 0.111, 0.311.

# EXHIBIT C

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Spectrum Five LLC | ) IB Docket No. 20-399 |
| | ) |
| Petition for Enforcement of Operational | ) |
| Limits and for Expedited Proceedings to | ) |
| Revoke Satellite Licenses | ) |

**APPLICATION FOR REVIEW OF MEMORANDUM OPINION AND ORDER**
**(DA 23-1067)**

Michael H. Strub, Jr.
Greenberg Gross LLP
650 Town Center Drive
Costa Mesa, California 92626
(949) 383-2800
mstrub@ggtriallaw.com

January 12, 2024

## TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY .................................................................................5

SUMMARY OF FACTS AND PROCEDURAL HISTORY.........................................................8

I.     Summary of the Petition ..........................................................................................8

II.    Mr. Wilson cedes control of Spectrum Five's efforts to monetize 95 W.L. to BIU ..........13

III.   Procedural history ...................................................................................................14

ARGUMENT....................................................................................................................16

IV.    Jurisdiction................................................................................................................16

V.     The Commission has an obligation to investigate the circumstances behind the
       withdrawal of the Petition..................................................................................................17

VI.    While BIU's rights are derived from a contract, the issue of whether the
       withdrawal of the Spectrum Five Petition was procured by fraud is not a mere
       contractual dispute .......................................................................................................20

VII.   Conclusion ...................................................................................................................22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In the Matter of Amend. of the Commission's Regul. Pol'ys to Allow Non-U.S.
Licensed Space Stations to Provide Domestic & Int'l Satellite Serv. in the
United States,*
12 F.C.C. Rcd. 24094 (1997)...................................................................................................21

*American Industrial Door, Inc. and Norcom Communications Corp., Order on
Reconsideration,* 16 FCC Rcd. 16300 ....................................................................................17

*Applications by Am. Broad. Cos.,*
7 F.C.C.2d 336 (1967) (Wadsworth, J., dissenting) ...............................................................17

*Applications for the Transfer of Control of D. H. Overmyer Commc'ns Co., Inc.,
& D. H. Overmyer Broad. Co., Inc., from D. H. Overmyer to U.S. Commc'ns
Corp.,*
27 F.C.C.2d 982 (1971) ...........................................................................................................18

*Applications of Arecibo Radio Corp.,*
101 F.C.C.2d 545 (1985) .........................................................................................................21

*Applications of Cellco Partnership,*
23 F.C.C. Rcd. 17444 (2008).....................................................................................................21

*Applications of Roy M. Speer (Transferor) & Silver Mgmt. Co. (Transferee),*
11 F.C.C. Rcd. 14684 (1996)..............................................................................................18, 19

*Applications of Wioo, Inc. Carlisle,*
95 F.C.C.2d 974 (1983) ...........................................................................................................17

*In the Matter of Champion Commc'ns Servs., Inc.,*
15 F.C.C. Rcd. 12832 (2000)...................................................................................................20

*In Re Comtex Commc'ns, Inc.,*
15 F.C.C. Rcd. 11730 (2000)...................................................................................................18

*In the Matter of Establishment of the Fraud Div. of the Enf't Bureau,*
34 F.C.C. Rcd. 781 (2019)........................................................................................................22

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.,*
322 U.S. 238 (1944)............................................................................................................19, 20

*In the Matter of John M. Roberts for Authorization to Construct A Cellular Sys. in the Steubenville-Weirton, Ohio/west Virginia Msa,*
  3 F.C.C. Rcd. 371 (1988) ..........................................................................................................17

*In the Matter of K. Rupert Murdoch (Transferor) & Fox Ent. Grp. (Transferee),*
  24 F.C.C. Rcd. 5824 (2009) ....................................................................................................20

*Listeners' Guild, Inc. v. F.C.C.,*
  813 F.2d 465 (D.C. Cir. 1987) ................................................................................................21

*Luttrell v. United States,*
  644 F.2d 1274 (9th Cir. 1980) ................................................................................................18

*Radio Station WOW v. Johnson,*
  326 U.S. 120 (1945)................................................................................................................20

*Synanon Church v. United States,*
  579 F. Supp. 967 (D.D.C. 1984), *aff'd,* 820 F.2d 421 (D.C. Cir. 1987)..................................22

**Statutes & Regulations**

47 C.F.R. § 1.106..........................................................................................................................17

47 C.F.R. § 25.137..........................................................................................................................9

47 C.F.R. § 54.719...................................................................................................................5, 16

47 C.F.R. § 54.719.......................................................................................................................16

47 C.F.R. § 54.720...................................................................................................................5, 16

47 U.S.C. § 155.........................................................................................................................5, 16

47 U.S.C. § 405.............................................................................................................................17

Fed. R. Civ. Proc. 60.....................................................................................................................18

4

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Spectrum Five LLC | )    IB Docket No. 20-399 |
| | ) |
| Petition for Enforcement of Operational | ) |
| Limits and for Expedited Proceedings to | ) |
| Revoke Satellite Licenses | ) |

## INTRODUCTION AND SUMMARY

Pursuant to 47 U.S.C. § 155(c)(4) and (c)(7) and 47 C.F.R. §§ 54.719 and 54.720,

applicant BIU, LLC ("Applicant" or "BIU") hereby asks the Commission to review and reverse

the November 13, 2023 Memorandum Opinion and Order of the Enforcement Bureau (the

"Enforcement Bureau") of the Federal Communications Commission (the "Commission" or

"FCC") in IB Docket No. 20-399 and thereby reinstate the Petition for Enforcement of

Operational Limits and for Expedited Proceedings to Revoke Satellite Licenses (the "Petition")

filed by Spectrum Five LLC ("Spectrum Five"). A copy of the Order (the "Order") for which

Applicant seeks review is attached hereto as **Exhibit A.**

The Petition was fraudulently withdrawn at the direction of Spectrum Five's manager,

R. David Wilson, who had no authority to withdraw it. Mr. Wilson had conveyed to BIU, LLC

("BIU") the power to act on behalf of Spectrum Five in connection with the Petition, and BIU

asks the Commission to reverse the Order under its well-established power and authority to

protect the integrity of its procedures.

The underlying proceeding arises out of actions by Intelsat License LLC ("Intelsat"),

which has flouted the requirements of the licenses for two of its satellites and covered up its non-

compliance with shell-game tactics and outright misrepresentations to deprive Spectrum Five of

5

the benefit of its rights to operate for the satellite slot located at the 95.05° West Longitude ("95 W.L."). In November 2020, Spectrum Five filed the Petition to compel Intelsat to come into compliance with the terms of its licenses and to revoke Intelsat's licenses for those satellites that were in violation of those terms.

On April 24, 2023, the Enforcement Bureau suddenly entered an order dismissing Spectrum Five's Petition (the "Order of Dismissal").[1] It did so at the request of Spectrum Five's counsel, Jenner & Block LLP ("Jenner & Block"), who, in turn, was directed to make the request by Mr. Wilson. Mr. Wilson, however, had no authority to give this direction because he had appointed BIU as Spectrum Five's exclusive attorney-in-fact with the sole authority to authorize the dismissal of the Petition. Mr. Wilson gave no notice of his withdrawal of the Petition to BIU and, apparently, did not notify Jenner & Block that he was not authorized to withdraw it. If the Petition is dismissed, Spectrum Five's ability to obtain compensation for its rights will be significantly jeopardized, and the value of those rights is potentially hundreds of millions of dollars.

On June 9, 2023, immediately after learning that Spectrum Five had dismissed the Petition, BIU sent a letter to the Enforcement Bureau notifying it that the Petition had been fraudulently dismissed and asking that it reinstate the Petition.[2] The Enforcement Bureau refused to do so for two reasons. First, it held that BIU's request for reconsideration was

---

[1] Petition of Spectrum Five for Enforcement of Operational Limits and for Expedited Proceedings to Revoke Satellite Licenses, IB Docket No. 20-399 (filed Nov. 6, 2020) ("Spectrum Five Petition" or the "Petition").

[2] *See* Letter from Michael H. Strub, Jr., Counsel for BIU, LLC, to Loyaan A. Egal, Chief, Enforcement Bureau, FCC, IB Docket No. 20-399 (filed June 9, 2023) ("BIU Reconsideration Letter")

untimely because it was not filed within 30 days of the dismissal.[3]  But the Commission has held

repeatedly that it has the authority to take action after the statutory deadline has passed to prevent

fraud and to preserve the integrity of its procedures.  BIU had no notice that Mr. Wilson had

requested that the Petition be dismissed nor any reason to believe that he would do so.  The

Petition was actively being litigated.  Indeed, as recently as January 19, 2023, three months

before the Petition was withdrawn, Jenner & Block sent a comprehensive letter explaining why

Intelsat was not in compliance with its licenses because the operation of its satellites exceeded

the authorized power limits and band-width restrictions.[4]

Second, the Enforcement Bureau held that the withdrawal of the Petition "is a matter of

private contract dispute between BIU and Spectrum Five."[5]  It is not.  No court in a civil

litigation can restore Spectrum Five's rights to 95 W.L.  As courts and the Commission have

held, the Commission has exclusive jurisdiction over matters affecting licensing issues.  The

only way those rights can be restored is by the Commission reinstating the Petition and making a

full determination as to whether it was lawfully withdrawn.  Critically, neither Mr. Wilson nor

his counsel have offered any explanation for why the Petition was dismissed after Spectrum Five

spent millions of dollars bringing it and prosecuting it.  The only possible explanation is that

Mr. Wilson was paid to order Jenner & Block to withdraw the Petition, and the only person or

entity that would do this is one with an interest in the outcome of these proceedings.  Although

Mr. Wilson has denied this, there is no other plausible explanation.

---

[3] Order, para. 6 (citing 47 U.S.C. § 405(a), 47 C.F.R. § 1.106(f)).

[4] *See* Letter from Samuel L. Feeder, Counsel for Spectrum Five, to William R. Richardson, Jr., Deputy Associate General Counsel – Agenda Review, Office of the General Counsel, Federal Communications Commission, IB Docket No. 20-399 (filed Jan. 19, 2023).

[5] Order, para. 7.

7

As discussed below, the fraudulent dismissal of the Petition is just the latest suspicious occurrence in these proceedings to date. The Commission has a duty to ensure that its processes are not being abused and can only do so by reinstating the Petition.

**SUMMARY OF FACTS AND PROCEDURAL HISTORY**

**I.     Summary of the Petition**

1.     In 2002, Intelsat launched its Galaxy 3C satellite to broadcast DirecTV satellite television services into South and Central America and Puerto Rico. Galaxy 3C provided service using only the Ku-Band. The International Telecommunications Union ("ITU") satellite network associated with Galaxy 3C is USASAT-60F. USASAT-60F covered only the Ku-Band and C-Band frequencies used by Galaxy 3C.

2.     Galaxy 3C had been designed for standard-definition video. By 2011, DirecTV wanted to upgrade its service in Latin America to offer high-definition video and more regional channels. DirecTV therefore funded the construction and launch of two satellites, Intelsat 30 and 31, which would be operated by Intelsat, to replace Galaxy 3C at 95 W.L.

3.     To support high-definition video at the bandwidth permitted by USASAT-60F, DirecTV would have had to replace the set-top boxes of all its customers in South and Central America and Puerto Rico, which would have been very expensive. Rather than do this, Intelsat 30 and 31 were designed to operate at double the maximum power flux-density permitted by USASAT-60F. The antenna of the two satellites also were designed to operate at 5,000% over the 27dBi gain authorized for Galaxy 3C.

4.     On October 25, 2012, Intelsat filed an application for a license to operate a new satellite network (Intelsat 30) at 95 W.L. Among other things, Intelsat represented to the Commission that it was not using rights conveyed by a foreign government – that is, a foreign-

8

licensed space station. Intelsat also did not seek market access under 47 C.F.R. § 25.137 for a non-US satellite network to broadcast into the Commonwealth of Puerto Rico, an unincorporated Territory of the United States. The Commission granted the Intelsat 30 license, as amended, on October 30, 2014.[6] The license required Intelsat to secure, through the Satellite Division, the necessary ITU satellite network broadcast rights. This is because the rights to operate satellites are public rights and can be secured only by the Commission, through international treaties. They do not belong to and cannot be controlled by Intelsat.

5.    During the relevant timeframe, when the Commission was reviewing and approving the licenses for Intelsat 30 and 31, the Division Chief of the International Bureau's Satellite Division was Jose Albuquerque, who had previously been a long-time employee of Intelsat.

6.    On January 8, 2014, in connection with its consideration of the Intelsat 30 license application, the Satellite Division filed an application with the ITU for a new satellite network, USASAT-60U. The application covered the additional Ku-Extended Band frequencies and extended satellite antenna gain that were not covered by Intelsat's previous license. At this time, however, Spectrum Five had already obtained a satellite network through the Netherlands at those frequencies: BSSNET4-95. Although Spectrum Five had not yet obtained a satellite to operate at BSSNET4-95, Spectrum Five's rights were secured on July 9, 2013 and thus had senior priority over Intelsat's rights.

7.    In October 2014, after receiving notice of USASAT-60U, the Netherlands administration set a letter to the Satellite Division warning that operations proposed under

---

[6] Intelsat subsequently applied for and obtained a license for Intelsat 30's "twin" satellite, Intelsat 31.

USASAT-60U would create "unacceptable interference" to BSSNET4-95W and explaining that USASAT-60U must be coordinated with BSSNET4-95W.[7] Neither the Satellite Division nor Intelsat responded to that letter. Instead, Intelsat launched Intelsat 30 in October 2014 and Intelsat 31 in June 2016 without ever obtaining ITU rights to operate at the frequencies and gain at which the satellites were designed to operate.

8.      Spectrum Five had obtained the right to monetize BSSNET4-95W in 2004[8] but because of the interference from Intelsat, had been unable to do so until 2018, when it licensed a satellite, HS-2, and moved it to 95 W.L. Shortly thereafter, Intelsat, with the assistance of the Satellite Division, went to war with Spectrum Five. Specifically, the Satellite Division complained to the Netherlands administration and ultimately filed an interference report with the ITU claiming that HS-2 was causing C-Band interference to Galaxy 3C. Neither Intelsat nor the Satellite Division ever explained how this was possible given that the HS-2 telemetry signal was of low power and much narrower than Galaxy 3C's signal.

9.      So Spectrum Five conducted its own investigation of the spectrum measurements of Intelsat's satellites. What Spectrum Five discovered is that the complaint about the disruption to Galaxy 3C's signal was a ruse. The reason that Intelsat wanted Spectrum Five to cease using HS-2 was because it was disrupting the signals from Intelsat 30 and 31, which were operating in excess of ITU limits in Latin America and Brazil. When Spectrum Five raised this issue with Intelsat and AT&T, which had acquired DirecTV, they responded that even though Intelsat had

---

[7] Petition, Ex. A.

[8] *See* Agreement between the State of the Netherlands, the Government of the Netherlands Antilles, Spectrum Five LLC and Spectrum Five BV i.o, Letter from Michael H. Strub, Jr. to Loyann A. Egal, Chief, Enforcement Bureau, Federal Communications Commission, IB Docket No. 20-399, Ex. 1 (filed Sept. 5, 2023). Exhibit 1 is largely illegible, so BIU attached a subsequent 2007 agreement, which is identical, as Exhibit 2 to its letter.

filed applications for a new satellite network, USASAT-60U, Intelsat 30 and 31's Ku-Band operations were under Galaxy 3C's satellite network, USASAT-60F. And even though Intelsat's license applications expressly stated that Intelsat was not using a foreign-licensed space station, AT&T and Intelsat further claimed that Intelsat 30's and 31's Ku-Extended Band operations were under a Papua New Guinea ITU satellite network, BLUE1.

10.     Spectrum Five asked Intelsat for documentation from the Commission authorizing operations under USASAT-60F and BLUE1, and Intelsat was forced to admit that no such documentation existed.

11.     Spectrum Five also observed that Intelsat 30 and 31 cannot be authorized to operate under USASAT-60F and BLUE1 because they are not designed nor constructed to comply with the operational requirements of those satellite networks. Intelsat denied this but again provided no support for its position.

12.     In January 2020, the Netherlands administration sent a letter to the Satellite Division seeking an explanation for its position authorizing Intelsat 30 and 31,[9] and in March 2020, the Netherlands administration sent a follow-up letter stating that Intelsat 30 and 31's operations were causing "harmful interference" to Spectrum Five's HS-2 and were operating in excess of ITU maximum power levels.[10]

13.     In March 2020, Mr. Albuquerque sent a response. He merely restated Intelsat's position that Intelsat 30 was operating under USASAT-60F and BLUE1 but identified no Commission Order permitting operation under those satellite networks.[11] He also did not address

---

[9] Spectrum Five Petition Ex. B.

[10] Spectrum Five Petition Ex. B-1, at 1.

[11] Spectrum Five Petition Ex. C.

11

the fact that Intelsat never sought nor was granted access to broadcast into Puerto Rico nor Intelsat's representation in its license application that a foreign-licensed satellite network would not be used to transmit into the United States. The Netherlands administration continued to seek answers concerning Intelsat's lack of compliance with its licenses, and Mr. Albuquerque continued to dodge the questions.

14.    On August 24, 2020, Mr. Albuquerque abruptly resigned. On September 23, 2020, counsel for Spectrum Five had a conference call with the chief of the International Bureau, Thomas Sullivan. Mr. Sullivan was asked about discussions between the Bureau's Satellite Division and the Netherlands administration regarding Intelsat 30 and 31. Mr. Sullivan stated that he should not discuss the matter with Spectrum Five without Intelsat present because Intelsat was "the FCC's client." He did acknowledge that the matter of Intelsat 30 and 31's operational non-compliance fell within the Commission's authority.

15.    On November 6, 2020, Spectrum Five filed the Petition, which asked the Commission, among other things, to issue an order directing Intelsat to come into compliance with the terms of its license and to revoke Intelsat's licenses for those satellites that were in violation of its license terms.

16.    As the filings in Docket No. 20-399 demonstrate, the Petition was actively litigated. Spectrum Five has made 15 separate filings, and as recently as January 19, 2023, Jenner & Block sent a comprehensive letter on behalf of Spectrum Five explaining why Intelsat was not in conformance with its licenses for its power limits and band-width restrictions.[12] Those efforts were funded by BIU.

---

[12] *See* Letter from Samuel L. Feeder, Counsel for Spectrum Five, to William R. Richardson, Jr., Deputy Associate General Counsel – Agenda Review, Office of the General Counsel, Federal Communications Commission, IB Docket No. 20-399 (filed Jan. 19, 2023).

**II.**    **Mr. Wilson cedes control of Spectrum Five's efforts to monetize 95 W.L. to BIU**

17.    Spectrum Five and BIU are parties to that certain Loan Agreement dated

September 6, 2018, as supplemented and amended by that certain Amended and Restated Loan

Agreement dated August 28, 2019, as further supplemented and amended by that certain Second

Amended and Restated Loan Agreement dated December 30, 2019, and as further supplemented

and amended by that certain Third Amended and Restated Loan Agreement dated January 31,

2020;[13] the Security Agreement dated September 6, 2018;[14] the UCC Security Agreement dated

August 28, 2019;[15] the Pledge Agreement dated September 2018;[16] the Letter Agreement entered

into as of September 5, 2020;[17] and the Letter Agreement entered into as of February 15, 2021[18]

(the "Loan Documents").

18.    The Loan Documents reflect the agreements between BIU, as Lender, on one

hand, and Spectrum Five, on the other, in connection with loans by BIU to Spectrum Five (the

"BIU Loan"). Pursuant to Section 4 of the 2021 Letter Agreement, the BIU Loan is in default as

it was not paid by August 1, 2021. Therefore, BIU is entitled to exercise all rights and remedies

under the Loan Documents. Those rights include, without limitation, the rights under Section 3.4

of the Security Agreement and Section 6 of the Pledge Agreement, pursuant to which Spectrum

Five has irrevocably designated, made, constituted, and appointed BIU as Spectrum Five's true

---

[13] *See* Letter from Michael H. Strub, Jr. to Loyann A. Egal, Chief, Enforcement Bureau, Federal Communications Commission, IB Docket No. 20-399, Att. B through E (filed June 9, 2023).

[14] *See id.,* Att. F.

[15] *See id.,* Att. G.

[16] *See id.,* Att. H.

[17] *See id.,* Att. I.

[18] *See id.,* Att. J.

and lawful attorney-in-fact.[19]

19.     Moreover, in October 2021, Mr. Wilson agreed not to interfere with lobbying efforts of BIU on behalf of Spectrum Five in connection with the monetization of Spectrum Five's rights for a satellite slot located at the 95 W.L. [20]

### III.   Procedural history

20.     On June 6, 2023, Scott Crawford, one of the Managing Members of BIU, learned that Spectrum Five had asked the Commission to withdraw the Petition and that a staff-level order had accepted the withdrawal.[21]  BIU was unaware that the Petition had been withdrawn.[22]

21.     The following day, June 7, 2023, BIU's counsel sent a letter to Jenner & Block informing them that they were not authorized to withdraw the Petition.[23]  On June 8, 2023, Jenner & Block responded that they were directed by Mr. Wilson, whom they believed to have the authority to direct them to withdraw the Petition, and that "[i]n light of the apparent disagreement between BIU and Mr. Wilson, Jenner & Block is not currently in a position, as your letter requests, to take any action at the FCC to seek to reinstate the Petition.  Of course, BIU is free to engage other counsel to seek that relief."[24]

---

[19] BIU did not assume operational control of Spectrum Five.

[20] *See* Letter from Michael H. Strub, Jr. to Loyann A. Egal, Chief, Enforcement Bureau, Federal Communications Commission, IB Docket No. 20-399, Att. K (filed June 9, 2023).

[21] *See* Scott Crawford Declaration ¶ 2 ("Crawford Decl."), Letter from Michael H. Strub, Jr. to Loyann A. Egal, Chief, Enforcement Bureau, Federal Communications Commission, IB Docket No. 20-399, Att. L (filed June 9, 2023).

[22] *See* Crawford Decl. ¶ 3.

[23] *See* Letter from Michael H. Strub, Jr. to Loyann A. Egal, Chief, Enforcement Bureau, Federal Communications Commission, IB Docket No. 20-399, Att. M (filed June 9, 2023).

[24] *See id.*, Att. A.

14

22.    On June 9, 2023, BIU asked the Enforcement Bureau to reinstate the Petition.[25] Concerned that it might not receive a response to its letter and that it had exhausted its administrative remedies, on June 23, 2023, BIU filed a Petition for Review with the United States Court of Appeals for the District of Columbia Circuit.[26]

23.    The Enforcement Bureau did, however, ultimately respond to BIU's letter.  On August 11, 2023, the Enforcement Bureau sent a letter to Jenner & Block asking for a response to BIU's June 9 letter.[27]  On August 25, 2023, Mr. Wilson filed a response to the Enforcement Bureau's inquiry in *pro per*.[28]  Jenner & Block did not respond.  On September 5, 2023, BIU responded to Mr. Wilson's letter.[29]

24.    On August 14, 2023, after the Enforcement Bureau responded to BIU's letter, the Commission filed a motion to dismiss BIU's appeal based on the assertion that BIU had not exhausted its administrative remedies.[30]  On September 6, 2023, BIU sent a letter to the Commission asking the Commission to confirm the representation that it made in the motion to dismiss: that BIU had not exhausted its administrative remedies and that BIU continued to have

---

[25] *See* Letter from Michael H. Strub, Jr. to Loyann A. Egal, Chief, Enforcement Bureau, Federal Communications Commission, IB Docket No. 20-399 (filed June 9, 2023).

[26] *See BIU, LLC v. Federal Communications Comm'n*, No. 23-1163.

[27] *See* Letter from Loyann A. Egal, Chief, Enforcement Bureau, Federal Communications Commission, to Samuel L. Feder, Jenner & Block LLP, IB Docket No. 20-399 (filed August 11, 2023).

[28] *See* Letter from R. David Wilson to Loyann A. Egal, Chief, Enforcement Bureau, Federal Communications Commission, IB Docket No. 20-399 (filed Aug. 25, 2023).

[29] *See* Letter from Michael H. Strub, Jr. to Loyann A. Egal, Chief, Enforcement Bureau, Federal Communications Commission, IB Docket No. 20-399 (filed Sept. 5, 2023).

[30] *See BIU, LLC v. Federal Communications Comm'n,* No. 23-1163, Doc. 2012382.

an avenue to pursue those remedies.[31]  The following day, BIU filed an opposition to the motion to dismiss asking the court to hold in abeyance issuing a ruling on the motion to dismiss until the Commission responded to BIU's letter.[32]  The Commission did not respond to BIU's letter, and on October 19, 2023, the Court of Appeals granted the motion to dismiss.[33]  The Enforcement Bureau issued its Order on November 13, 2023 refusing to reconsider the dismissal of the Petition.

**ARGUMENT**

**IV.    Jurisdiction**

25.    The Commission has jurisdiction to review the Order.

26.    47 U.S.C. § 155(c)(4) of title 47 provides that "[a]ny person aggrieved by any … order, decision, report or action [of an individual commissioner] may file an application for review by the Commission within such time and in such manner as the Commission shall prescribe, and every such application shall be passed upon by the Commission."

27.    47 C.F.R. § 54.719(b) provides that "[a]ny party aggrieved by an action taken by the Administrator, after seeking review from the Administrator, may then seek review from the Federal Communications Commission."

28.    47 C.F.R. § 54.720(a) provides that "[a]n affected party requesting review or waiver of an Administrator decision by the Commission pursuant to § 54.719, shall file such a request within sixty (60) days from the date the Administrator issues a decision."

---

[31] *See BIU, LLC v. Federal Communications Comm'n,* No. 23-1163, Doc. 2015694, Ex. 3.

[32] *See BIU, LLC v. Federal Communications Comm'n,* No. 23-1163, Doc. 2015694.

[33] *See BIU, LLC v. Federal Communications Comm'n,* No. 23-1163, Doc. 2022717.

29. As discussed above, BIU sought review from the Enforcement Bureau prior to filing this Application.

30. The Order was sent on November 13, 2023, so this Application is timely.

## V. The Commission has an obligation to investigate the circumstances behind the withdrawal of the Petition

31. "Licensees of this Commission have fundamental obligations ... to respect the integrity of the Commission's processes, and to be candid and forthright in dealing with this agency." *Applications of Wioo, Inc. Carlisle*, 95 F.C.C.2d 974, 999 (1983). "The Commission has an obligation to ensure the integrity of its administrative processes. Where the Commission has reason to believe its processes may have been abused, the Commission has ample authority to investigate." *In the Matter of John M. Roberts for Authorization to Construct A Cellular Sys. in the Steubenville-Weirton, Ohio/west Virginia Msa*, 3 F.C.C. Rcd. 371, para. 3 (1988). "The public interest in the independence, impartiality, and integrity of the agency and processes of government is far greater than the disposition of any single case, no matter how large or dramatic." *Applications by Am. Broad. Cos.*, 7 F.C.C.2d 336, 343 (1967) (Wadsworth, J., dissenting).

32. The Enforcement Bureau denied BIU's Petition for Reconsideration because it was filed after the 30-day deadline in 47 U.S.C. § 405(a) and 47 C.F.R. 1.106(f). Order, para. 6. BIU filed its Petition for Reconsideration the day after it learned that the Petition had been withdrawn and two weeks after the deadline expired. Strict enforcement of these statutory deadlines is superseded by the need to preserve the integrity of the Commission's processes by reviewing whether the Petition was validly withdrawn. *See American Industrial Door, Inc. and Norcom Communications Corp., Order on Reconsideration*, 16 FCC Rcd. 16300, 16302, para. 5 & n.10 (WTB 2001) (explaining, in a case where a timely petition for reconsideration was not

17

properly filed, that "[e]ven when a proper petition for reconsideration is not filed, we will

consider taking action on our own motion in cases where there is possible fraud on the

Commission's processes"); *Applications for the Transfer of Control of D. H. Overmyer*

*Commc'ns Co., Inc., & D. H. Overmyer Broad. Co., Inc., from D. H. Overmyer to U.S.*

*Commc'ns Corp.*, 27 F.C.C.2d 982, 984, para. 6 (1971) ("Both Court and Commission case

precedents have recognized an inherent power to reopen a judgment at any time where it is

procured by fraud"); *In Re Comtex Commc'ns, Inc.*, 15 F.C.C. Rcd. 11730, 11731, para. 6 (2000)

("The fact that Tufco did not file a petition for reconsideration within thirty days of the Comtex

grant does not limit the Commission's authority to modify or to revoke a license"); *cf.* Fed. R.

Civ. Proc. 60(b)(3) ("On motion and just terms, the court may relieve a party or its legal

representative from a final judgment, order, or proceeding for .. fraud (whether previously called

intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party.").

    33.    Fraud on the Commission includes where "the attorney fraudulently or without

authority assumes to represent a party and connives at his defeat." *Luttrell v. United States*, 644

F.2d 1274, 1276 (9th Cir. 1980).

    34.    The order issued in *Applications of Roy M. Speer, (Transferor) & Silver Mgmt.*

*Co., (Transferee)*, 11 F.C.C. Rcd. 14684 (1996), is instructive. In that proceeding, the

Commission granted consent to transfer control of Silver King Communications, Inc. ("Silver

King") from Roy M. Speer to Silver Management Company ("Silver Management"). *Id.* at

14686, para. 1. After the Commission had granted consent, Urban Broadcasting Corporation

("Urban") "filed an informal objection to the Silver King applications raising serious allegations

which, if substantiated, might adversely affect Silver King's qualifications to remain a licensee."

*Id.*, para. 2. The objection was based on what otherwise might be considered a private dispute:

18

that Silver King, a passive non-voting equity interest holder in Urban, was constructing a television station without consulting Urban, which had the sole right to approve the construction. *Id*. Despite this, the Commission found that Urban's allegations "potentially raise serious issues of misrepresentation and/or lack of candor to the Commission by both Urban and Silver King." *Id*., para. 3. In a statement that is apposite here, the Commission stated: "We believe that fairness to the parties and our own interest in the integrity of our processes counsel an expeditious resolution of the issues raised by Urban's belated objection." *Id*. at 14687, para. 5.

35.    Also instructive is the decision in *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944). In that case, a court determined in 1932 that a patent was valid and infringed based, in part, on an article allegedly written by a union president espousing the novelty and effectiveness of the patented invention. *Id*. at 240. The alleged infringer did not question the authenticity of the article but accepted it at face value. *Id*. Approximately 10 years later, it came to light in a different litigation involving the patent holder that the article was written by the patent holder's counsel. *Id*. at 243. The Court of Appeal refused to overturn the judgment because, among other things, it held that the alleged infringer failed to exercise due diligence in discovering the source of the article. *Id*. at 243-244. The Supreme Court reversed, holding that the judgment must be overturned, not only because of fraud on the private litigant, but also because fraud was perpetrated against the court:

> [T]ampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.

19

*Id.* at 246.

36.     BIU's rights should not be superseded by strict enforcement of the timing requirements. "Whatever would be their standing in a court of law on the merits of the matter before the Commission, participants in an agency action have an undeniable interest in seeing to it that the procedural rights guaranteed them by law are respected." *In the Matter of K. Rupert Murdoch (Transferor) & Fox Ent. Grp. (Transferee)*, 24 F.C.C. Rcd. 5824, 5827 para. 11 (2009) (quoting *Gardner v. Federal Commc'n Comm'n*, 530 F.2d 1086, 1091 (D.C. Cir. 1976)).

## VI.     While BIU's rights are derived from a contract, the issue of whether the withdrawal of the Spectrum Five Petition was procured by fraud is not a mere contractual dispute

37.     The Enforcement Bureau also denied the reconsideration request on the alternative ground that the issue of whether the withdrawal of the Spectrum Five Petition was procured by fraud on the Commission's processes "is a matter of private contract dispute between BIU and Spectrum Five." Order, para. 7. Not so. BIU cannot bring a civil action against Mr. Wilson seeking the relief of restoring the Petition. *See Radio Station WOW v. Johnson*, 326 U.S. 120, 131 (1945) (state court lacks jurisdiction to "control[] the conduct of parties before the Communications Commission").

38.     The Order in *In the Matter of Champion Commc'ns Servs., Inc.*, 15 F.C.C. Rcd. 12832 (2000), which the Enforcement Bureau attempts to distinguish, see Order, para. 7, n.21, fully supports BIU's position here. In that proceeding, the Commission approved the transfer of station licenses from Sagara Farms, Inc. ("Sagara Farms") to Champion Communication Services, Inc. *Id.*, para. 1. After undertaking an investigation, however, the Commission determined that Sagara Farms had "never authorized the assignment of its license for [the station], and that the person who purportedly signed the application on its behalf had no authority to do so." *Id.* at 12833, para. 4. It therefore rescinded its approval of the transfer and restored

20

the licenses to Sagara Farms. *See id.* at 12382, para. 1. There is no material distinction between Sagra Farms' assignment of rights at issue in *Champion Communications* and Spectrum Five's assignment of rights at issue here. Just as the person who purported to make the assignment had no power to so, Mr. Wilson had no power to withdraw the Petition.

39.     Moreover, the underlying rights at issue are public rights. They do not belong to Intelsat or any other private party. The public has an interest in ensuring that Intelsat is not operating beyond the scope of its license just as it does in any other aspect of communications that the Commission regulates. *See In the Matter of Amend. of the Commission's Regul. Pol'ys to Allow Non-U.S. Licensed Space Stations to Provide Domestic & Int'l Satellite Serv. in the United States*, 12 F.C.C. Rcd. 24094, 24098, para. 7 (1997) (discussing public policy interests in connection with allowing non-U.S. licensed satellites to broadcast into the U.S.). The Commission has the "exclusive authority to make public interest determinations on licensing matters." *See Applications of Arecibo Radio Corp.*, 101 F.C.C.2d 545, 548, para. 8 (1985).

40.     The opinions cited by the Enforcement Bureau do not support the proposition that the issue before the Commission is purely a matter of private contractual rights. In *Applications of Arecibo Radio Corp.*, 101 F.C.C.2d at 549, para. 10, the Commission held that a state court had jurisdiction to determine whether assets of a radio station could be sold at public auction, but the Commission had jurisdiction to decide whether "licenses should be assigned to the purchaser of those assets." In *Applications of Cellco Partnership*, 23 F.C.C. Rcd. 17444, 17538, para. 214 (2008), the Commission held that it would not add additional contractual restrictions to the terms of resale agreements. And in *Listeners' Guild, Inc. v. F.C.C.*, 813 F.2d 465, 469 (D.C. Cir. 1987), the court agreed with the Commission that the issue of whether a party had breached an obligation to allow another party to acquire a radio station was a matter of private contract.

21

None of these situations addressed the integrity of proceedings before the Commission or encroached the Commission's exclusive jurisdiction over licensing issues.

## VII.    Conclusion

41.     Fraud on the Commission is fraud that "subvert[s] the integrity of the" Commission. *See Synanon Church v. United States*, 579 F. Supp. 967, 974 (D.D.C. 1984), *aff'd*, 820 F.2d 421 (D.C. Cir. 1987). Fraud on the Commission is fraud on the public. Indeed, to protect the public, the Commission created a division "within the Enforcement Bureau that is specifically dedicated to investigating and pursuing fraud in the programs that the Commission oversees." *See In the Matter of Establishment of the Fraud Div. of the Enf't Bureau*, 34 F.C.C. Rcd. 781, 782, para. 3 (2019).

42.     Jenner & Block had no authority to withdraw the Petition on behalf of Spectrum Five. It did so at the direction of Mr. Wilson, who had no authority to cause Spectrum Five to withdraw the Petition and who was no doubt paid by a party in interest to give that instruction. He also did this without providing any notice to BIU that he was going to make the request and without notifying Jenner & Block that he had no authority to make that request. Therefore, to preserve the integrity of the Commission and these proceedings, we ask that the Commission set aside the Enforcement Bureau's Order, reinstate the Petition, and reopen the docket.

Respectfully submitted,

Michael H. Strub, Jr.
Greenberg Gross LLP
650 Town Center Drive
Costa Mesa, California 92626
(949) 383-2800
mstrub@ggtriallaw.com

January 12, 2024

22

# EXHIBIT A

Federal Communications Commission                              DA 23-1067

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Spectrum Five LLC | )  IB Docket No. 20-399 |
| | ) |
| Petition for Enforcement of Operational Limits and | ) |
| for Expedited Proceedings to Revoke Satellite | ) |
| Licenses | ) |

### MEMORANDUM OPINION AND ORDER

**Adopted: November 13, 2023**                            **Released: November 13, 2023**

By the Chief, Enforcement Bureau:

## I.    INTRODUCTION

1.    In this Order on Reconsideration, we dismiss and, on alternative and independent grounds, deny a request filed by BIU, LLC (BIU) to reinstate the above-captioned Petition filed by Spectrum Five LLC (Spectrum Five).[1]  For the reasons discussed below, we dismiss BIU's reconsideration request because it was filed late in violation of Section 405(a) of the Communications Act of 1934, as amended (the Act), and section 1.106(f) of the Commission's rules.[2]  On alternative and independent grounds, after reviewing the record, we deny the reconsideration request because BIU has not demonstrated that the withdrawal of the Spectrum Five Petition was procured by fraud on the Commission's processes.

## II.    BACKGROUND

2.    On November 6, 2020, Spectrum Five filed the above-captioned Petition asking the Commission to require Intelsat License LLC (Intelsat) to come into compliance with the terms of its licenses for the Intelsat 30 and Intelsat 31 satellites.[3]  On April 12, 2023, Spectrum Five's outside counsel submitted a letter stating that Spectrum Five withdraws its Petition.[4]  In response, the Commission's Enforcement Bureau (Bureau) on April 24, 2023, publicly released an Order dismissing the Spectrum Five Petition with prejudice.[5]

---

[1] *See* Letter from Michael H. Strub, Jr., Counsel for BIU, LLC, to Loyaan A. Egal, Chief, Enforcement Bureau, FCC, IB Docket No. 20-399 (filed June 9, 2023) (BIU Reconsideration Letter); Petition of Spectrum Five for Enforcement of Operational Limits and for Expedited Proceedings to Revoke Satellite Licenses, IB Docket No. 20-399 (filed Nov. 6, 2020) (Spectrum Five Petition).

[2] 47 U.S.C. § 405(a); 47 CFR § 1.106(f).

[3] *See* Spectrum Five Petition.

[4] *See* Letter from Samuel L. Feder, Counsel for Spectrum Five, LLC, to Marlene H. Dortch, Secretary, FCC, IB Docket No. 20-399 (filed Apr. 12, 2023) ("Spectrum Five LLC respectfully withdraws its petition for Enforcement of Operational Limits and for Expedited Proceedings to Revoke Satellite Licenses.").

[5] *See* Spectrum Five LLC, Order, DA 23-345, 2023 WL 3152002 (EB 2023) (*EB Dismissal Order*).  On June 23, 2023, BIU filed a Petition for Review of the *EB Dismissal Order* with the United States Court of Appeals for the D.C. Circuit. *See* Petition for Review of Petitioner BIU, LLC, *BIU, LLC v. FCC*, No. 23-1163 (D.C. Cir. June 23, 2023).  On August 14, 2023, the Commission filed a Motion to Dismiss the BIU Petition for Review. *See* Motion to

(continued....)

EXHIBIT A

3.    On June 9, 2023, BIU filed a letter in the above-captioned proceeding alleging that the withdrawal of the Petition was "procured by fraud" at the direction of R. David Wilson, Chairman and CEO of Spectrum Five.[6]  In the letter, BIU alleges that BIU and Spectrum Five are parties to certain loan agreements.[7]  According to BIU, Spectrum Five defaulted on its loan, resulting by the terms of the loan agreements in the appointment of BIU as Spectrum Five's exclusive attorney-in-fact with the sole authority to authorize the dismissal of the Spectrum Five Petition.[8]  BIU asserts that Mr. Wilson did not notify BIU of his withdrawal of the Petition.[9]  In its letter, BIU asks the Bureau to reinstate the Petition and reopen the docket.[10]

4.    On August 25, 2023, Mr. Wilson, on behalf of Spectrum Five, replied to the BIU Reconsideration Letter, contending that BIU has no right to assert control over Spectrum Five and has no right to claim it represents Spectrum Five.[11]  Rather, Mr. Wilson claims that he was the only person authorized to make decisions for Spectrum Five, and that the provisions of the loan agreements cited by BIU related only to BIU's authority to perform ministerial functions on Spectrum Five's behalf, such as signing of tax filings.[12]

5.    On September 5, 2023, BIU responded to Spectrum Five's August 25, 2023 letter, claiming that specified terms of the loan agreements "irrevocably designated, made, constituted, and appointed BIU as Spectrum Five's true and lawful attorney-in-fact."[13]  BIU claims that Spectrum Five's interpretation of the contractual language would mean BIU's power-of-attorney does not convey the right to protect BIU's investment, which BIU alleges would violate the "'fundamental principle of contract interpretation that a contract should be interpreted so as to give meaning to each of its provisions.'"[14]

## III.    DISCUSSION

6.    Pursuant to section 405(a) of the Act and section 1.106(f) of the Commission's rules, a petition for reconsideration must be filed within 30 days from the date of public notice of the Commission action.[15]  Public notice of the Bureau's decision to grant Spectrum Five's request to withdraw its Petition and to terminate the proceeding was given on April 24, 2023, when the decision was released to the public.[16]  Pursuant to section 1.4 of the Commission's rules, the first day to be counted in computing the 30-day reconsideration period was April 25, 2023, resulting in the last day for filing an acceptable petition

---

Dismiss of Respondent Federal Communications Commission, *BIU, LLC v. FCC*, No. 23-1163 (D.C. Cir. Aug. 14, 2023).  On October 19, 2023, the D.C. Circuit granted the Motion to Dismiss. *See* Order, *BIU, LLC v. FCC*, No. 23-1163 (D.C. Cir. Oct. 19, 2023).

[6] *See* BIU Reconsideration Letter, *supra* note 1, at 1.

[7] *Id.* at 3.

[8] *Id.*

[9] *Id.*

[10] *Id.* at 5.

[11] *See* Letter from R. David Wilson, Spectrum Five, LLC, to Loyaan A. Egal, Chief, Enforcement Bureau, FCC, IB Docket No. 20-399, at 2-3 (filed Aug. 25, 2023) (Spectrum Five Reply).

[12] *Id.* at 3.

[13] *See* Letter from Michael H. Strub, Jr., Counsel for BIU, LLC, to Loyaan A. Egal, Chief, Enforcement Bureau, FCC, IB Docket No. 20-399, at 1 (filed Sept. 5, 2023) (BIU Response).

[14] *Id.* at 1-2 (quoting *Nationwide Mut. Ins. Co. v. Nat'l REO Mgmt., Inc.*, 205 F.R.D. 1, 11 (D.D.C. 2000)).

[15] 47 U.S.C. § 405; 47 CFR § 1.106(f).

[16] 47 CFR § 1.4(b)(2) (providing that "for non-rulemaking documents released by the Commission or staff" the date of public notice is "the release date"); *see supra* note 5.

Federal Communications Commission                    DA 23-1067

for reconsideration of May 24, 2023.[17] BIU filed its reconsideration request on June 9, 2023, over two weeks after the statutory deadline for seeking reconsideration.[18] While BIU claims that it did not become aware of the Bureau's decision until June 6, 2023, the Bureau's public release of the decision on April 24, 2023, provided BIU with constructive notice of the decision.[19] Accordingly, we dismiss BIU's reconsideration request as untimely.[20]

       7.      On alternative and independent grounds, we deny the reconsideration request because BIU has not demonstrated that the withdrawal of the Spectrum Five Petition was procured by fraud on the Commission's processes, but rather is a matter of private contract dispute between BIU and Spectrum Five. The Commission has previously considered procedurally improper petitions for reconsideration where there was undisputed evidence of fraud on the Commission's processes.[21] In this case, however, there is no such evidence. Rather, Spectrum Five and BIU disagree as to whether Mr. Wilson had authority to withdraw the Petition based on competing interpretations of contractual language. The Commission has long held that it is not the proper forum for adjudicating such private contractual disputes.[22] This is solely a matter between BIU and Spectrum Five and is justiciable, if at all, in a court of competent jurisdiction and not by the Commission.[23] Accordingly, based on the record before us, we conclude that BIU has not demonstrated that the withdrawal of the Spectrum Five Petition was procured by fraud on the Commission's processes. Therefore, on alternative and independent grounds, we deny the Spectrum Five Petition.

## IV.    ORDERING CLAUSES

       8.      Accordingly, **IT IS ORDERED** that, pursuant to sections 4(i) and 405(a) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 405(a), and section 1.106 of the

---

[17] 47 CFR § 1.4(c)–(d).

[18] *See supra* note 1.

[19] *See K. Rupert Murdoch (Transferor) and Fox Entm't Group (Transferee)*, Memorandum Opinion and Order on Reconsideration, 24 FCC Rcd 5824, 5827, para. 11 (2009) ("public notice constitutes constructive notice"); *see also Holy Family Oratory of St. Philip Neri*, Memorandum Opinion and Order, 29 FCC Rcd 13273, 13274, para. 5 (2014) (unawareness of public notice of decision insufficient basis for consideration of late-filed reconsideration petition).

[20] 47 U.S.C. § 405(a); 47 CFR § 1.106(f).

[21] *See, e.g., Champion Communications Services, Inc.*, Order, 15 FCC Rcd 12832, 12832, para. 3 (WTB 2000) (both assignee and assignor agreed that assignment application was signed by unauthorized person); *Comtex Communications, Inc.*, Order, 15 FCC Rcd 11730, 11731, para. 6 (WTB 2000) (undisputed showing that assignor never authorized the assignment of its license).

[22] *See, e.g., Arecibo Radio Corp.*, Memorandum Opinion and Order, 101 FCC 2d 545, 548 (1985); *Applications of Cellco Partnership d/b/a Verizon Wireless and Atlantis Holdings LLC*, Memorandum Opinion and Order and Declaratory Ruling, 23 FCC Rcd 17444, 17538, para. 214 (2008); *see also Listeners' Guild, Inc. v. FCC*, 813 F.2d 465, 469 (D.C. Cir. 1987) (referring to the "Commission's longstanding policy of refusing to adjudicate private contract law questions for which a forum exists in the state courts").

[23] *See In Re Am. Indus. Door, Inc.*, Order on Reconsideration, 16 FCC Rcd 16300, 16302, para. 5 (WTB 2001) (finding insufficient evidence that assignment was procured by fraud on the Commission's processes; rather, dispute was "solely a matter between assignor and assignee, justiciable, if at all, in a court with civil jurisdiction and not by the Commission").

Commission's rules, 47 CFR § 1.106, the reconsideration request filed by BIU, LLC on June 9, 2023, is DISMISSED and, in the alternative, is DENIED.[24]

9.    **IT IS FURTHER ORDERED** that a copy of this Memorandum Opinion and Order shall be sent by first class mail and certified mail, return receipt requested, to Counsel for BIU, LLC, Michael H. Strub Jr., Esq., Greenberg Gross LLP, 650 Town Center Drive, Suite 1700, Costa Mesa, California 92626.

FEDERAL COMMUNICATIONS COMMISSION

Loyaan A. Egal
Chief
Enforcement Bureau

---

[24] This action is taken pursuant to authority delegated by sections 0.111 and 0.311 of the Commission's rules. *See* 47 CFR §§ 0.111, 0.311.

## CERTIFICATE OF SERVICE

I, Michael H. Strub, Jr., do hereby certify that I have, on this 12th day of January, 2024, caused a copy of the foregoing **APPLICATION FOR REVIEW OF MEMORANDUM OPINION AND ORDER (DA 23-1067)** to be sent via electronic mail to:

R. David Wilson
Spectrum Five LLC
2445 California Street NW
Washington, D.C. 20008
rdw@spectrumfive.com

Jennifer D. Hindin
Henry Gola
Sara M. Baxenberg
Garriott Boyd
Wiley Rein LLP
1776 K Street NW
Washington, D.C. 20006
JHindin@wiley.law
HGola@wiley.law
SBaxenberg@wiley.law
BGarriott@wiley.law
*Counsel for IntelSat*

Samuel L. Feder
Jenner & Block
1099 New York Avenue, NW, Suite 900
Washington, D.C. 20001-4412
SFeder@jenner.com
*Counsel for Spectrum Five, LLC*

Francisco R. Montero
Seth Williams
Fletcher Heald & Hildreth, PLC
1300 North 17th St., 11th Fl.
Arlington, VA 22209
montero@fhhlaw.com
williams@fhhlaw.com
*Counsel for Spectrum Five, LLC*

Michelle Bryan
Susan H. Crandall
Cynthia J. Grady
Intelsat US LLC
7900 Tysons One Place
McLean, VA 22102
michelle.bryan@intelsat.com
susan.crandall@intelsat.com
cynthia.grady@intelsat.com
*General Counsel*

Michael H. Strub, Jr.

28

# EXHIBIT D



Michael H. Strub Jr.
Direct Dial: (949) 383-2770
MStrub@GGTrialLaw.com

June 9, 2023

**VIA ECFS**

Loyaan A. Egal
Chief
Enforcement Bureau
Federal Communications Commission
45 L Street NE
Washington, D.C. 20554

> Re:    **April 24, 2023 Order Dismissing Petition for Enforcement of Operational Limits and for Expedited Proceedings to Revoke Satellite Licenses, IB Docket 20-399**

Dear Mr. Egal:

We represent BIU, LLC ("BIU"). We write to inform you that the April 12, 2023 withdrawal of the Petition for Enforcement of Operational Limits and for Expedited Proceedings to Revoke Satellite Licenses[1] (the "Petition") and subsequent April 24, 2023 Order dismissing the Petition with Prejudice, terminating the proceedings, and closing the docket were procured by fraud, and we ask that the Petition be reinstated and the docket be reopened so, at a minimum, the issue whether the Petition was validly withdrawn can be reviewed by the full Commission. *See American Industrial Door, Inc. and Norcom Communications Corp.*, Order on Reconsideration, 16 FCC Rcd. 16300 ¶ 5 & n.10 (WTB 2001) (explaining, in a case where a timely petition for reconsideration was not properly filed, that "[e]ven when a proper petition for reconsideration is not filed, we will consider taking action on our own motion in cases where there is possible fraud on the Commission's processes").

The request to withdraw the Petition was made by Jenner & Block LLP ("Jenner & Block") at the direction of R. David Wilson, whom it "believed to be the senior officer of Spectrum Five LLC with the full authority to act on its behalf." (Att. A) On the contrary, as described below, Mr. Wilson had appointed BIU as Spectrum Five's exclusive attorney-in-fact with the sole authority to authorize the dismissal of the Petition. Mr. Wilson gave no notice of his withdrawal of the Petition to BIU and, apparently, did not notify Jenner & Block that he was not authorized to withdraw it. We do not know why he did this but must assume that he was

---

[1] Petition of Spectrum Five for Enforcement of Operational Limits and for Expedited Proceedings to Revoke Satellite Licenses, Misc. Docket No. INBOX-1.41 (filed Nov. 6, 2020); *see also* IB Docket No. 20-399.

**GG Greenberg Gross LLP**

Loyaan A. Egal
June 9, 2023
Page 2

compensated by a party-in-interest in the proceeding to do so – that is, he was bribed.  We do not make this assertion lightly, but there is no other logical reason why he would covertly take this action when doing so not only threatens to squander the significant efforts and resources expended in pursuing of the Petition but also threatens the substantial financial interests of Spectrum Five's investors, who include Mr. Wilson himself.

If the Petition is dismissed, Spectrum Five's ability to obtain compensation for its rights for the satellite slot located at the 95.15° West Longitude ("95 W.L.") will be significantly jeopardized, and the value of those rights is potentially hundreds of millions of dollars.  We therefore ask that the Petition be reinstated to protect those interests.

### SUMMARY OF PETITION AND LEGISLATIVE INITIATIVE

In 2014, Intelsat enlisted the Satellite Division in helping it to take a series of actions to deprive Spectrum Five of its rights to operate the slot at 95 W.L.  It secured licenses for S2887 (Intelsat 30) and S2924 (Intelsat 31), located at 95.05° West Longitude from the Commission, which required Intelsat to obtain, through the International Bureau ("IB"), rights to operate new space stations from the International Telecommunication Union ("ITU") in accordance with ITU rules.  Intelsat never submitted an ITU application for a satellite network reflecting the operation of Intelsat 30 and 31.  Instead, it applied for a new ITU satellite network that was junior to Spectrum Five's network and began operating at higher power levels than it was permitted to use.  It took these steps with the assistance of the Bureau's Satellite Division, which failed to supervise Intelsat and force it to come into compliance with its licenses.  Those actions have, among other things, caused Spectrum Five to lose the rights to its own satellite.[2]

On November 6, 2020, Spectrum Five, represented by Francisco R. Montero of Fletcher Heald & Hildreth, PLC, filed the Petition.

Beginning in 2017, the Commission conducted a series of auctions for the satellite bands needed for high-speed communications.  The auction yielded over $80 billion in proceeds, a portion of which was paid to Intelsat and other companies to compensate them for the loss of their frequency assignments.  *See* https://docs.fcc.gov/public/attachments/FCC-20-22A1.pdf.  BIU, on behalf of Spectrum Five, has been negotiating with the United States legislature to

---

[2] In late July 2020, a series of virtual meetings were held between Spectrum Five, the offices of the eight FCC Commissioners, former Chairman Ajit Pai's office, and the IB.  During these meetings, the principals and outside counsel of Spectrum Five disclosed to the FCC the findings of MoloLamken LLP, describing the false statements and misrepresentations by Intelsat, conveyed by the IB of the FCC to various regulatory agencies, including the ITU, falsely claiming superiority over Spectrum Five's rights at 95 W.L.

**Gᴳ Greenberg Gross LLP**

Loyaan A. Egal
June 9, 2023
Page 3

obtain compensation for its rights to operate at 95 W.L. in exchange for dismissing the Petition and giving up its challenge to Intelsat's satellite operations.

## BECAUSE SPECTRUM FIVE DEFAULTED ON ITS LOAN, BIU IS ITS ATTORNEY-IN-FACT

Spectrum Five and BIU are parties to that certain Loan Agreement dated September 6, 2018, as supplemented and amended by that certain Amended and Restated Loan Agreement dated August 28, 2019, as further supplemented and amended by that certain Second Amended and Restated Loan Agreement dated December 30, 2019, and as further supplemented and amended by that certain Third Amended and Restated Loan Agreement dated January 31, 2020 (Att. B through E) (the "Loan Agreement"); the Security Agreement dated September 6, 2018 (the "Security Agreement") (Att. F); the UCC Security Agreement dated August 28, 2019 (the "UCC Agreement") (Att. G); the Pledge Agreement dated September 2018 (the "Pledge Agreement") (Att. H); the Letter Agreement entered into as of September 5, 2020 (Att. I); and the Letter Agreement entered into as of February 15, 2021 (the "2021 Letter Agreement") (Att. J) (collectively referred to herein and, together with any additional documents related hereto, as the "Loan Documents"). The Loan Documents reflect the agreements between BIU, as Lender, on one hand, and Spectrum Five, on the other, in connection with loans by BIU to Spectrum Five (the "BIU Loan").

Pursuant to Section 4 of the 2021 Letter Agreement, the BIU Loan is in default as it was not paid by August 1, 2021. Therefore, BIU is entitled to exercise all rights and remedies under the Loan Documents. Those rights include, without limitation, the rights under Section 3.4 of the Security Agreement and Section 6 of the Pledge Agreement, pursuant to which Spectrum Five has irrevocably designated, made, constituted, and appointed BIU as Spectrum Five's true and lawful attorney-in-fact.

Moreover, in October 2021, Mr. Wilson agreed not to interfere with lobbying efforts of BIU on behalf of Spectrum Five in connection with the monetization of Spectrum Five's rights for a satellite slot located at the 95 W.L. (Att. K).

## MR. WILSON SECRETLY WITHDRAWS THE PETITION

On June 6, 2023, Scott Crawford, one of the Managing Members of BIU, learned that Spectrum Five had asked the Commission to withdraw the Petition and that a staff-level order had accepted the withdrawal. Scott Crawford Declaration ("Crawford Decl." ¶ 2, Att. L.) The request to withdraw the Petition was filed by Jenner & Block. BIU was unaware that Spectrum Five had retained Jenner & Block to prosecute the Petition and, of course, was completely unaware that the Petition had been withdrawn. Crawford Decl. ¶ 3.

**⦿ Greenberg Gross LLP**

Loyaan A. Egal
June 9, 2023
Page 4

The following day, June 7, 2023, BIU's counsel sent a letter to Jenner & Block informing them that they were not authorized to withdraw the Petition. (Att. M.) On June 8, 2023, Jenner & Block responded that they were directed by Mr. Wilson, whom they believed to have the authority to direct them to withdraw the Petition, and that "[i]n light of the apparent disagreement between BIU and Mr. Wilson, Jenner & Block is not currently in a position, as your letter requests, to take any action at the FCC to seek to reinstate the Petition. Of course, BIU is free to engage other counsel to seek that relief." (Att. A.)

## ARGUMENT

The Commission clearly has the ability to reinstate the Petition given that it was withdrawn at the direction of Mr. Wilson, who had no authority to do so. The Order in *Champion Communications Services, Inc.*, 15 FCC Rcd. 12832 ¶¶ 2-4 (WTB 2000), is instructive. In that proceeding, Sagra Farms, Inc. ("Sagra Farms") assigned a license to Champion Communication Services, Inc. ("Champion"), but the person who signed the assignment application "had no authority to do so." Based on this, the Commission determined that it was appropriate to reinstate the license to Sagra Farms. *See id.* ¶¶ 3, 4.

Moreover, the Commission should reinstate the Petition because it was defrauded. *See American Industrial Door, Inc.*, 16 FCC Rcd. 16300 ¶ 5 & n.10. "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for .. fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party." Fed. R. Civ. Proc. 60(b)(3); *see also Dausuel v. Dausuel*, 195 F.2d 774, 775 (D.C. Cir. 1952) ("A court may at any time set aside a judgment for after-discovered fraud upon the court"); *In re Bressman*, 874 F.3d 142, 150 (3d Cir. 2017) (district court did not abuse its discretion vacating judgment based on failure to disclose information about settlement agreement); *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 561 (7th Cir. 1999) ("an order procured by fraud, can be attacked at any time, in any court, either directly or collaterally, provided that the party is properly before the court."); Fed. R. Civ. Proc. 60(b)(3). Fraud on the Commission includes, as here, where "the attorney fraudulently or without authority assumes to represent a party and connives at his defeat." *Luttrell v. United States*, 644 F.2d 1274, 1276 (9th Cir. 1980).

Fraud on the Commission is fraud that "subvert[s] the integrity of the" Commission. *See Synanon Church v. United States*, 579 F. Supp. 967, 974 (D.D.C. 1984), *aff'd*, 820 F.2d 421 (D.C. Cir. 1987); *see also Davis v. U.S. Dep't of Health & Hum. Servs.*, 968 F. Supp. 2d 176, 184 (D.D.C. 2013), *aff'd*, No. 1:12-CV-01246-JDB, 2014 WL 2178705 (D.C. Cir. Apr. 25, 2014) ("Fraud on the court is fraud which is directed to the judicial machinery itself") (quoting *Baltia Air Lines, Inc. v. Transaction Mgmt., Inc.*, 98 F.3d 640, 642–43 (D.C.Cir.1996)).

Here, Jenner & Block had no authority to withdraw the Petition on behalf of Spectrum Five. It did so at the direction of Mr. Wilson, who had no authority to cause Spectrum Five to

**Greenberg Gross LLP**

Loyaan A. Egal
June 9, 2023
Page 5

withdraw the Petition, and who was no doubt paid by a party-in-interest to give that instruction. He also did this without providing any notice to BIU that he was going to make the request and without notifying Jenner & Block that he had no authority to make that request. Therefore, to preserve the integrity of the Commission and these proceedings, we ask that the Commission set aside the Order, reinstate the Petition, and reopen the docket.

Respectfully submitted,

Michael H. Strub Jr.

Attachments

cc:    See attached service list

# ATTACHMENT A

| From: | Feder, Samuel L. <SFeder@jenner.com> |
|---|---|
| Sent: | Thursday, June 8, 2023 8:03 AM |
| To: | Michael H. Strub |
| Cc: | Amir A. Shakoorian; Cheryl Winsten; Sanders, David P. |
| Subject: | [EXT] RE: IB Docket No. 20-399, Spectrum Five LLC, Petition for Enforcement of Operational Limits and for Expedited Proceedings to Revoke Satellite Licenses |

Mr. Strub,

I am in receipt of your letter dated June 7, 2023 concerning Jenner & Block's work for our client Spectrum Five LLC.

Our work has at all times been directed by R. David Wilson, who we believed to be the senior officer of Spectrum Five with full authority to act on its behalf.

We are not in a position to address the assertions in your letter that your client BIU has the authority to direct the activities of our firm, rather than Mr. Wilson. Instead, you will need to address that matter directly with Mr. Wilson.

In light of the apparent disagreement between BIU and Mr. Wilson, Jenner & Block is not currently in a position, as your letter requests, to take any action at the FCC to seek to reinstate the Petition. Of course, BIU is free to engage other counsel to seek that relief.

Given the positions asserted in your letter concerning who has the right to direct Jenner & Block's work, and to make sure that all interested parties are apprised of your assertions, we are providing a copy of your June 7 letter to Mr. Wilson.

Sincerely,
Sam Feder

**From:** Cheryl Winsten <CWinsten@GGTrialLaw.com>
**Sent:** Wednesday, June 7, 2023 12:48 PM
**To:** Feder, Samuel L. <SFeder@jenner.com>
**Cc:** Michael H. Strub <MStrub@GGTrialLaw.com>; Amir A. Shakoorian <AShakoorian@GGTrialLaw.com>
**Subject:** IB Docket No. 20-399, Spectrum Five LLC, Petition for Enforcement of Operational Limits and for Expedited Proceedings to Revoke Satellite Licenses

**External Email - Do Not Click** Links or Attachments Unless You Know They Are Safe
Dear Counsel,

Please see the attached correspondence from Michael H. Strub, Jr., and Amir A. Shakoorian. Your prompt attention is appreciated.

Regards,

**Cheryl Winsten**
**Legal Secretary to Evan Borges, Michael H. Strub Jr., and Edward Danielyan**

**Greenberg Gross LLP**
650 Town Center Drive | Suite 1700 | Costa Mesa, CA 92626
601 South Figueroa Street, 30th Floor | Los Angeles, CA 90017

1

Direct 949.383.2781 | Main 949.383.2800
CWinsten@GGTrialLaw.com



Los Angeles | Orange County | Las Vegas | New York

This email may contain privileged and/or confidential information. If you are not an intended recipient of this email, please delete it, notify us immediately at postmaster@ggtriallaw.com, and do not use or disseminate such information.

**Samuel L. Feder**

**Jenner & Block LLP**
1099 New York Avenue, N.W.
Suite 900, Washington, DC 20001-4412  |  jenner.com
+1 202 639 6092 | TEL
+1 202 661 4999 | FAX
Pronouns: He / Him
SFeder@jenner.com
Download V-Card  |  View Biography

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

# ATTACHMENT B

Final Execution Version

## LOAN AGREEMENT

This Loan Agreement (this "**Agreement**") is entered into on this _____ day of _____, 2018 by and among **SPECTRUM FIVE LLC**, a Delaware limited liability company having its registered address at 251 Little Falls Drive, Wilmington Delaware, 19808 and represented herein by its Member/Manager R. David Wilson ("**Wilson**") and **SPECTRUM FIVE, NETHERLANDS B.V.**, a company formed under the laws of Netherland Antilles (collectively, the "**Borrower**" or the "**Company**"), and **BIU, LLC** (the "**Lender**," and together with the Company, the "**Parties**"), a Delaware limited liability company having its registered address at 8702 Jefferson Hwy, Suite B, Baton Rouge, LA 70809 and represented herein by its Sole Manager Melton C. McGuire ("**McGuire**");

### W I T N E S S E T H

**WHEREAS**, the Company has rights for a satellite slot located at the 95.15° West Longitude Orbital Slot (the "**95.15° Slot**") which must be perfected by moving, or "bringing into use", a satellite into that certain location (the "**BIU Project**"); and

**WHEREAS**, the Company requires funding, in amounts and to be applied as detailed herein, to complete the BIU Project; and

**WHEREAS**, the Company previously entered into an agreement with Lender (the "**BIU Agreement**") whereby Lender was to provide the required funding for completion of BIU Project pursuant to a loan (the "**BIU Loan**") from Lender; and

**WHEREAS**, the Company and Lender desire to enter into this Agreement to set forth the rights, obligations, covenants and agreements under which the BIU Loan will be obtained from Lender, including but not limited to certain restrictions on the BIU Project expenditures and the specifics of how the BIU Funding will be repaid,

**NOW THEREFORE**, in consideration of the foregoing, and the covenants and agreements hereinafter set forth to be kept and performed by the Parties hereto, it is agreed by and between the Parties that:

**SECTION 1.  BIU Project Loan Amounts.** (a) As set forth herein, Lender will make loans by the deposit into an Escrow Fund (the "**Escrow Fund**") to be established and created by Argent Institutional Services, LLC, a state limited liability company organized under the laws of the State of Oklahoma, having its corporate trust offices in Ruston, Louisiana and duly authorized to exercise corporate trust powers, as escrow agent (the "**Escrow Agent**"), funds in the aggregate amount of Eight Million Six Hundred Fifty-Four Thousand Nine Hundred Seventy-Eight Dollars ($8,654,978)* (as such amount may be adjusted, the "**Principal Amount**") to be funded and applied as directed in the agreement by and between the Escrow Agent and the Lender (the "**Escrow Agreement**") and in this Agreement for the following purposes and in the following amounts:

*Subject to Change

1

Execution Version

**PHASE ONE:**

| | | |
|---|---|---|
| (i) | Akin Gump BIU Memorandum | $ 110,000 |
| (ii) | Dutch Registration Fee | $ 71,543 |
| (iii) | Gapsat (Deposit) | $ 149,940 |
| (iv) | Kellogg, Hansen Legal Fees | $ 60,000 |
| (v) | Northern Sky Research | $ 4,495 |
| (vi) | Trustee Fee | $ 2,500 |
| (vii) | General and Administrative | $ 1,500 |
| | **Phase One Principal Amount** | **$ 399,978** |

Notwithstanding the foregoing, the amounts set forth in (i) and (ii) above have been previously loaned by having been directly paid to Akin Gump and the Dutch, respectively. No further funding of these loan amounts is required.

**PHASE TWO:**

| | | |
|---|---|---|
| (i) | Satellite Lease Fee | $ 4,600,000 |
| (ii) | Satellite Extension Fee | $ 600,000** |
| (iii) | Satellite Brokerage Fee | $ 520,000 |
| (iv) | Legal Fees | $ 600,000 |
| (v) | BIU Defense | $ 250,000 |
| (vi) | Company General and Administrative | $ 585,000 |
| (vii) | Lender General and Administrative | $ 100,000 |
| (viii) | Contingency | $ 600,000 |
| (ix) | Placement Fees | $ 400,000* |
| | **Phase Two Principal Amount** | **$8,255,000*** |
| | **GRAND TOTAL** | **$8,654,978 *** |

*Subject to Change
**Minimum Amount

2

Execution Version

The Escrow Agreement shall provide that any loan funding expended on the items above shall only be released upon the written direction of McGuire, such direction to be evidenced in writing and signed by McGuire with a copy to the Company.

    (a)    The Phase Two Principal Amount may be changed or adjusted once the Satellite Lease Fee has been determined and finalized.

    (b)    In the event the amounts detailed in Phase Two are insufficient to achieve the intended purpose or accomplish the task for which they are designated within twelve (12) months from the date hereof, (i) any funds remaining in the Escrow Fund shall be returned to Lender, or (ii) the Lender may elect to make additional Phase Two funding available in order to facilitate the completion of the BIU Project. Lender shall have the sole discretion to provide such additional funds.

    (c)    The Escrow Fund for each Phase of funding shall not be utilized until minimum amounts necessary for funding have been deposited therein. In the event (i) Phase Two is not funded in its entirety and, (ii) a contract with a satellite provider has not been executed, in each case, on or prior to November 27, 2018, then in such event, Phase Two Investors shall each have the option to have their investment returned to them.

**SECTION 2. Security.** The Loan shall be secured by and entitled to a specific pledge of the proceeds from the sale, lease or other monetization of all satellite spectrum and priority rights pertaining to the 95.15° Slot shall be established in a form as required by and approved by Lender prior to funding of the Phase Two loan amount. The documents required will include but not limited to, a final Convertible Promissory Note (the "**Note**"), Security Agreement, Blocked Control Account, Control Account Agreement and such other documents as Lender may require in its sole discretion (collectively, the "**Transaction Documents**").

    (a)    If the security hereunder is insufficient to satisfy the Note in full, then any unpaid balance of the Lender Returns that has not been converted pursuant to Section 7 shall be an unsecured obligation of the Company ranking pari-passu in right of payment with all existing and future unsecured promissory notes issued by the Company.

    (b)    Borrower shall not make any distribution of its assets to Members of the Company prior to payment in-full of the Lender Returns.

**SECTION 3. BIU Loan.** Lender hereby agrees to make the BIU Loan and make funding available for the BIU Project, to be expended as set forth in Section 1. The Phase Two Loan amounts is subject to execution by Borrower of Transaction Documents and other documents reasonably required by Lender as provided in Section 2 above. Upon execution of this Agreement, as well as the Escrow Agreement and any other ancillary documents, the Lender shall, within seventy-two (72) hours of funding, cause the Phase One Principal Amount to be transferred to the Escrow Agent for deposit in the Escrow Fund to be applied as set forth above, provided that all other conditions precedent to funding have been completed.

**SECTION 4. Note.** The BIU Loan shall be represented by the Note from Borrower, such Note being convertible as set forth in Section 7 below. The Note and Lender's rights under the Loan and Transaction documents referenced herein may be assigned by Lender, in whole or

Execution Version

in part, but only to Members of Lender.  If Lender assigns its rights in part to Members of Lender, Lender may in its discretion, serve as agent and retain the servicing of the Loan on behalf of all such permitted assignees.  The Note shall be due on the earlier of (i) the second anniversary date of its issuance or (ii) the date which is ten (10) days subsequent to receipt by Borrower (or Lender on behalf of Borrower) of funds sufficient to pay the Lender Return in full (the **"Maturity Date"**).

SECTION 5. **Payment.** All revenues received by the Borrower (**"Borrower Funds"**) from the BIU Project and until repayment of the Lender Returns described in Section 6 below (the **"Payment Period"**) shall be deposited into a Control Account of Lender as referenced above to be held for the repayment of the BIU Loan. McGuire is hereby appointed as the Borrower's agent and attorney-in-fact for the purposes of notifying any payor of amounts to be received by the Borrower during the Payment Period that such amounts are to be paid to Lender or to the Lender's investors and the existence of Lender's lien upon such funds.

SECTION 6. **Lender Returns.** The Borrower agrees that during the Payment Period it shall pay the Phase One Lender Returns and the Phase Two Lender Returns (as each term is defined below) to Lender in the following order of priority:

(a)      First, the Phase One Principal Amount plus 600% of the Phase One Principal Amount (the sum of the two amounts referred to as the **"Phase One Lender Returns"**) for the benefit of Lender's Phase One investors, and then;

(b)      Second, the Phase Two Principal Amount plus 600% of the Phase Two Principal Amount (the sum of the two amounts referred to as the **"Phase Two Lender Returns"**).

(c)      As used herein the term **"Lender Returns"** shall mean the Phase One Lender Returns together with the Phase Two Lender Returns.

(d)      Upon full repayment of the Lender Returns, the security interests to be granted herein shall cease, and be terminated and all remaining Borrower Funds shall be delivered to the Borrower.

SECTION 7. **Holder's Voluntary Conversion.** The Lender may convert the Note in whole or in part into Borrower's Class B Membership Units (**"Class B Units"**) as follows:

(a)      If, by September 1, 2019 (the **"Conversion Date"**) the BIU Project fails to generate sufficient revenues to pay any portion of the Lender Returns described in Section 6, then at any time up to the payment in-full of all Lender Returns on the Note, the Lender may elect to convert any remaining portion of Lender Returns outstanding on the Note in accordance with the formula set forth in paragraph (b) of this Section 7.

(b)      Any unpaid Lender Returns converted shall be converted into Class B Units of Borrower on a Fifty Million ($50,000,000) "post-money" basis, based on the following formula: (Unpaid Lender Returns / Lender Returns) * (Lender Returns/ $50,000,000).

4

Execution Version

    i.  Example: $8,000,000 is loaned to Borrower, resulting in $56,000,000 in Lender Returns due under the Note. If the Note is completely unpaid after the Conversion Date, the Note is convertible as follows: ($56,000,000 / $56,000,000) * (8,000,000/ $50,000,000) = 16.00% of Borrower through issuance of its Class B Units. Assuming Borrower has 1,000,000 aggregate Membership Units *post-conversion*, Lender will have been issued 160,000 of Borrower Class B Units out of the aggregate 1,000,000 Borrower Membership Units. Stated another way, $8,000,000 is converted at $50 per Class B Unit.

    ii.  Example: Same as above, except that $28,000,000 is paid to Lender under the terms of the Note, leaving $28,000,000 in unpaid Lender Returns. The remaining portion due under the Note is convertible as follows: ($28,000,000/ $56,000,000) * ($8,000,000 / $50,000,000) = 50.00% * 16.00% = 8.00% of Borrower through issuance of Class B Units. Assuming Borrower has 1,000,000 aggregate Membership Units *post-conversion*, Lender will have been issued 80,000 of Borrower Class B Units out of the aggregate 1,000,000 Borrower Membership Units. Stated another way, $4,000,000 (50% of the Principal amount) is converted at $50 per Class B Unit.

(c)    If, within ninety (90) days of the Conversion Date, the Company pays the Note and all Lender Returns in full, Company shall have the right to redeem and have cancelled any Class B Units previously issued upon such conversion.

**SECTION 8. Representations and Warranties of the Borrower.** The Borrower represents and warrants to Lender that as of the date hereof and as of each Closing Date that:

(a)    *Due Organization, Qualification, etc.* Each Borrower (i) is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and the Netherland Antilles, respectively; (ii) has the power and authority to own, lease and operate its respective properties and carry on its respective business as now conducted; and (iii) is duly qualified, licensed to do business and in good standing as a foreign organization in each jurisdiction where the failure to be so qualified or licensed could reasonably be expected to have a Material Adverse Effect. For purposes of this Agreement, the term "**Material Adverse Effect**" means a change, event or occurrence that individually, or together with any other change, event or occurrence, has or would reasonably be expected to have a material adverse impact on the financial condition or results of operations of the Borrowers and their subsidiaries taken as a whole.

(b)    *Authority.* The execution, delivery and performance by each Borrower of this Agreement, and the Transaction Documents and consummation of the transactions contemplated hereby and thereby (i) are within the power of each Borrower and (ii) have been duly authorized by all necessary actions on the part of the Borrower.

5

Execution Version

(c) *Enforceability.* Each Transaction Document executed, or to be executed, by the Borrower has been, or will be, duly executed and delivered by the Borrower and constitutes, or will constitute, a legal, valid and binding obligation of each Borrower, enforceable against each Borrower in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(d) *Non-Contravention.* The execution and delivery by the Borrower of the Transaction Documents executed by the Company and the performance and consummation of the transactions contemplated thereby do not and will not (i) violate the Amended and Restated Limited Liability Company Agreement of the Company, dated as of June 21, 2004 (as amended, the **"LLC Agreement"**), or any judgment, order, writ, decree, statute, rule or regulation applicable to the Borrower; (ii) violate any provision of, or result in the breach or the acceleration of, or entitle any other Person to accelerate (whether after the giving of notice or lapse of time or both), any mortgage, indenture, agreement, instrument or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any Lien upon any property, asset or revenue of the Company or the suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license, authorization or approval applicable to the Borrower, its business or operations, or any of its assets or properties; except for any such violation, breach, acceleration, creation, imposition, suspension, revocation, impairment, forfeiture or nonrenewal that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(e) *Approvals.* No consent, approval, order or authorization of, or registration, declaration or filing with, any governmental authority or other Person (including, without limitation, the members of the Company) is required in connection with the execution and delivery by the Company of the Transaction Documents or the performance by the Company of the transactions contemplated thereby.

(f) *Title.* The Company owns and has good and marketable title in fee simple absolute to, or a valid leasehold interest in, all its real properties and good title to the 95.15° Slot priority rights for the frequencies filed with the International Telecommunication Union (**"ITU"**) to be brought into use under ITU rules pursuant to the Transaction Documents and is subject to no Liens. Furthermore, the Company has disclosed to the Netherlands Radiocommunications Agency the Company's intent to bring into use the 95.15° Slot. As used herein the term *"Lien"* shall mean, with respect to any property, any security interest, mortgage, pledge, lien, claim, charge or other encumbrance in, of, or on such property or the income therefrom, including, without limitation, the interest of a vendor or lessor under a conditional sale agreement, capital lease or other title retention agreement, or any agreement to provide any of the foregoing, and the filing of any financing statement or similar instrument under the Uniform Commercial Code or comparable law of any jurisdiction; and

6

Execution Version

(g) *Valid Issuance of Notes and Warrants; Reservation and Status of Class B Unites.* Any Class B Units issued upon conversion of the Note, when issued in compliance with the provisions of this Agreement and, in the case of the Class B Units, will be validly issued and will be free of any liens or encumbrances and, assuming the accuracy of the representations and warranties of the Investors, will be issued in compliance with (or exemption from) with all applicable federal and state securities laws; and the Class B Units will be duly and validly issued, fully paid and non-assessable; provided, however, that such Class B Units are subject to restrictions on transfer pursuant to the terms of the Transaction Documents and under federal or state securities laws.

(h) *Tax Returns and Payments.* The Company has timely filed all tax returns required to be filed by it with appropriate federal, state and local governmental agencies (after giving effect to any extensions granted therefor). These returns and reports are true and correct in all material respects. All taxes shown to be due and payable on such returns, any assessments imposed, and, to the Company's knowledge, all other taxes due and payable by the Company on or before the Closing Date have been paid or will be paid prior to the time they become delinquent, in each case except to the extent such taxes or assessments are being contested in good faith by the Company.

(i) *Committee.* In order to induce Lender into making the BIU Loan, Borrower represents and warrants that it will, upon execution of the Transaction Documents, appoint a committee (the **"Committee"**) of three (3) persons to handle all decisions with respect to the disposition or licensure of the 95.15° Slot, and that all decisions with respect thereto shall be made by a majority vote of the Committee, with each member of the Committee having one (1) vote. Borrower shall appoint two (2) members and Lender shall appoint one (1) member. If any member of the Committee is willing or unable to continue to serve on the Committee, then the remaining Committee members will replace that person with another person that is agreeable to all remaining Committee members. The Committee shall meet as and when needed to determine the most expeditious manner to monetize the 95.15° Slot. Additionally, as to any proposed payments not specifically budgeted herein (Contingency Fund), the Committee shall determine, approve and direct the McGuire, as manager of Lender, to make or not make such payments. Borrower acknowledges that Lender has reasonably relied upon these representations and warranties in loaning funds to Borrower under this Agreement.

**SECTION 9. Further Documentation.** The Borrower will from time to time execute, deliver, endorse and authorize the filing of any and all instruments, documents, conveyances, assignments, security agreements, financing statements, control agreements and other agreements and writings that the Lender may reasonably request in order to secure, protect, perfect or enforce the Security Interest or the Lenders rights under the Loan Documents (but any failure to request or assure that the Borrower executes, delivers, endorses or authorizes the filing of any such item shall not affect or impair the validity, sufficiency or enforceability of the Loan Documents and the Security Interest, regardless of whether any such item was or was not executed, delivered or endorsed in a similar context or on a prior occasion).

7

Execution Version

**SECTION 10. No Control.** The Parties hereto understand that certain members, representatives and/or agents of Lender are also members, representatives and/or agents of the Borrower, including but not limited to Scott H. Crawford, William R. Boles, Jr. and McGuire (collectively, the "**Dual Members**"). The Parties hereto agree that the Dual Members exercise no control over the Borrower and are not responsible for the decisions and representations made by the Borrower in this or any other agreement. The Parties hereto agree that no conflict of interest exists for the Dual Members, as it relates to the transactions contemplated herein and each Party expressly waives any claim for conflict of interest as to the Dual Members with regard to the BIU Project.

**SECTION 11. No Waiver.** No waiver of any of the terms and conditions of this Agreement will be binding or effective for any purpose unless expressed in writing and signed by the party hereto giving the same, and any such waiver will be effective only in the specific instance and for the purpose given. No failure or delay on the part of either party hereto in exercising any right, power or privilege hereunder will operate as a waiver thereof, nor will any single or partial exercise of any right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

**SECTION 12. Whole Agreement.**

(a)     This Agreement constitutes the whole of the Agreement between the Parties hereto relating to the subject matter hereof and save as otherwise provided herein no amendment, alteration, addition, variation or consensual cancellation will be of any force or effect unless reduced to writing and signed by the Parties hereto or their duly authorized representatives.

(b)     Subject to paragraph (a), the Parties agree that no other terms or conditions, whether oral or written, and whether express or implied will be applicable to this Agreement.

(c)     Section and paragraph headings have been inserted in this Agreement as a matter of convenience of reference only, and it is agreed that such section headings are not a part of this Agreement and shall not be used in the interpretation of any provisions of this Agreement.

(d)     If any provision of this Agreement shall be held or deemed to be or shall, in fact, be invalid, inoperative or unenforceable as applied in any particular case in any jurisdiction or jurisdictions, or in all jurisdictions because it conflicts with any provisions of any constitution, statute, rule of public policy, or for any other reason, such circumstances shall not have the effect of rendering the provision in question invalid, inoperative or unenforceable in any other case or circumstance, or of rendering any other provision or provisions of this Agreement invalid, inoperative or unenforceable to any extent whatever.

(e)     This Agreement may be executed simultaneously in two or more counterparts, each of which will be deemed an original, but all of which will constitute one agreement.  Execution and delivery of this Agreement by exchange of electronically transmission counterparts bearing the signature of a Party shall be equally as effective as delivery of a manually executed counterpart of such Party.

8

Execution Version

SECTION 13.  **Successors and Assigns; Third Party Beneficiaries**.  Except as otherwise provided in <u>Section 4</u> herein, neither this Agreement nor the rights and obligations hereunder may be assigned, subcontracted or otherwise delegated or transferred without the prior written consent of the other Party hereto.  All of the terms, covenants, representations, warranties and conditions of this Agreement will be binding upon, and inure solely for the benefit of, and be enforceable by, the Parties and any person or entity to whom rights hereunder are lawfully assigned in accordance with the preceding sentence.  Except pursuant to an express assignment permitted hereunder, no person or entity will have any rights or remedies under this Agreement or by reason of the transactions contemplated hereby or thereby or a third-party beneficiary, as an assignee of or successor of rights, by means of subrogation or otherwise.

SECTION 14.  **Amendments/Waiver**.  This Agreement may be amended, modified or superseded, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the Parties hereto or, in the case of a waiver, by the Party or Parties waiving compliance.  The failure of any Party at any time or times to require performance of any provisions hereof will in no manner affect the right at a later time to enforce the same.  No waiver by any Party of any condition, or of any breach of any term, covenant, representation or warranty contained in this Agreement, in any one or more instances, will be deemed to be or construed as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of any breach of any other term, covenant, representation or warranty.

SECTION 15.  **Notices**.  Unless otherwise provided herein, all notices, requests, consents, approvals, demands and other communications to be given hereunder (collectively, **"Notices"**) will be in writing and will be deemed given upon (a) confirmation of receipt of an electronic transmission to the extent transmitted by 5:00 p.m. (local time of recipient) on a Business Day or if transmitted after such time on a Business Day or any other day, the Business Day next following the day of transmission and confirmation of receipt of such electronic transmission (b) confirmed delivery by a reputable overnight carrier or when delivered by hand, (c) actual receipt or (d) the expiration of four (4) Business Days after the day when mailed by registered or certified mail (postage prepaid, return receipt requested), addressed to the respective Parties listed below at the following addresses (or such other address for a Party hereto as will be specified by like Notice):

If to Borrower, to:

Spectrum Five LLC
2445 California Street NW
Washington, DC  20008
Attn: R. David Wilson
dwilson@spectrumfive.com


If to Lender, to:

BIU, LLC
8702 Jefferson Hwy, Suite B
Baton Rouge, LA 70808
Attention: Melton C. McGuire

9

Execution Version

**SECTION 16.  Governing Law.**  This Agreement will be governed by and construed in accordance with the laws of the State of Delaware and all disputes, actions and other matters relating thereto will be determined in accordance with such law.

**SECTION 17.  Duration of Agreement.**  This Agreement shall take effect upon execution and shall remain in effect until such time as the BIU Loan Returns set forth in Section 4 hereof has been paid in full and all remaining Borrower Funds have been delivered to Borrower.

**SECTION 18.  Specific Enforcement.**  Each of the Parties hereto acknowledges and agrees that irreparable damage would occur and that the parties would not have any adequate remedy at law in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that, prior to the valid termination of this Agreement, the Parties shall be entitled to an injunction or injunctions, specific performance and other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement (including Borrower's obligation to grant and/or confirm the Lender lien in Borrower Funds, to deliver Borrower Funds and/or to pay the Lender Returns contemplated by this Agreement), this being in addition to any other remedy to which they are entitled at law or in equity.  Each of the Parties agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief when expressly available pursuant to the terms of this Agreement, and hereby waives (x) any defenses in any action for an injunction, specific performance or other equitable relief, including the defense that the other parties have an adequate remedy at law or an award of specific performance is not an appropriate remedy for any reason at law or equity, and (y) any requirement under applicable law to post a bond, undertaking or other security as a prerequisite to obtaining equitable relief.

10

Execution Version

**THUS DONE, EXECUTED AND SIGNED,** in multiple originals, on the day, month and year herein first above written.

BORROWER:
SPECTRUM FIVE LLC

By: _____
    R. David Wilson, Member/Manager

SPECTRUM FIVE, NETHERLANDS B.V.

By: _____
    R. David Wilson, Member/Manager

LENDER:
BIU, LLC

By: _____
    Melton C. McGuire, Sole Manager

LOAN AGREEMENT SIGNATURE PAGE

Execution Version

THUS DONE, EXECUTED AND SIGNED, in multiple originals, on the day, month and year herein first above written.

BORROWER:
SPECTRUM FIVE LLC

By:_____
R. David Wilson, Member/Manager

SPECTRUM FIVE, NETHERLANDS B.V.

By:_____
R. David Wilson, Member/Manager

LENDER:
BIU, LLC

By:_____
Melton C. McGuire, Sole Manager

LOAN AGREEMENT SIGNATURE PAGE

# ATTACHMENT C

EXECUTION COPY

## AMENDED AND RESTATED
## LOAN AGREEMENT

This Amended and Restated Loan Agreement (this **"Agreement"**) is entered into on this 28TH day of August, 2019 by and among **SPECTRUM FIVE LLC**, a Delaware limited liability company having its registered address at 251 Little Falls Drive, Wilmington Delaware, 19808, and represented herein by its Member/Manager R. David Wilson (**"Wilson"**) and **SPECTRUM FIVE, NETHERLANDS B.V.**, a company formed under the laws of Netherland Antilles (collectively, the **"Borrower"** or the **"Company"**), and **BIU, LLC** (the **"Lender,"** and together with the Company, the **"Parties"**), a Delaware limited liability company having its registered address at 8702 Jefferson Hwy, Suite B, Baton Rouge, LA 70809 and represented herein by its Sole Manager Melton C. McGuire (**"McGuire"**);

## W I T N E S S E T H

**WHEREAS,** the Company has rights for a satellite slot located at the 95.15° West Longitude Orbital Slot (the **"95.15° Slot"**) which must be perfected by moving, or "bringing into use", a satellite into that certain location (the **"BIU Project"**); and

**WHEREAS,** the Company required funding, in amounts, as applied and to be applied as detailed herein, to complete the BIU Project; and

**WHEREAS,** the Company previously entered into an agreement with Lender (the **"BIU Agreement"**) whereby Lender was to provide the required funding for completion of BIU Project pursuant to a loan (the **"BIU Loan"**) from Lender; and

**WHEREAS,** the Company previously entered into that certain Loan Agreement dated September 6, 2018 (the **"Prior Loan Agreement"**); and

**WHEREAS,** the Company and Lender desire to enter into this Agreement to set forth the rights, obligations, covenants and agreements under which the BIU Loan will be obtained from Lender, including but not limited to certain restrictions on the BIU Project expenditures and the specifics of how the BIU Funding will be repaid,

**NOW THEREFORE,** in consideration of the foregoing, and the covenants and agreements hereinafter set forth to be kept and performed by the Parties hereto, it is agreed by and between the Parties that:

**SECTION 1. BIU Project Loan Amounts.** (a) As set forth herein, Lender has made and continues to make loans by (i) the deposit into an Escrow Fund (the **"Escrow Fund"**) to be established and created by Argent Institutional Services, LLC, a state limited liability company organized under the laws of the State of Oklahoma, having its corporate trust offices in Ruston, Louisiana and duly authorized to exercise corporate trust powers, as escrow agent (the **"Escrow Agent"**) and, (ii) certain in-kind contributions, in the aggregate amount (as of the date hereof) of Ten Million Four Hundred Thirty-Three Thousand Six Hundred Sixty Dollars ($10,433,660) (as

1

such amount may be increased, the **"Principal Amount"**) to be funded and applied as directed in the agreement by and between the Escrow Agent and the Lender (the **"Escrow Agreement"**) and in this Agreement for the following purposes and in the following amounts:

**PHASE ONE:**

| | | |
|---|---|---|
| (i) | Akin Gump BIU Memorandum | $ 110,000 |
| (ii) | Dutch Registration Fee | $  71,543 |
| (iii) | Gapsat (Deposit) | $ 149,940 |
| (iv) | Kellogg, Hansen Legal Fees | $  60,000 |
| (v) | Northern Sky Research | $   4,495 |
| (vi) | Trustee Fee | $   2,500 |
| (vii) | General and Administrative | $   1,500 |
| **Phase One Principal Funded Amount** | | **$ 399,978** |

[REMAINDER OF THIS PAGE INTENTIONALLY BLANK]

2

EXECUTION COPY

Notwithstanding the foregoing, the amounts set forth in (i) and (ii) above have been previously loaned by having been directly paid to Akin Gump and the Dutch, respectively. No further funding of these loan amounts is required.

**PHASE TWO (paid):**

| | | |
|---|---|---|
| (i) | Satellite Lease Fee | $ 4,600,000 |
| (ii) | Satellite Extension Fee | $   600,000 |
| (iii) | Satellite Brokerage Fee | $   557,560* |
| (iv) | Legal Fees | $   633,818* |
| (v) | BIU Defense | $ 1,402,504* |
| (vi) | Company General and Administrative | $ 1,180,405 |
| (vii) | Lender General and Administrative | $     68,574* |
| (viii) | Contingency | $   713,421 |
| (ix) | Placement Fees | $   277,400* |
| **Phase Two Principal Funded Amount** | | **$10,033,681** |
| **GRAND TOTAL (FUNDED)** | | **$10,433,660** |

\* Includes in-kind contributions

The Escrow Agreement has and shall continue to provide that any loan funding expended on the items above shall only be released upon the written direction of McGuire, such direction to be evidenced in writing and signed by McGuire with a copy to the Company.

(a)  The Phase Two Principal Amount above has been funded where indicated, in part, through in-kind contributions.

(b)  The Lender will use its efforts to make additional Phase Two funding available in order to facilitate the completion of the BIU Project, including but not limited to an additional One Million Eight Hundred Sixteen Thousand One Hundred Thirty-Seven Dollars ($1,816,137) identified as being needed by the Company. Lender is under no obligation to provide any additional funding, in the event it is unable to raise additional funding for the BIU Project.

EXECUTION COPY

(c)    Cash on hand, remaining from BIU Loan proceeds, for the BIU Project funding as of the date hereof is $964,885.

**SECTION 2. <u>Security.</u>** The Loan shall be secured by and entitled to a specific pledge of the proceeds from the sale, lease or other monetization of all satellite spectrum and priority rights pertaining to the 95.15° Slot shall be established in a form as required by and approved by Lender prior to funding of the Phase Two loan amount. The documents required will include but not be limited to, a Convertible Promissory Note (the **"Note"**), Security Agreement, Blocked Control Account, Control Account Agreement and such other documents as Lender may require in its sole discretion (collectively, the **"Transaction Documents"**).

(a)    If the security hereunder is insufficient to satisfy the Note in full, then any unpaid balance of the Lender Returns that has not been converted pursuant to <u>Section 7</u> shall be an unsecured obligation of the Company ranking pari-passu in right of payment with all existing and future unsecured promissory notes issued by the Company.

(b)    Borrower shall not make any distribution of its assets to Members of the Company prior to payment in-full of the Lender Returns.

**SECTION 3. <u>BIU Loan</u>.** Lender has made the Loan and hereby agrees to continue to make the BIU Loan (as indicated in <u>Section 1</u> above) and make funding available for the BIU Project, to be expended as set forth in <u>Section 1</u>. Funding of the Phase Two Loan amounts is subject to execution by Borrower of Transaction Documents and other documents reasonably required by Lender as provided in <u>Section 2</u> above. Upon execution of this Agreement, as well as the Escrow Agreement and any other ancillary documents, the Lender shall, within seventy-two (72) hours of funding, cause the remaining Phase Two Principal Amounts to be transferred to the Escrow Agent for deposit in the Escrow Fund to be applied as set forth above, provided that all other conditions precedent to funding have been completed.

**SECTION 4. <u>Note</u>.** The BIU Loan shall be represented by the Note from Borrower, such Note being convertible as set forth in <u>Section 7</u> below. The Note and Lender's rights under the Loan and Transaction documents referenced herein may be assigned by Lender, in whole or in part, but only to Members of Lender. If Lender assigns its rights in part to Members of Lender, Lender may in its discretion, serve as agent and retain the servicing of the Loan on behalf of all such permitted assignees. The Note shall be due on the earlier of (i) the second anniversary date of its issuance or (ii) the date which is ten (10) days subsequent to receipt by Borrower (or Lender on behalf of Borrower) of funds sufficient to pay the Lender Return in full (the **"Maturity Date"**).

**SECTION 5. <u>Payment.</u>** All revenues received by the Borrower (**"Borrower Funds"**) from the BIU Project and until repayment of the Lender Returns described in <u>Section 6</u> below (the **"Payment Period"**) shall be deposited into a Control Account of Lender as referenced above to be held for the repayment of the BIU Loan. McGuire is hereby appointed as the Borrower's agent and attorney-in-fact for the purposes of notifying any payor of amounts to be

4

received by the Borrower during the Payment Period that such amounts are to be paid to Lender or to the Lender's investors and the existence of Lender's lien upon such funds.

**SECTION 6. Lender Returns**. The Borrower agrees that during the Payment Period it shall pay the Phase One Lender Returns and the Phase Two Lender Returns (as each term is defined below) to Lender in the following order of priority:

(a)    First, the Phase One Principal Amount plus 600% of the Phase One Principal Amount (the sum of the two amounts referred to as the **"Phase One Lender Returns"**) for the benefit of Lender's Phase One investors, and then;

(b)    Second, the Phase Two Principal Amount plus 600% of the Phase Two Principal Amount (the sum of the two amounts referred to as the **"Phase Two Lender Returns"**).

(c)    As used herein the term **"Lender Returns"** shall mean the Phase One Lender Returns together with the Phase Two Lender Returns.

(d)    Upon full repayment of the Lender Returns, the security interests to be granted herein shall cease, and be terminated and all remaining Borrower Funds shall be delivered to the Borrower.

**SECTION 7. Holder's Voluntary Conversion.** The Lender may convert the Note in whole or in part into Borrower's Class B Membership Units (**"Class B Units"**) as follows:

(a)    If, by January 20, 2020 the BIU Project fails to generate sufficient revenues to pay any portion of the Lender Returns described in <u>Section 6</u>, then at any time up to the payment in-full of all Lender Returns on the Note, the Lender may elect to convert any remaining portion of Lender Returns outstanding on the Note in accordance with the formula set forth in paragraph (b) of this <u>Section 7</u>.

(b)    Any unpaid Lender Returns converted shall be converted into Class B Units of Borrower on a Fifty Million ($50,000,000) "post-money" basis, based on the following formula: (Unpaid Lender Returns / Lender Returns) * (Lender Returns/ $50,000,000).

i.    Example: $8,000,000 is loaned to Borrower, resulting in $56,000,000 in Lender Returns due under the Note. If the Note is completely unpaid after the Conversion Date, the Note is convertible as follows: ($56,000,000 / $56,000,000) * ($8,000,000/ $50,000,000) = 16.00% of Borrower through issuance of its Class B Units. Assuming Borrower has 1,000,000 aggregate Membership Units *post-conversion*, Lender will have been issued 160,000 of Borrower Class B Units out of the aggregate 1,000,000 Borrower Membership Units. Stated another way, $8,000,000 is converted at $50 per Class B Unit.

EXECUTION COPY

    ii.   Example: Same as above, except that $28,000,000 is paid to Lender under the terms of the Note, leaving $28,000,000 in unpaid Lender Returns. The remaining portion due under the Note is convertible as follows: ($28,000,000/ $56,000,000) * ($8,000,000 / $50,000,000) = 50.00% * 16.00% = 8.00% of Borrower through issuance of Class B Units. Assuming Borrower has 1,000,000 aggregate Membership Units ***post-conversion***, Lender will have been issued 80,000 of Borrower Class B Units out of the aggregate 1,000,000 Borrower Membership Units. Stated another way, $4,000,000 (50% of the Principal amount) is converted at $50 per Class B Unit.

(c)   If, within ninety (90) days from the date of any conversion (the "**Conversion Date**"), the Company pays the Note and all Lender Returns in full, Company shall have the right to redeem and have cancelled any Class B Units previously issued upon such conversion.

**SECTION 8. Representations and Warranties of the Borrower.** The Borrower represents and warrants to Lender that as of the date hereof and as of each Closing Date that:

(a)   ***Due Organization, Qualification, etc.*** Each Borrower (i) is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and the Netherland Antilles, respectively; (ii) has the power and authority to own, lease and operate its respective properties and carry on its respective business as now conducted; and (iii) is duly qualified, licensed to do business and in good standing as a foreign organization in each jurisdiction where the failure to be so qualified or licensed could reasonably be expected to have a Material Adverse Effect. For purposes of this Agreement, the term "**Material Adverse Effect**" means a change, event or occurrence that individually, or together with any other change, event or occurrence, has or would reasonably be expected to have a material adverse impact on the financial condition or results of operations of the Borrowers and their subsidiaries taken as a whole.

(b)   ***Authority.*** The execution, delivery and performance by each Borrower of this Agreement, and the Transaction Documents and consummation of the transactions contemplated hereby and thereby (i) are within the power of each Borrower and (ii) have been duly authorized by all necessary actions on the part of the Borrower.

(c)   ***Enforceability.*** Each Transaction Document executed, or to be executed, by the Borrower has been, or will be, duly executed and delivered by the Borrower and constitutes, or will constitute, a legal, valid and binding obligation of each Borrower, enforceable against each Borrower in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

EXECUTION COPY

(d)     ***Non-Contravention***. The execution and delivery by the Borrower of the Transaction Documents executed by the Company and the performance and consummation of the transactions contemplated thereby do not and will not (i) violate the Amended and Restated Limited Liability Company Agreement of the Company, dated as of June 21, 2004 (as amended, the **"LLC Agreement"**), or any judgment, order, writ, decree, statute, rule or regulation applicable to the Borrower; (ii) violate any provision of, or result in the breach or the acceleration ` of, or entitle any other Person to accelerate (whether after the giving of notice or lapse of time or both), any mortgage, indenture, agreement, instrument or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any Lien upon any property, asset or revenue of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any permit, license, authorization or approval applicable to the Borrower, its business or operations, or any of its assets or properties; except for any such violation, breach, acceleration, creation, imposition, suspension, revocation, impairment, forfeiture or nonrenewal that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(e)     ***Approvals***. No consent, approval, order or authorization of, or registration, declaration or filing with, any governmental authority or other Person (including, without limitation, the members of the Company) is required in connection with the execution and delivery by the Company of the Transaction Documents or the performance by the Company of the transactions contemplated thereby.

(f)     ***Title***. The Company owns and has good and marketable title in fee simple absolute to, or a valid leasehold interest in, all its real properties and good title to the 95.15° Slot priority rights for the frequencies filed with the International Telecommunication Union (**"ITU"**) to be brought into use under ITU rules pursuant to the Transaction Documents and is subject to no Liens. Furthermore, the Company has disclosed to the Netherlands Radiocommunications Agency the Company's intent to bring into use the 95.15° Slot. As used herein the term **"*Lien*"** shall mean, with respect to any property, any security interest, mortgage, pledge, lien, claim, charge or other encumbrance in, of, or on such property or the income therefrom, including, without limitation, the interest of a vendor or lessor under a conditional sale agreement, capital lease or other title retention agreement, or any agreement to provide any of the foregoing, and the filing of any financing statement or similar instrument under the Uniform Commercial Code or comparable law of any jurisdiction; and

(g)     ***Valid Issuance of Notes and Warrants; Reservation and Status of Class B Unites***. Any Class B Units issued upon conversion of the Note, when issued in compliance with the provisions of this Agreement and, in the case of the Class B Units, will be validly issued and will be free of any liens or encumbrances and, assuming the accuracy of the representations and warranties of the Investors, will be issued in compliance with (or exemption from) with all applicable federal and

EXECUTION COPY

state securities laws; and the Class B Units will be duly and validly issued, fully paid and non-assessable; provided, however, that such Class B Units are subject to restrictions on transfer pursuant to the terms of the Transaction Documents and under federal or state securities laws.

(h)    ***Tax Returns and Payments.*** The Company has timely filed all tax returns required to be filed by it with appropriate federal, state and local governmental agencies (after giving effect to any extensions granted therefor). These returns and reports are true and correct in all material respects. All taxes shown to be due and payable on such returns, any assessments imposed, and, to the Company's knowledge, all other taxes due and payable by the Company on or before the Closing Date have been paid or will be paid prior to the time they become delinquent, in each case except to the extent such taxes or assessments are being contested in good faith by the Company.

(i)    ***Committee.*** In order to induce Lender into making the BIU Loan, Borrower represents and warrants that it will, upon execution of the Transaction Documents, appoint a committee (the **"Committee"**) of three (3) persons to handle all decisions with respect to the disposition or licensure of the 95.15° Slot, and that all decisions with respect thereto shall be made by a majority vote of the Committee, with each member of the Committee having one (1) vote. Borrower shall appoint two (2) members and Lender shall appoint one (1) member. If any member of the Committee is willing or unable to continue to serve on the Committee, then the remaining Committee members will replace that person with another person that is agreeable to all remaining Committee members. The Committee shall meet as and when needed to determine the most expeditious manner to monetize the 95.15° Slot. Additionally, as to any proposed payments not specifically budgeted herein (Contingency Fund), the Committee shall determine, approve and direct the McGuire, as manager of Lender, to make or not make such payments. Borrower acknowledges that Lender has reasonably relied upon these representations and warranties in loaning funds to Borrower under this Agreement.

**SECTION 9. Further Documentation**. The Borrower will from time to time execute, deliver, endorse and authorize the filing of any and all instruments, documents, conveyances, assignments, security agreements, financing statements, control agreements and other agreements and writings that the Lender may reasonably request in order to secure, protect, perfect or enforce the Security Interest or the Lenders rights under the Loan Documents (but any failure to request or assure that the Borrower executes, delivers, endorses or authorizes the filing of any such item shall not affect or impair the validity, sufficiency or enforceability of the Loan Documents and the Security Interest, regardless of whether any such item was or was not executed, delivered or endorsed in a similar context or on a prior occasion).

**SECTION 10. No Control**. The Parties hereto understand that certain members, representatives and/or agents of Lender are also members, representatives and/or agents of the Borrower, including but not limited to Scott H. Crawford, William R. Boles, Jr. and McGuire

8

(collectively, the **"Dual Members"**). The Parties hereto agree that the Dual Members exercise no control over the Borrower and are not responsible for the decisions and representations made by the Borrower in this or any other agreement. The Parties hereto agree that no conflict of interest exists for the Dual Members, as it relates to the transactions contemplated herein and each Party expressly waives any claim for conflict of interest as to the Dual Members with regard to the BIU Project.

**SECTION 11. <u>No Waiver</u>.** No waiver of any of the terms and conditions of this Agreement will be binding or effective for any purpose unless expressed in writing and signed by the party hereto giving the same, and any such waiver will be effective only in the specific instance and for the purpose given. No failure or delay on the part of either party hereto in exercising any right, power or privilege hereunder will operate as a waiver thereof, nor will any single or partial exercise of any right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

**SECTION 12. <u>Whole Agreement</u>.**

(a)    This Agreement constitutes the whole of the Agreement between the Parties hereto relating to the subject matter hereof and save as otherwise provided herein no amendment, alteration, addition, variation or consensual cancellation will be of any force or effect unless reduced to writing and signed by the Parties hereto or their duly authorized representatives.

(b)    Subject to paragraph (a), the Parties agree that no other terms or conditions, whether oral or written, and whether express or implied will be applicable to this Agreement.

(c)    Section and paragraph headings have been inserted in this Agreement as a matter of convenience of reference only, and it is agreed that such section headings are not a part of this Agreement and shall not be used in the interpretation of any provisions of this Agreement.

(d)    If any provision of this Agreement shall be held or deemed to be or shall, in fact, be invalid, inoperative or unenforceable as applied in any particular case in any jurisdiction or jurisdictions, or in all jurisdictions because it conflicts with any provisions of any constitution, statute, rule of public policy, or for any other reason, such circumstances shall not have the effect of rendering the provision in question invalid, inoperative or unenforceable in any other case or circumstance, or of rendering any other provision or provisions of this Agreement invalid, inoperative or unenforceable to any extent whatever.

(e)    This Agreement may be executed simultaneously in two or more counterparts, each of which will be deemed an original, but all of which will constitute one agreement. Execution and delivery of this Agreement by exchange of electronically transmission counterparts bearing the signature of a Party shall be equally as effective as delivery of a manually executed counterpart of such Party.

EXECUTION COPY

**SECTION 13.** <u>**Successors and Assigns; Third Party Beneficiaries**</u>.  Except as otherwise provided in <u>Section 4</u> herein, neither this Agreement nor the rights and obligations hereunder may be assigned, subcontracted or otherwise delegated or transferred without the prior written consent of the other Party hereto.  All of the terms, covenants, representations, warranties and conditions of this Agreement will be binding upon, and inure solely for the benefit of, and be enforceable by, the Parties and any person or entity to whom rights hereunder are lawfully assigned in accordance with the preceding sentence.  Except pursuant to an express assignment permitted hereunder, no person or entity will have any rights or remedies under this Agreement or by reason of the transactions contemplated hereby or thereby or a third-party beneficiary, as an assignee of or successor of rights, by means of subrogation or otherwise.

**SECTION 14.** <u>**Amendments/Waiver**</u>.  This Agreement may be amended, modified or superseded, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the Parties hereto or, in the case of a waiver, by the Party or Parties waiving compliance. The failure of any Party at any time or times to require performance of any provisions hereof will in no manner affect the right at a later time to enforce the same.  No waiver by any Party of any condition, or of any breach of any term, covenant, representation or warranty contained in this Agreement, in any one or more instances, will be deemed to be or construed as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of any breach of any other term, covenant, representation or warranty.

**SECTION 15.** <u>**Notices**</u>.  Unless otherwise provided herein, all notices, requests, consents, approvals, demands and other communications to be given hereunder (collectively, **"Notices"**) will be in writing and will be deemed given upon (a) confirmation of receipt of an electronic transmission to the extent transmitted by 5:00 p.m. (local time of recipient) on a Business Day or if transmitted after such time on a Business Day or any other day, the Business Day next following the day of transmission and confirmation of receipt of such electronic transmission (b) confirmed delivery by a reputable overnight carrier or when delivered by hand, (c) actual receipt or (d) the expiration of four (4) Business Days after the day when mailed by registered or certified mail (postage prepaid, return receipt requested), addressed to the respective Parties listed below at the following addresses (or such other address for a Party hereto as will be specified by like Notice):

If to Borrower, to:

Spectrum Five LLC
2445 California Street NW
Washington, DC  20008
Attn:  R. David Wilson
<u>dwilson@spectrumfive.com</u>

EXECUTION COPY

If to Lender, to:

BIU, LLC
8702 Jefferson Hwy, Suite B
Baton Rouge, LA 70808
Attention: Melton C. McGuire

**SECTION 16. <u>Governing Law</u>.** This Agreement will be governed by and construed in accordance with the laws of the State of Delaware and all disputes, actions and other matters relating thereto will be determined in accordance with such law.

**SECTION 17. <u>Duration of Agreement</u>.** This Agreement shall take effect upon execution and shall remain in effect until such time as the BIU Loan Returns set forth in <u>Section 4</u> hereof has been paid in full and all remaining Borrower Funds have been delivered to Borrower.

**SECTION 18. <u>Specific Enforcement</u>.** Each of the Parties hereto acknowledges and agrees that irreparable damage would occur and that the parties would not have any adequate remedy at law in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that, prior to the valid termination of this Agreement, the Parties shall be entitled to an injunction or injunctions, specific performance and other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement (including Borrower's obligation to grant and/or confirm the Lender lien in Borrower Funds, to deliver Borrower Funds and/or to pay the Lender Returns contemplated by this Agreement), this being in addition to any other remedy to which they are entitled at law or in equity. Each of the Parties agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief when expressly available pursuant to the terms of this Agreement, and hereby waives (x) any defenses in any action for an injunction, specific performance or other equitable relief, including the defense that the other parties have an adequate remedy at law or an award of specific performance is not an appropriate remedy for any reason at law or equity, and (y) any requirement under applicable law to post a bond, undertaking or other security as a prerequisite to obtaining equitable relief.

**SECTION 19. <u>Effect</u>.** This Agreement amends and restates the Prior Loan Agreement in its entirety. This Agreement shall be deemed effective the 6th day of September 2018 notwithstanding the fact that it has been amended and restated on the date first above written.

11

**THUS DONE, EXECUTED AND SIGNED,** in multiple originals, on the day, month and year herein first above written.

BORROWER:
SPECTRUM FIVE LLC

By:_____
    R. David Wilson, Member/Manager

SPECTRUM FIVE, NETHERLANDS B.V.

By:_____
    R. David Wilson, Member/Manager

LENDER:
BIU, LLC

By: *[signature]*
    Melton C. McGuire, Sole Manager

**THUS DONE, EXECUTED AND SIGNED,** in multiple originals, on the day, month and year herein first above written.

BORROWER:
SPECTRUM FIVE LLC

By: _____
      R. David Wilson, Member/Manager


SPECTRUM FIVE, NETHERLANDS B.V.

By: _____
      R. David Wilson, Member/Manager


LENDER:
BIU, LLC

By: _____
      Melton C. McGuire, Sole Manager

LOAN AGREEMENT SIGNATURE PAGE

# ATTACHMENT D

EXECUTION COPY

## SECOND AMENDED AND RESTATED
## LOAN AGREEMENT

This Second Amended and Restated Loan Agreement (this "**Agreement**") is entered into on this 30th day of December, 2019 by and among **SPECTRUM FIVE LLC**, a Delaware limited liability company having its registered address at 251 Little Falls Drive, Wilmington Delaware, 19808, and represented herein by its Member/Manager R. David Wilson ("**Wilson**") and **SPECTRUM FIVE, NETHERLANDS B.V.**, a company formed under the laws of Netherland Antilles (collectively, the "**Borrower**" or the "**Company**"), and **BIU, LLC** (the "**Lender**," and together with the Company, the "**Parties**"), a Delaware limited liability company having its registered address at 8702 Jefferson Hwy, Suite B, Baton Rouge, LA 70809 and represented herein by its Sole Manager Melton C. McGuire ("**McGuire**");

## W I T N E S S E T H

**WHEREAS,** the Company has rights for a satellite slot located at the 95.15° West Longitude Orbital Slot (the "**95.15° Slot**") which must be perfected by moving, or "bringing into use", a satellite into that certain location (the "**BIU Project**"); and

**WHEREAS,** the Company required funding, in amounts, as applied and to be applied as detailed herein, to complete the BIU Project; and

**WHEREAS,** the Company previously entered into an agreement with Lender (the "**BIU Agreement**") whereby Lender was to provide the required funding for completion of BIU Project pursuant to a loan (the "**BIU Loan**") from Lender; and

**WHEREAS,** the Parties previously entered into that certain Loan Agreement dated September 6, 2018, as supplemented and amended by that certain Amended and Restated Loan Agreement dated August 28, 2019 (together, the "**Prior Loan Agreement**"); and

**WHEREAS,** the Parties desire to enter into this Agreement to further supplement and amend the Prior Agreement to extend the date that the Lender may convert the Note (as defined in the herein) into Borrower's Class B Membership Units (as defined herein).

**NOW THEREFORE,** in consideration of the foregoing, and the covenants and agreements hereinafter set forth to be kept and performed by the Parties hereto, it is agreed by and between the Parties that:

**SECTION 1.  BIU Project Loan Amounts.** (a) As set forth herein, Lender has made and continues to make loans by (i) the deposit into an Escrow Fund (the "**Escrow Fund**") to be established and created by Argent Institutional Services, LLC, a state limited liability company organized under the laws of the State of Oklahoma, having its corporate trust offices in Ruston, Louisiana and duly authorized to exercise corporate trust powers, as escrow agent (the "**Escrow Agent**") and, (ii) certain in-kind contributions, in the aggregate amount (as of the date hereof) of Twelve Million Eight Hundred Seventy-Four Thousand Three Hundred Seventy-Four Dollars

1

EXECUTION COPY

($12,874,374) (as such amount may be increased, the **"Principal Amount"**) to be funded and applied as directed in the agreement by and between the Escrow Agent and the Lender (the **"Escrow Agreement"**) and in this Agreement for the following purposes and in the following amounts:

**PHASE ONE:**

| | | |
|------|------|------|
| (i) | Akin Gump BIU Memorandum | $ 110,000 |
| (ii) | Dutch Registration Fee | $ 71,543 |
| (iii) | Gapsat (Deposit) | $ 149,940 |
| (iv) | Kellogg, Hansen Legal Fees | $ 60,000 |
| (v) | Northern Sky Research | $ 4,495 |
| (vi) | Trustee Fee | $ 2,500 |
| (vii) | General and Administrative | $ 1,500 |
| **Phase One Principal Funded Amount** | | **$ 399,978** |

[REMAINDER OF THIS PAGE INTENTIONALLY BLANK]

2

EXECUTION COPY

Notwithstanding the foregoing, the amounts set forth in (i) and (ii) above have been previously loaned by having been directly paid to Akin Gump and the Dutch, respectively. No further funding of these loan amounts is required.

**PHASE TWO (paid):**

| | | |
|---|---|---|
| (i) | Satellite Lease Fee | $ 4,600,000 |
| (ii) | Satellite Extension Fee | $ 2,000,000 |
| (iii) | Satellite Brokerage Fee | $    677,560 |
| (iv) | Legal Fees | $    685,125 |
| (v) | BIU Defense | $ 1,838,480 |
| (vi) | Company General and Administrative | $ 1,581,127 |
| (vii) | Lender General and Administrative | $    106,704 |
| (viii) | Contingency | $    708,000 |
| (ix) | Placement Fees | $    277,400 |
| **Phase Two Principal Funded Amount** | | **$12,474,396** |
| **GRAND TOTAL (FUNDED)** | | **$12,874,374** |

\* Includes in-kind contributions

The Escrow Agreement has and shall continue to provide that any loan funding expended on the items above shall only be released upon the written direction of McGuire, such direction to be evidenced in writing and signed by McGuire with a copy to the Company.

(a)  The Phase Two Principal Amount above has been funded where indicated, in part, through in-kind contributions.

(b)  The Lender will use its efforts to make additional Phase Two funding available in order to facilitate the completion of the BIU Project, including but not limited to an additional One Million Eight Hundred Sixteen Thousand One Hundred Thirty-Seven Dollars ($1,816,137) identified as being needed by the Company. Lender is under no obligation to provide any additional funding, in the event it is unable to raise additional funding for the BIU Project.

EXECUTION COPY

(c)    Cash on hand, remaining from BIU Loan proceeds, for the BIU Project funding as of August 28, 2019 is $964,885.

**SECTION 2. Security.** The Loan shall be secured by and entitled to a specific pledge of the proceeds from the sale, lease or other monetization of all satellite spectrum and priority rights pertaining to the 95.15° Slot shall be established in a form as required by and approved by Lender prior to funding of the Phase Two loan amount. The documents required will include but not be limited to, a Convertible Promissory Note (the "**Note**"), Security Agreement, Blocked Control Account, Control Account Agreement and such other documents as Lender may require in its sole discretion (collectively, the "**Transaction Documents**").

(a)    If the security hereunder is insufficient to satisfy the Note in full, then any unpaid balance of the Lender Returns that has not been converted pursuant to Section 7 shall be an unsecured obligation of the Company ranking pari-passu in right of payment with all existing and future unsecured promissory notes issued by the Company.

(b)    Borrower shall not make any distribution of its assets to Members of the Company prior to payment in-full of the Lender Returns.

**SECTION 3. BIU Loan.** Lender has made the Loan and hereby agrees to continue to make the BIU Loan (as indicated in Section 1 above) and make funding available for the BIU Project, to be expended as set forth in Section 1. Funding of the Phase Two Loan amounts is subject to execution by Borrower of Transaction Documents and other documents reasonably required by Lender as provided in Section 2 above. Upon execution of this Agreement, as well as the Escrow Agreement and any other ancillary documents, the Lender shall, within seventy-two (72) hours of funding, cause the remaining Phase Two Principal Amounts to be transferred to the Escrow Agent for deposit in the Escrow Fund to be applied as set forth above, provided that all other conditions precedent to funding have been completed.

**SECTION 4. Note.** The BIU Loan shall be represented by the Note from Borrower, such Note being convertible as set forth in Section 7 below. The Note and Lender's rights under the Loan and Transaction documents referenced herein may be assigned by Lender, in whole or in part, but only to Members of Lender. If Lender assigns its rights in part to Members of Lender, Lender may in its discretion, serve as agent and retain the servicing of the Loan on behalf of all such permitted assignees. The Note shall be due on the earlier of either (i) September 6, 2020, or (ii) the date which is ten (10) days subsequent to receipt by Borrower (or Lender on behalf of Borrower) of funds sufficient to pay the Lender Return in full (in either case, the "**Maturity Date**").

**SECTION 5. Payment.** All revenues received by the Borrower (**"Borrower Funds"**) from the BIU Project and until repayment of the Lender Returns described in Section 6 below (the "**Payment Period**") shall be deposited into a Control Account of Lender as referenced above to be held for the repayment of the BIU Loan. McGuire is hereby appointed as the Borrower's agent and attorney-in-fact for the purposes of notifying any payor of amounts to be

4

received by the Borrower during the Payment Period that such amounts are to be paid to Lender or to the Lender's investors and the existence of Lender's lien upon such funds.

**SECTION 6. Lender Returns**. The Borrower agrees that during the Payment Period it shall pay the Phase One Lender Returns and the Phase Two Lender Returns (as each term is defined below) to Lender in the following order of priority:

(a)     First, the Phase One Principal Amount plus 600% of the Phase One Principal Amount (the sum of the two amounts referred to as the **"Phase One Lender Returns"**) for the benefit of Lender's Phase One investors, and then;

(b)     Second, the Phase Two Principal Amount plus 600% of the Phase Two Principal Amount (the sum of the two amounts referred to as the **"Phase Two Lender Returns"**).

(c)     As used herein the term **"Lender Returns"** shall mean the Phase One Lender Returns together with the Phase Two Lender Returns.

(d)     Upon full repayment of the Lender Returns, the security interests to be granted herein shall cease, and be terminated and all remaining Borrower Funds shall be delivered to the Borrower.

**SECTION 7. Holder's Voluntary Conversion.** The Lender may convert the Note in whole or in part into Borrower's Class B Membership Units (**"Class B Units"**) as follows:

(a)     If, by April 15, 2020 the BIU Project fails to generate sufficient revenues to pay any portion of the Lender Returns described in Section 6, then at any time up to the payment in-full of all Lender Returns on the Note, the Lender may elect to convert any remaining portion of Lender Returns outstanding on the Note in accordance with the formula set forth in paragraph (b) of this Section 7.

(b)     Any unpaid Lender Returns converted shall be converted into Class B Units of Borrower on a Fifty Million ($50,000,000) "post-money" basis, based on the following formula: (Unpaid Lender Returns / Lender Returns) * (Lender Returns/ $50,000,000).

        i. Example: $8,000,000 is loaned to Borrower, resulting in $56,000,000 in Lender Returns due under the Note. If the Note is completely unpaid after the Conversion Date (as defined below), the Note is convertible as follows: ($56,000,000 / $56,000,000)* (8,000,000/ $50,000,000) = 16.00% of Borrower through issuance of its Class B Units. Assuming Borrower has 1,000,000 aggregate Membership Units ***post-conversion***, Lender will have been issued 160,000 of Borrower Class B Units out of the aggregate 1,000,000 Borrower Membership Units. Stated another way, $8,000,000 is converted at $50 per Class B Unit.

ii. Example: Same as above, except that $28,000,000 is paid to Lender under the terms of the Note, leaving $28,000,000 in unpaid Lender Returns. The remaining portion due under the Note is convertible as follows: ($28,000,000/ $56,000,000) * ($8,000,000 / $50,000,000) = 50.00% * 16.00% = 8.00% of Borrower through issuance of Class B Units. Assuming Borrower has 1,000,000 aggregate Membership Units ***post-conversion***, Lender will have been issued 80,000 of Borrower Class B Units out of the aggregate 1,000,000 Borrower Membership Units. Stated another way, $4,000,000 (50% of the Principal amount) is converted at $50 per Class B Unit.

(c) If, within ninety (90) days from the date of any conversion (the "**Conversion Date**"), the Company pays the Note and all Lender Returns in full, Company shall have the right to redeem and have cancelled any Class B Units previously issued upon such conversion.

**SECTION 8. Representations and Warranties of the Borrower.** The Borrower represents and warrants to Lender that as of the date hereof and as of each Closing Date that:

(a) *Due Organization, Qualification, etc.* Each Borrower (i) is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and the Netherland Antilles, respectively; (ii) has the power and authority to own, lease and operate its respective properties and carry on its respective business as now conducted; and (iii) is duly qualified, licensed to do business and in good standing as a foreign organization in each jurisdiction where the failure to be so qualified or licensed could reasonably be expected to have a Material Adverse Effect. For purposes of this Agreement, the term "**Material Adverse Effect**" means a change, event or occurrence that individually, or together with any other change, event or occurrence, has or would reasonably be expected to have a material adverse impact on the financial condition or results of operations of the Borrowers and their subsidiaries taken as a whole.

(b) *Authority.* The execution, delivery and performance by each Borrower of this Agreement, and the Transaction Documents and consummation of the transactions contemplated hereby and thereby (i) are within the power of each Borrower and (ii) have been duly authorized by all necessary actions on the part of the Borrower.

(c) *Enforceability.* Each Transaction Document executed, or to be executed, by the Borrower has been, or will be, duly executed and delivered by the Borrower and constitutes, or will constitute, a legal, valid and binding obligation of each Borrower, enforceable against each Borrower in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

6

(d) **_Non-Contravention_**. The execution and delivery by the Borrower of the Transaction Documents executed by the Company and the performance and consummation of the transactions contemplated thereby do not and will not (i) violate the Amended and Restated Limited Liability Company Agreement of the Company, dated as of June 21, 2004 (as amended, the "**LLC Agreement**"), or any judgment, order, writ, decree, statute, rule or regulation applicable to the Borrower; (ii) violate any provision of, or result in the breach or the acceleration of, or entitle any other Person to accelerate (whether after the giving of notice or lapse of time or both), any mortgage, indenture, agreement, instrument or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any Lien upon any property, asset or revenue of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any permit, license, authorization or approval applicable to the Borrower, its business or operations, or any of its assets or properties; except for any such violation, breach, acceleration, creation, imposition, suspension, revocation, impairment, forfeiture or nonrenewal that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(e) **_Approvals_**. No consent, approval, order or authorization of, or registration, declaration or filing with, any governmental authority or other Person (including, without limitation, the members of the Company) is required in connection with the execution and delivery by the Company of the Transaction Documents or the performance by the Company of the transactions contemplated thereby.

(f) **_Title_**. The Company owns and has good and marketable title in fee simple absolute to, or a valid leasehold interest in, all its real properties and good title to the 95.15° Slot priority rights for the frequencies filed with the International Telecommunication Union ("**ITU**") to be brought into use under ITU rules pursuant to the Transaction Documents and is subject to no Liens. Furthermore, the Company has disclosed to the Netherlands Radiocommunications Agency the Company's intent to bring into use the 95.15° Slot. As used herein the term "**_Lien_**" shall mean, with respect to any property, any security interest, mortgage, pledge, lien, claim, charge or other encumbrance in, of, or on such property or the income therefrom, including, without limitation, the interest of a vendor or lessor under a conditional sale agreement, capital lease or other title retention agreement, or any agreement to provide any of the foregoing, and the filing of any financing statement or similar instrument under the Uniform Commercial Code or comparable law of any jurisdiction; and

(g) **_Valid Issuance of Notes and Warrants; Reservation and Status of Class B Unites_**. Any Class B Units issued upon conversion of the Note, when issued in compliance with the provisions of this Agreement and, in the case of the Class B Units, will be validly issued and will be free of any liens or encumbrances and, assuming the accuracy of the representations and warranties of the Investors, will be issued in compliance with (or exemption from) with all applicable federal and state securities laws; and the Class B Units will be duly and validly issued, fully

paid and non-assessable; provided, however, that such Class B Units are subject to restrictions on transfer pursuant to the terms of the Transaction Documents and under federal or state securities laws.

(h)   ***Tax Returns and Payments.*** The Company has timely filed all tax returns required to be filed by it with appropriate federal, state and local governmental agencies (after giving effect to any extensions granted therefor). These returns and reports are true and correct in all material respects. All taxes shown to be due and payable on such returns, any assessments imposed, and, to the Company's knowledge, all other taxes due and payable by the Company on or before the Closing Date have been paid or will be paid prior to the time they become delinquent, in each case except to the extent such taxes or assessments are being contested in good faith by the Company.

(i)   ***Committee.*** In order to induce Lender into making the BIU Loan, Borrower represents and warrants that it will, upon execution of the Transaction Documents, appoint a committee (the **"Committee"**) of three (3) persons to handle all decisions with respect to the disposition or licensure of the 95.15° Slot, and that all decisions with respect thereto shall be made by a majority vote of the Committee, with each member of the Committee having one (1) vote.  Borrower shall appoint two (2) members and Lender shall appoint one (1) member.  If any member of the Committee is willing or unable to continue to serve on the Committee, then the remaining Committee members will replace that person with another person that is agreeable to all remaining Committee members. The Committee shall meet as and when needed to determine the most expeditious manner to monetize the 95.15° Slot.  Additionally, as to any proposed payments not specifically budgeted herein (Contingency Fund), the Committee shall determine, approve and direct the McGuire, as manager of Lender, to make or not make such payments.  Borrower acknowledges that Lender has reasonably relied upon these representations and warranties in loaning funds to Borrower under this Agreement.

**SECTION 9. <u>Further Documentation</u>**.    The Borrower will from time to time execute, deliver, endorse and authorize the filing of any and all instruments, documents, conveyances, assignments, security agreements, financing statements, control agreements and other agreements and writings that the Lender may reasonably request in order to secure, protect, perfect or enforce the Security Interest or the Lenders rights under the Loan Documents (but any failure to request or assure that the Borrower executes, delivers, endorses or authorizes the filing of any such item shall not affect or impair the validity, sufficiency or enforceability of the Loan Documents and the Security Interest, regardless of whether any such item was or was not executed, delivered or endorsed in a similar context or on a prior occasion).

**SECTION 10. <u>No Control</u>**.    The Parties hereto understand that certain members, representatives and/or agents of Lender are also members, representatives and/or agents of the Borrower, including but not limited to Scott H. Crawford, William R. Boles, Jr. and McGuire (collectively, the **"Dual Members"**). The Parties hereto agree that the Dual Members exercise no

control over the Borrower and are not responsible for the decisions and representations made by the Borrower in this or any other agreement. The Parties hereto agree that no conflict of interest exists for the Dual Members, as it relates to the transactions contemplated herein and each Party expressly waives any claim for conflict of interest as to the Dual Members with regard to the BIU Project.

SECTION 11. **No Waiver.** No waiver of any of the terms and conditions of this Agreement will be binding or effective for any purpose unless expressed in writing and signed by the party hereto giving the same, and any such waiver will be effective only in the specific instance and for the purpose given. No failure or delay on the part of either party hereto in exercising any right, power or privilege hereunder will operate as a waiver thereof, nor will any single or partial exercise of any right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

SECTION 12. **Whole Agreement.**

(a)    This Agreement constitutes the whole of the Agreement between the Parties hereto relating to the subject matter hereof and save as otherwise provided herein no amendment, alteration, addition, variation or consensual cancellation will be of any force or effect unless reduced to writing and signed by the Parties hereto or their duly authorized representatives.

(b)    Subject to paragraph (a), the Parties agree that no other terms or conditions, whether oral or written, and whether express or implied will be applicable to this Agreement.

(c)    Section and paragraph headings have been inserted in this Agreement as a matter of convenience of reference only, and it is agreed that such section headings are not a part of this Agreement and shall not be used in the interpretation of any provisions of this Agreement.

(d)    If any provision of this Agreement shall be held or deemed to be or shall, in fact, be invalid, inoperative or unenforceable as applied in any particular case in any jurisdiction or jurisdictions, or in all jurisdictions because it conflicts with any provisions of any constitution, statute, rule of public policy, or for any other reason, such circumstances shall not have the effect of rendering the provision in question invalid, inoperative or unenforceable in any other case or circumstance, or of rendering any other provision or provisions of this Agreement invalid, inoperative or unenforceable to any extent whatever.

(e)    This Agreement may be executed simultaneously in two or more counterparts, each of which will be deemed an original, but all of which will constitute one agreement. Execution and delivery of this Agreement by exchange of electronically transmission counterparts bearing the signature of a Party shall be equally as effective as delivery of a manually executed counterpart of such Party.

EXECUTION COPY

**SECTION 13.  Successors and Assigns; Third Party Beneficiaries**.  Except as otherwise provided in Section 4 herein, neither this Agreement nor the rights and obligations hereunder may be assigned, subcontracted or otherwise delegated or transferred without the prior written consent of the other Party hereto.  All of the terms, covenants, representations, warranties and conditions of this Agreement will be binding upon, and inure solely for the benefit of, and be enforceable by, the Parties and any person or entity to whom rights hereunder are lawfully assigned in accordance with the preceding sentence.  Except pursuant to an express assignment permitted hereunder, no person or entity will have any rights or remedies under this Agreement or by reason of the transactions contemplated hereby or thereby or a third-party beneficiary, as an assignee of or successor of rights, by means of subrogation or otherwise.

**SECTION 14.  Amendments/Waiver**.  This Agreement may be amended, modified or superseded, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the Parties hereto or, in the case of a waiver, by the Party or Parties waiving compliance.  The failure of any Party at any time or times to require performance of any provisions hereof will in no manner affect the right at a later time to enforce the same.  No waiver by any Party of any condition, or of any breach of any term, covenant, representation or warranty contained in this Agreement, in any one or more instances, will be deemed to be or construed as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of any breach of any other term, covenant, representation or warranty.

**SECTION 15.  Notices.**  Unless otherwise provided herein, all notices, requests, consents, approvals, demands and other communications to be given hereunder (collectively, **"Notices"**) will be in writing and will be deemed given upon (a) confirmation of receipt of an electronic transmission to the extent transmitted by 5:00 p.m. (local time of recipient) on a Business Day or if transmitted after such time on a Business Day or any other day, the Business Day next following the day of transmission and confirmation of receipt of such electronic transmission (b) confirmed delivery by a reputable overnight carrier or when delivered by hand, (c) actual receipt or (d) the expiration of four (4) Business Days after the day when mailed by registered or certified mail (postage prepaid, return receipt requested), addressed to the respective Parties listed below at the following addresses (or such other address for a Party hereto as will be specified by like Notice):

If to Borrower, to:

Spectrum Five LLC
2445 California Street NW
Washington, DC  20008
Attn:  R. David Wilson
dwilson@spectrumfive.com

If to Lender, to:

BIU, LLC
8702 Jefferson Hwy, Suite B
Baton Rouge, LA 70808

EXECUTION COPY

Attention: Melton C. McGuire

**SECTION 16.  Governing Law.**  This Agreement will be governed by and construed in accordance with the laws of the State of Delaware and all disputes, actions and other matters relating thereto will be determined in accordance with such law.

**SECTION 17.  Duration of Agreement.**  This Agreement shall take effect upon execution and shall remain in effect until such time as the BIU Loan Returns set forth in Section 4 hereof has been paid in full and all remaining Borrower Funds have been delivered to Borrower.

**SECTION 18.  Specific Enforcement.**  Each of the Parties hereto acknowledges and agrees that irreparable damage would occur and that the parties would not have any adequate remedy at law in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that, prior to the valid termination of this Agreement, the Parties shall be entitled to an injunction or injunctions, specific performance and other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement (including Borrower's obligation to grant and/or confirm the Lender lien in Borrower Funds, to deliver Borrower Funds and/or to pay the Lender Returns contemplated by this Agreement), this being in addition to any other remedy to which they are entitled at law or in equity.  Each of the Parties agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief when expressly available pursuant to the terms of this Agreement, and hereby waives (x) any defenses in any action for an injunction, specific performance or other equitable relief, including the defense that the other parties have an adequate remedy at law or an award of specific performance is not an appropriate remedy for any reason at law or equity, and (y) any requirement under applicable law to post a bond, undertaking or other security as a prerequisite to obtaining equitable relief.

**SECTION 19.  Effect.**  This Agreement amends and restates the Prior Loan Agreement in its entirety.  This Agreement shall be deemed effective the 6th day of September 2018 notwithstanding the fact that it has been subsequently amended and restated including on the date first above written.

11

**THUS DONE, EXECUTED AND SIGNED**, in multiple originals, on the day, month and year herein first above written.

**BORROWER:**
**SPECTRUM FIVE LLC**

By: _____
      R. David Wilson, Member/Manager

**SPECTRUM FIVE, NETHERLANDS B.V.**

By: _____
      R. David Wilson, Member/Manager

**LENDER:**
**BIU, LLC**

By: _____
      Melton C. McGuire, Sole Manager

EXECUTION COPY

**THUS DONE, EXECUTED AND SIGNED,** in multiple originals, on the day, month and year herein first above written.

BORROWER:
SPECTRUM FIVE LLC

By:_____
    R. David Wilson, Member/Manager

SPECTRUM FIVE, NETHERLANDS B.V.

By:_____
    R. David Wilson, Member/Manager

LENDER:
BIU, LLC

By:_____
    Melton C. McGuire, Sole Manager

# ATTACHMENT E

EXECUTION COPY 1-30-20

# THIRD AMENDED AND RESTATED
# LOAN AGREEMENT

This Third Amended and Restated Loan Agreement (this **"Agreement"**) is entered into on this 31st day of January, 2020 by and among **SPECTRUM FIVE LLC**, a Delaware limited liability company having its registered address at 251 Little Falls Drive, Wilmington Delaware, 19808, and represented herein by its Member/Manager R. David Wilson (**"Wilson"**) and **SPECTRUM FIVE, NETHERLANDS B.V.** and **SPECTRUM FIVE B.V.**, both companies formed under the laws of the Netherlands (collectively, the **"Borrower"** or the **"Company"**), and **BIU, LLC** (the **"Lender,"** and together with the Company, the **"Parties"**), a Delaware limited liability company having its registered address at 8702 Jefferson Hwy, Suite B, Baton Rouge, LA 70809 and represented herein by its Sole Manager Melton C. McGuire (**"McGuire"**);

## W I T N E S S E T H

**WHEREAS**, the Company has rights for a satellite slot located at the 95.15° West Longitude Orbital Slot (the **"95.15° Slot"**) which must be perfected by moving, or "bringing into use", a satellite into that certain location (the **"BIU Project"**); and

**WHEREAS**, the Company required funding, in amounts, as applied and to be applied as detailed herein, to complete the BIU Project; and

**WHEREAS**, the Company previously entered into an agreement with Lender (the **"BIU Agreement"**) whereby Lender was to provide the required funding for completion of BIU Project pursuant to a loan (the **"BIU Loan"**) from Lender; and

**WHEREAS**, the Parties previously entered into that certain Loan Agreement dated September 6, 2018, as supplemented and amended by that certain Amended and Restated Loan Agreement dated August 28, 2019, as further supplemented and amended by that certain Second Amended and Restated Loan Agreement dated the 30th day of December, 2019 (collectively, the **"Prior Loan Agreement"**); and

**WHEREAS**, the Parties desire to enter into this Agreement to further supplement and amend the Prior Agreement to extend the date that the Lender may convert the Note (as defined in the herein) into Borrower's Class B Membership Units (as defined herein).

**NOW THEREFORE**, in consideration of the foregoing, and the covenants and agreements hereinafter set forth to be kept and performed by the Parties hereto, it is agreed by and between the Parties that:

**SECTION 1. BIU Project Loan Amounts.** (a) As set forth herein, Lender has made and continues to make loans by (i) the deposit into an Escrow Fund (the **"Escrow Fund"**) to be established and created by Argent Institutional Services, LLC, a state limited liability company organized under the laws of the State of Oklahoma, having its corporate trust offices in Ruston, Louisiana and duly authorized to exercise corporate trust powers, as escrow agent (the **"Escrow**

1

EXECUTION COPY 1-30-20

Agent"), (ii) after conclusion of the BIU Project, by making direct payments in conjunction with the monetization of the BIU Project and, (iii) certain in-kind contributions, in the aggregate amount (as of the date hereof) of Twelve Million Eight Hundred Seventy-Four Thousand Three Hundred Seventy-Four Dollars ($12,874,374) (as such amount may be increased, the **"Principal Amount"**) to be funded and applied (A) prior to conclusion of the BIU Project, as directed in the agreement by and between the Escrow Agent and the Lender (the **"Escrow Agreement"**) and in accordance with this Agreement, and (B) after conclusion of the BIU Project, in accordance with this Agreement, in each case for the following purposes and in the following amounts:

**PHASE ONE:**

| | | |
|------|------------------------------|-------------|
| (i) | Akin Gump BIU Memorandum | $ 110,000 |
| (ii) | Dutch Registration Fee | $ 71,543 |
| (iii) | Gapsat (Deposit) | $ 149,940 |
| (iv) | Kellogg, Hansen Legal Fees | $ 60,000 |
| (v) | Northern Sky Research | $ 4,495 |
| (vi) | Trustee Fee | $ 2,500 |
| (vii) | General and Administrative | $ 1,500 |
| **Phase One Principal Funded Amount** | | **$ 399,978** |

[REMAINDER OF THIS PAGE INTENTIONALLY BLANK]

Notwithstanding the foregoing, the amounts set forth in (i) and (ii) above have been previously loaned by having been directly paid to Akin Gump and the Dutch, respectively. No further funding of these loan amounts is required.

**PHASE TWO (paid):**

| | | |
|---|---|---|
| (i) | Satellite Lease Fee | $ 4,600,000 |
| (ii) | Satellite Extension Fee | $ 2,000,000 |
| (iii) | Satellite Brokerage Fee | $   677,560 |
| (iv) | Legal Fees | $   685,125 |
| (v) | BIU Defense | $ 1,838,480 |
| (vi) | Company General and Administrative | $ 1,581,127 |
| (vii) | Lender General and Administrative | $   106,704 |
| (viii) | Contingency | $   708,000 |
| (ix) | Placement Fees | $   277,400 |

| | |
|---|---|
| **Phase Two Principal Funded Amount** | **$12,474,396** |
| **GRAND TOTAL (FUNDED)** | **$12,874,374** |

\* Includes in-kind contributions

Any BIU Loan funding expended on the items above shall be upon the written direction of McGuire, such direction to be evidenced in writing and signed by McGuire.

(a)    The Phase Two Principal Amount above has been funded where indicated, in part, through in-kind contributions.

(b)    The Lender will use its efforts to make additional Phase Two funding available in order to facilitate the completion and monetization of the BIU Project, including but not limited to an additional One Million Eight Hundred Sixteen Thousand One Hundred Thirty- Seven Dollars ($1,816,137) identified as being needed by the Company. Lender is under no obligation to provide any additional funding, in the event it is unable to raise additional funding for the BIU Project.

EXECUTION COPY 1-30-20

    (c)      Cash on hand, remaining from BIU Loan proceeds, for the BIU Project funding as of August 28, 2019 is $964,885.

**SECTION 2. Security.** The Loan shall be secured by and entitled to a specific pledge of the proceeds from the sale, lease or other monetization of all satellite spectrum and priority rights pertaining to the 95.15° Slot shall be established in a form as required by and approved by Lender prior to funding of the Phase Two loan amount. The documents required will include but not be limited to, a Convertible Promissory Note (the **"Note"**), Security Agreement, Blocked Control Account, Control Account Agreement and such other documents as Lender may require in its sole discretion (collectively, the **"Transaction Documents"**).

    (a)      If the security hereunder is insufficient to satisfy the Note in full, then any unpaid balance of the Lender Returns that has not been converted pursuant to Section 7 shall be an unsecured obligation of the Company ranking pari-passu in right of payment with all existing and future unsecured promissory notes issued by the Company.

    (b)      Borrower shall not make any distribution of its assets to Members of the Company prior to payment in-full of the Lender Returns.

**SECTION 3. BIU Loan.** Lender has made the Loan and hereby agrees to continue to make the BIU Loan (as indicated in Section 1 above) and make funding available for the BIU Project and monetization thereof, to be expended as set forth in Section 1. Funding of the Phase Two Loan amounts is subject to execution by Borrower of Transaction Documents and other documents reasonably required by Lender as provided in Section 2 above. The Phase Two Principal Amounts shall be applied as set forth above, provided that all other conditions precedent to funding have been completed.

**SECTION 4. Note.** The BIU Loan shall be represented by the Note from Borrower, such Note being convertible as set forth in Section 7 below. The Note and Lender's rights under the Loan and Transaction documents referenced herein may be assigned by Lender, in whole or in part, but only to Members of Lender. If Lender assigns its rights in part to Members of Lender, Lender may in its discretion, serve as agent and retain the servicing of the Loan on behalf of all such permitted assignees. The Note shall be due on the earlier of either (i) September 6, 2020, or (ii) the date which is ten (10) days subsequent to receipt by Borrower (or Lender on behalf of Borrower) of funds sufficient to pay the Lender Return in full (in either case, the **"Maturity Date"**).

**SECTION 5. Payment.** All revenues received by the Borrower (**"Borrower Funds"**) from the BIU Project and until repayment of the Lender Returns described in Section 6 below (the **"Payment Period"**) shall be deposited into a Control Account of Lender as referenced above to be held for the repayment of the BIU Loan. McGuire is hereby appointed as the Borrower's agent and attorney-in-fact for the purposes of notifying any payor of amounts to be received by the Borrower during the Payment Period that such amounts are to be paid to Lender or to the Lender's investors and the existence of Lender's lien upon such funds.

EXECUTION COPY 1-30-20

**SECTION 6. Lender Returns.** The Borrower agrees that during the Payment Period it shall pay the Phase One Lender Returns and the Phase Two Lender Returns (as each term is defined below) to Lender in the following order of priority:

(a)     First, the Phase One Principal Amount plus 600% of the Phase One Principal Amount (the sum of the two amounts referred to as the **"Phase One Lender Returns"**) for the benefit of Lender's Phase One investors, and then;

(b)     Second, the Phase Two Principal Amount plus 600% of the Phase Two Principal Amount (the sum of the two amounts referred to as the **"Phase Two Lender Returns"**).

(c)     As used herein the term **"Lender Returns"** shall mean the Phase One Lender Returns together with the Phase Two Lender Returns.

(d)     Upon full repayment of the Lender Returns, the security interests to be granted herein shall cease, and be terminated and all remaining Borrower Funds shall be delivered to the Borrower.

**SECTION 7. Holder's Voluntary Conversion.** The Lender may convert the Note in whole or in part into Borrower's Class B Membership Units (**"Class B Units"**) as follows:

(a)     If, by the Maturity Date the BIU Project fails to generate sufficient revenues to pay any portion of the Lender Returns described in <u>Section 6</u>, then at any time up to the payment in-full of all Lender Returns on the Note, the Lender may elect to convert any remaining portion of Lender Returns outstanding on the Note in accordance with the formula set forth in paragraph (b) of this <u>Section 7</u>.

(b)     Any unpaid Lender Returns converted shall be converted into Class B Units of Borrower on a Fifty Million ($50,000,000) "post-money" basis, based on the following formula: (Unpaid Lender Returns / Lender Returns) * (Lender Returns/ $50,000,000).

      i. Example: $8,000,000 is loaned to Borrower, resulting in $56,000,000 in Lender Returns due under the Note. If the Note is completely unpaid after the Conversion Date (as defined below), the Note is convertible as follows: ($56,000,000 / $56,000,000)* (8,000,000/ $50,000,000) = 16.00% of Borrower through issuance of its Class B Units. Assuming Borrower has 1,000,000 aggregate Membership Units ***post-conversion***, Lender will have been issued 160,000 of Borrower Class B Units out of the aggregate 1,000,000 Borrower Membership Units. Stated another way, $8,000,000 is converted at $50 per Class B Unit.

      ii. Example: Same as above, except that $28,000,000 is paid to Lender under the terms of the Note, leaving $28,000,000 in unpaid Lender Returns. The remaining portion due under the Note is

EXECUTION COPY 1-30-20

convertible as follows: ($28,000,000/ $56,000,000) * ($8,000,000 / $50,000,000) = 50.00% * 16.00% = 8.00% of Borrower through issuance of Class B Units. Assuming Borrower has 1,000,000 aggregate Membership Units *post-conversion*, Lender will have been issued 80,000 of Borrower Class B Units out of the aggregate 1,000,000 Borrower Membership Units. Stated another way, $4,000,000 (50% of the Principal amount) is converted at $50 per Class B Unit.

(c)     If, within ninety (90) days from the date of any conversion (the **"Conversion Date"**), the Company pays the Note and all Lender Returns in full, Company shall have the right to redeem and have cancelled any Class B Units previously issued upon such conversion.

**SECTION 8. Representations and Warranties of the Borrower.** The Borrower represents and warrants to Lender that as of the date hereof and as of each Closing Date that:

(a)     ***Due Organization, Qualification, etc.*** Each Borrower (i) is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and the Netherland Antilles, respectively; (ii) has the power and authority to own, lease and operate its respective properties and carry on its respective business as now conducted; and (iii) is duly qualified, licensed to do business and in good standing as a foreign organization in each jurisdiction where the failure to be so qualified or licensed could reasonably be expected to have a Material Adverse Effect. For purposes of this Agreement, the term **"Material Adverse Effect"** means a change, event or occurrence that individually, or together with any other change, event or occurrence, has or would reasonably be expected to have a material adverse impact on the financial condition or results of operations of the Borrower and their subsidiaries taken as a whole.

(b)     ***Authority.*** The execution, delivery and performance by each Borrower of this Agreement, and the Transaction Documents and consummation of the transactions contemplated hereby and thereby (i) are within the power of each Borrower and (ii) have been duly authorized by all necessary actions on the part of the Borrower.

(c)     ***Enforceability.*** Each Transaction Document executed, or to be executed, by the Borrower has been, or will be, duly executed and delivered by the Borrower and constitutes, or will constitute, a legal, valid and binding obligation of each Borrower, enforceable against each Borrower in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(d)     ***Non-Contravention.*** The execution and delivery by the Borrower of the Transaction Documents executed by the Company and the performance and consummation of the transactions contemplated thereby do not and will not

6

EXECUTION COPY 1-30-20

(i) violate the Amended and Restated Limited Liability Company Agreement of the Company, dated as of June 21, 2004 (as amended, the "**LLC Agreement**"), or any judgment, order, writ, decree, statute, rule or regulation applicable to the Borrower; (ii) violate any provision of, or result in the breach or the acceleration of, or entitle any other Person to accelerate (whether after the giving of notice or lapse of time or both), any mortgage, indenture, agreement, instrument or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any Lien upon any property, asset or revenue of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any permit, license, authorization or approval applicable to the Borrower, its business or operations, or any of its assets or properties; except for any such violation, breach, acceleration, creation, imposition, suspension, revocation, impairment, forfeiture or nonrenewal that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(e)    *Approvals.* No consent, approval, order or authorization of, or registration, declaration or filing with, any governmental authority or other Person (including, without limitation, the members of the Company) is required in connection with the execution and delivery by the Company of the Transaction Documents or the performance by the Company of the transactions contemplated thereby.

(f)    *Title.* The Company owns and has good and marketable title in fee simple absolute to, or a valid leasehold interest in, all its real properties and good title to the 95.15° Slot priority rights for the frequencies filed with the International Telecommunication Union ("**ITU**") to be brought into use under ITU rules pursuant to the Transaction Documents and is subject to no Liens. Furthermore, the Company has disclosed to the Netherlands Radiocommunications Agency the Company's intent to bring into use the 95.15° Slot. As used herein the term "*Lien*" shall mean, with respect to any property, any security interest, mortgage, pledge, lien, claim, charge or other encumbrance in, of, or on such property or the income therefrom, including, without limitation, the interest of a vendor or lessor under a conditional sale agreement, capital lease or other title retention agreement, or any agreement to provide any of the foregoing, and the filing of any financing statement or similar instrument under the Uniform Commercial Code or comparable law of any jurisdiction; and

(g)    *Valid Issuance of Notes and Warrants; Reservation and Status of Class B Unites.* Any Class B Units issued upon conversion of the Note, when issued in compliance with the provisions of this Agreement and, in the case of the Class B Units, will be validly issued and will be free of any liens or encumbrances and, assuming the accuracy of the representations and warranties of the Investors, will be issued in compliance with (or exemption from) with all applicable federal and state securities laws; and the Class B Units will be duly and validly issued, fully paid and non-assessable; provided, however, that such Class B Units are subject to restrictions on transfer pursuant to the terms of the Transaction Documents and under federal or state securities laws.

7

EXECUTION COPY 1-30-20

(h)   ***Tax Returns and Payments.*** The Company has timely filed all tax returns required to be filed by it with appropriate federal, state and local governmental agencies (after giving effect to any extensions granted therefor). These returns and reports are true and correct in all material respects. All taxes shown to be due and payable on such returns, any assessments imposed, and, to the Company's knowledge, all other taxes due and payable by the Company on or before the Closing Date have been paid or will be paid prior to the time they become delinquent, in each case except to the extent such taxes or assessments are being contested in good faith by the Company.

(i)   ***Committee.*** In order to induce Lender into making the BIU Loan, Borrower represents and warrants that it will, upon execution of the Transaction Documents, appoint a committee (the **"Committee"**) of three (3) persons to handle all decisions with respect to the disposition or licensure of the 95.15° Slot, and that all decisions with respect thereto shall be made by a majority vote of the Committee, with each member of the Committee having one (1) vote. Borrower shall appoint two (2) members and Lender shall appoint one (1) member. If any member of the Committee is willing or unable to continue to serve on the Committee, then the remaining Committee members will replace that person with another person that is agreeable to all remaining Committee members. The Committee shall meet as and when needed to determine the most expeditious manner to monetize the 95.15° Slot. Additionally, as to any proposed payments not specifically budgeted herein (Contingency Fund), the Committee shall determine, approve and direct the McGuire, as manager of Lender, to make or not make such payments. Borrower acknowledges that Lender has reasonably relied upon these representations and warranties in loaning funds to Borrower under this Agreement.

**SECTION 9. Further Documentation**.    The Borrower will from time to time execute, deliver, endorse and authorize the filing of any and all instruments, documents, conveyances, assignments, security agreements, financing statements, control agreements and other agreements and writings that the Lender may reasonably request in order to secure, protect, perfect or enforce the Security Interest or the Lenders rights under the Loan Documents (but any failure to request or assure that the Borrower executes, delivers, endorses or authorizes the filing of any such item shall not affect or impair the validity, sufficiency or enforceability of the Loan Documents and the Security Interest, regardless of whether any such item was or was not executed, delivered or endorsed in a similar context or on a prior occasion).

**SECTION 10. No Control**.    The Parties hereto understand that certain members, representatives and/or agents of Lender are also members, representatives and/or agents of the Borrower, including but not limited to Scott H. Crawford, William R. Boles, Jr. and McGuire (collectively, the **"Dual Members"**). The Parties hereto agree that the Dual Members exercise no control over the Borrower and are not responsible for the decisions and representations made by the Borrower in this or any other agreement. The Parties hereto agree that no conflict of interest exists for the Dual Members, as it relates to the transactions contemplated herein and each Party

EXECUTION COPY 1-30-20

expressly waives any claim for conflict of interest as to the Dual Members with regard to the BIU Project.

**SECTION 11.  No Waiver.**  No waiver of any of the terms and conditions of this Agreement will be binding or effective for any purpose unless expressed in writing and signed by the party hereto giving the same, and any such waiver will be effective only in the specific instance and for the purpose given.  No failure or delay on the part of any of the Parties hereto in exercising any right, power or privilege hereunder will operate as a waiver thereof, nor will any single or partial exercise of any right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

**SECTION 12.  Whole Agreement.**

(a)     This Agreement constitutes the whole of the Agreement among the Parties hereto relating to the subject matter hereof and save as otherwise provided herein no amendment, alteration, addition, variation or consensual cancellation will be of any force or effect unless reduced to writing and signed by the Parties hereto or their duly authorized representatives.

(b)     Subject to paragraph (a), the Parties agree that no other terms or conditions, whether oral or written, and whether express or implied will be applicable to this Agreement.

(c)     Section and paragraph headings have been inserted in this Agreement as a matter of convenience of reference only, and it is agreed that such section and paragraph headings are not a part of this Agreement and shall not be used in the interpretation of any provisions of this Agreement.

(d)     If any provision of this Agreement shall be held or deemed to be or shall, in fact, be invalid, inoperative or unenforceable as applied in any particular case in any jurisdiction or jurisdictions, or in all jurisdictions because it conflicts with any provisions of any constitution, statute, rule of public policy, or for any other reason, such circumstances shall not have the effect of rendering the provision in question invalid, inoperative or unenforceable in any other case or circumstance, or of rendering any other provision or provisions of this Agreement invalid, inoperative or unenforceable to any extent whatever.

(e)     This Agreement may be executed simultaneously in two or more counterparts, each of which will be deemed an original, but all of which will constitute one agreement.   Execution and delivery of this Agreement by exchange of electronically transmission counterparts bearing the signature of a Party shall be equally as effective as delivery of a manually executed counterpart of such Party.

**SECTION 13.   Successors and Assigns; Third Party Beneficiaries.**   Except as otherwise provided in <u>Section 4</u> herein, neither this Agreement nor the rights and obligations hereunder may be assigned, subcontracted or otherwise delegated or transferred without the prior written consent of the other Parties hereto.   All of the terms, covenants, representations,

EXECUTION COPY 1-30-20

warranties and conditions of this Agreement will be binding upon, and inure solely for the benefit of, and be enforceable by, the Parties and any person or entity to whom rights hereunder are lawfully assigned in accordance with the preceding sentence. Except pursuant to an express assignment permitted hereunder, no person or entity will have any rights or remedies under this Agreement or by reason of the transactions contemplated hereby or thereby or a third-party beneficiary, as an assignee of or successor of rights, by means of subrogation or otherwise.

**SECTION 14. Amendments/Waiver.** This Agreement may be amended, modified or superseded, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the Parties hereto or, in the case of a waiver, by the Party or Parties waiving compliance. The failure of any Party at any time or times to require performance of any provisions hereof will in no manner affect the right at a later time to enforce the same. No waiver by any Party of any condition, or of any breach of any term, covenant, representation or warranty contained in this Agreement, in any one or more instances, will be deemed to be or construed as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of any breach of any other term, covenant, representation or warranty.

**SECTION 15. Notices.** Unless otherwise provided herein, all notices, requests, consents, approvals, demands and other communications to be given hereunder (collectively, **"Notices"**) will be in writing and will be deemed given upon (a) confirmation of receipt of an electronic transmission to the extent transmitted by 5:00 p.m. (local time of recipient) on a Business Day or if transmitted after such time on a Business Day or any other day, the Business Day next following the day of transmission and confirmation of receipt of such electronic transmission (b) confirmed delivery by a reputable overnight carrier or when delivered by hand, (c) actual receipt or (d) the expiration of four (4) Business Days after the day when mailed by registered or certified mail (postage prepaid, return receipt requested), addressed to the respective Parties listed below at the following addresses (or such other address for a Party hereto as will be specified by like Notice):

If to Borrower, to:

Spectrum Five LLC
2445 California Street NW
Washington, DC  20008
Attn:  R. David Wilson
dwilson@spectrumfive.com

If to Lender, to:

BIU, LLC
8702 Jefferson Hwy, Suite B
Baton Rouge, LA 70808
Attention:  Melton C. McGuire
verulamfarm@gmail.com

EXECUTION COPY 1-30-20

**SECTION 16.  Governing Law.**  This Agreement will be governed by and construed in accordance with the laws of the State of Delaware and all disputes, actions and other matters relating thereto will be determined in accordance with such law.

**SECTION 17. Duration of Agreement.**  This Agreement shall shall remain in effect until such time as the BIU Loan Returns set forth in Section 4 hereof have been paid in full and all remaining Borrower Funds have been delivered to Borrower.

**SECTION 18.  Specific Enforcement.**  Each of the Parties hereto acknowledges and agrees that irreparable damage would occur and that the parties would not have any adequate remedy at law in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that, prior to the valid termination of this Agreement, the Parties shall be entitled to an injunction or injunctions, specific performance and other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement (including Borrower's obligation to grant and/or confirm the Lender lien in Borrower Funds, to deliver Borrower Funds and/or to pay the Lender Returns  contemplated by this Agreement), this being in addition to any other remedy to which they are entitled at law or in equity.  Each of the Parties agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief when expressly available pursuant to the terms of this Agreement, and hereby waives (x) any defenses in any action for an injunction, specific performance or other equitable relief, including the defense that the other Parties have an adequate remedy at law or an award of specific performance is not an appropriate remedy for any reason at law or equity, and (y) any requirement under applicable law to post a bond, undertaking or other security as a prerequisite to obtaining equitable relief.

**SECTION 19.  Effect.**  This Agreement further amends and restates the Prior Loan Agreement in its entirety.  This Agreement shall be deemed effective the 6th day of September 2018 notwithstanding the fact that it has been subsequently amended and restated including on the date first above written.

11

THIS DONE, EXECUTED AND SIGNED, in multiple originals, on the day, month and year herein first above written.

BORROWER:
SPECTRUM FIVE LLC

By: _____
R. David Wilson, Member/Manager


SPECTRUM FIVE, NETHERLANDS B.V.

By: _____
R. David Wilson, Director


SPECTRUM FIVE B.V.

By: _____
R. David Wilson, Director


LENDER:
BIU, LLC

By: _____
Melton C. McGuire, Sole Manager

# ATTACHMENT F

FINAL EXECUTION VERSION

## SECURITY AGREEMENT

This Security Agreement (the "**Agreement**") is made as of September 6, 2018 by and among **SPECTRUM FIVE LLC**, a Delaware limited liability company having its registered address at 251 Little Falls Drive, Wilmington Delaware, 19808 and represented herein by its Member/Manager R. David Wilson ("**Wilson**") and **SPECTRUM FIVE, NETHERLANDS B.V.**, a company formed under the laws of Netherland Antilles (collectively, the "**Borrower**" or the "**Company**"), and BIU, LLC (the "**Lender**," or "**Secured Party**" and together with the Company, the "**Parties**"), a Delaware limited liability company having its registered address at 8702 Jefferson Hwy, Suite B, Baton Rouge, LA 70809 and represented herein by its Sole Manager Melton C. McGuire ("**McGuire**"); who agree as follows:

1.      Recitals.  This Agreement is entered into with reference to the following recitals of essential facts:

       1.1.      The Company has rights for a satellite slot located at the 95.15° West Longitude Orbital Slot (the "**95.15° Slot**") which must be perfected by moving, or "bringing into use", a satellite into that certain location (the "**BIU Project**"); and

       1.2      The Company requires funding, in amounts and to be applied as detailed herein, to complete the BIU Project; and

       1.3      The Company previously entered into an agreement with Lender (the "**BIU Agreement**") whereby Lender was to provide the required funding for completion of BIU Project pursuant to a loan (the "**BIU Loan**") from Lender; and

       1.4      Concurrently herewith, the Company and Lender have entered into that certain Loan Agreement ("**Loan Agreement**") and Convertible Promissory Note ("**Note**") which sets forth the terms of the BIU Loan.  Company and Secured Party desire to secure the Company's performance under the Loan Agreement and the Note by entering into this Agreement recognizing Secured Party would not have accepted the Note or entered into the Loan Agreement without the additional security represented by this Agreement.

       1.5      The Company's rights in the **95.15° Slot** are pursuant to the Netherlands Agreement for the bringing into use of satellite networks on designated orbital slots and the Company is finalizing the New Netherlands Agreement for bringing into use a satellite network for the **95.15° Slot.**

2.      Definitions.      For purposes of this Agreement, the definitions set forth in this Section will apply. Any term not defined in this Section, the Note, the Loan Agreement or in the body of this Agreement will have the meaning ascribed to that term pursuant to the UCC.

       2.1      "**Accounts**" means all accounts, accounts receivable, contract rights, instruments, documents, chattel paper, tax refunds from foreign, federal, state or local governments and all obligations in any form including those arising out of the sale or lease of goods or the rendition of services by Borrower; all guaranties, letters of credit and other security and supporting obligations for any of the above; and all books and records (including

FINAL EXECUTION VERSION

computer programs, tapes and data processing software) evidencing an interest in or relating to the above; and all "accounts" as the same is now or hereinafter defined in the UCC.

2.2    "Collateral" will have the definition provided in Section 3.1 of this Agreement.

2.3    "Contract Right" shall mean any right of Borrower to the **95.15° Slot** (KuFSS and Extended KuFSS only) under the Netherlands Agreement and/or the New Netherlands Agreement along with the sale, lease, transfer or other monetization of the **95.15° Slot** (KuFSS and Extended KuFSS only) which at the time not yet earned by performance.

2.4    "Default" will mean (i) any failure of Company to pay any amount owed to Secured Party under the Loan Agreement or the Note when due or any breach by the Company of its representations, warranties or covenants contained in the Loan Agreement, or (ii) any breach by Company of any obligation or covenant under this Agreement.

2.5    "Investment Property" means all securities, whether certificated or uncertificated, financial assets, security entitlements, securities accounts, commodity contracts or commodity accounts; and all "investment property" as the same is now or hereafter defined in the UCC.

2.6    "Proceeds" will mean all proceeds arising from the collection, sale, lease, exchange, assignment or other disposition of, or realization upon, any item or portion of the Collateral.

2.7    "Security Interest" will mean the security interest granted pursuant to this Agreement.

2.8    "Secured Obligations" will mean the obligations of Company to pay all amounts owed to Secured Party under the Transaction Documents and the performance of each covenant, obligation and the accuracy of all representations and warranties contained in the Transaction Documents.

2.9    "UCC" means the Uniform Commercial Code as in effect in the State of Delaware provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Delaware, "UCC" means the Uniform Commercial Code or such comparable law as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

FINAL EXECUTION VERSION

3.    Security Interest.

3.1.    Grant of Security Interest.  As security for the full, punctual, and final payment of the Secured Obligations, Company hereby grants to Secured Party a present security interest in and to the following property of Company (i) all monies or property received in connection with the sale, lease, transfer or other monetization in any manner of the Company's **95.15°** Slot (KuFSS and Extended KuFSS only) (ii) the Contract Rights, (iii) all bank and depository accounts now existing or hereinafter established by the Company ("**Deposit Accounts**"); and (iv) all Proceeds (collectively the "Collateral").

3.2.    Collections; Lockbox and other Deposit Accounts.  The Company shall establish and maintain only Deposit Accounts with financial institutions approved by Secured Party and all of such Deposit Accounts shall be subject to an Account Control Agreement ("**Lockbox Accounts**") in a form acceptable to Lender, which shall provide, among other things, that (A) the bank maintaining such deposit account will comply with any instructions originated by Lender directing the disposition of the funds in such deposit account without further consent by Borrower, (B) the bank maintaining such deposit account waives, subordinates, or agrees not to exercise any rights of setoff or recoupment or any other claim against the applicable deposit account other than for payment of its service fees and other charges directly related to the administration of such deposit account and for returned checks or other items of payment, and (C) the bank maintaining such deposit account will forward by daily sweep all amounts in the applicable deposit account to the Lender until the Lender instructs the bank that the Secured Obligations have been satisfied in full.

3.3.    Additional Documentation.  At the request of Lender, Borrower shall promptly execute and deliver to Lender security agreements, pledges, assignments, affidavits, reports, notices, schedules of accounts, letters of authority, and all other documents that Lender may reasonably request, in form satisfactory to Lender, to perfect and continue perfected Lender's security interest in the Collateral and in order to fully consummate all of the transactions contemplated hereunder and under the other Transaction Documents.

3.4.    Power of Attorney.  Borrower hereby irrevocably designates, makes, constitutes and appoints Lender (and any of Lender's officers, employees or agents designated by Lender) as Borrower's true and lawful attorney-in-fact. Pursuant to this power of attorney, Lender, or Lender's agent, may, without notice to Borrower and in either Borrower's or Lender's name, but at the cost and expense of Borrower, at such time or times as Lender in its sole discretion may determine after the occurrence and during the continuance of an Event of Default and solely in connection with the exercise of the Lender's rights hereunder: (a) direct payment of Accounts from Account Debtors to Lender or as designated by Lender, demand payment of the Accounts from the Account Debtors, enforce payment of the Accounts by legal proceedings or otherwise, and generally exercise all of Borrower's rights and remedies with respect to the collection of the Accounts; (b) take control, in any manner, of any item of payment or proceeds relating to any Collateral; (c) prepare, file and sign Borrower's name to a proof of claim in bankruptcy or similar document against any Account Debtor or to any notice of lien, assignment or satisfaction of lien or similar document in connection with any of the Collateral; (d) sign Borrower's name on any of documents described in Section 3.3 or on any other similar documents to be executed, recorded or filed in order to perfect or continue perfected Lender's security interest in the Collateral; (e) sign Borrower's name on any invoices, bills of lading, freight bills, chattel paper, documents,

P:00833628-3:13132.003                                    3

FINAL EXECUTION VERSION

instruments or similar documents or agreements relating to the Accounts, or other Collateral, drafts against Account Debtors, schedules and assignments of Accounts, verifications of Accounts and notices to Account Debtors; (f) send requests for verification of Accounts; (g) endorse Borrower's name on any checks, notes, acceptances, drafts or other items of payment or proceeds relating to any Collateral that may come into Lender's possession and deposit the same to the account of Lender for application to the Secured Obligations; (h) do all other acts and things necessary, in Lender's determination, to fulfill Borrower's obligations under this Agreement or any of the other Transaction Documents; (i) notify the post office authorities to change the address for delivery of Borrower's mail to an address designated by Lender, to receive and open all mail addressed to Borrower, and to retain all mail relating to the Collateral and forward all other mail to Borrower; (j) use the information recorded on or contained in any data processing equipment and computer hardware and software relating to the Accounts, and any other Collateral and to which Borrower has access; (k) make, settle and adjust all claims under Borrower's policies of insurance relating to the Collateral, make all determinations and decisions with respect to such policies of insurance and endorse the name of Borrower on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance; (l) sell or assign any of the Accounts and other Collateral upon such terms, for such amounts and at such time or times as Lender deems advisable; (m) settle, adjust or compromise disputes and claims respecting the Accounts directly with Account Debtors, for amounts and upon terms that Lender determines to be reasonable, and, in furtherance thereof, execute and deliver any documents and releases that Lender determines to be necessary; and (n) sign Borrower's name on tax returns and tax payment inquiries. The appointment of Lender as Borrower's attorney-in-fact and each and every one of Lender's rights and powers, being coupled with an interest, is irrevocable until all of the Secured Obligations have been fully repaid and performed and this Agreement has been terminated.

        3.5.   <u>Termination</u>.  The Security Interest granted in this Agreement will survive until the full and final satisfaction of the Secured Obligations, at which time the Security Interest will lapse and terminate without further notice or action by either party; provided, however, upon Company's request Secured Party shall deliver a Form UCC-3 and any other document or instrument required by Company to reflect the release of the Security Interest.

        4.   <u>Further Assurances; Covenants</u>.  While any Secured Obligation is outstanding:

        4.1.   <u>Further Assurances</u>.  Company shall, from time to time at its expense, execute, deliver, file and record any statement, assignment, instrument, document, agreement or other paper and take any other action (including without limitation any filings of financing or continuation statements under the UCC or amendments thereof) that from time to time may be necessary or desirable, or that Secured Party may request, in order to create, preserve, perfect, confirm or validate the Secured Obligations or to enable Secured Party to obtain the full benefits of this Agreement. Secured Party, at its expense, may file a UCC-1 or equivalent in any jurisdiction at any time on or following the date of this Agreement.

        4.2.   Company will cooperate and promptly upon request provide to Secured Party all information and evidence it may reasonably request concerning the Collateral to enable Secured Party to enforce the provisions of this Agreement.

        4.3.   Company expressly waives any and all benefits, rights and/or defenses based on principals of suretyship and/or guaranty, including without limitation, those benefits,

rights and/or defenses which might otherwise be available to Company under Delaware law and Company agrees that its obligations shall not be affected by any circumstances which constitute a legal or equitable discharge of a guarantor or surety.

4.4.    Secured Party may hold at any time or to pursue any judicial, nonjudicial and/or provisional remedy.  Company shall continue to be liable hereunder and the provisions hereof shall remain in full force and effect notwithstanding Secured Party's waiver of or failure to enforce any of the terms, covenants or conditions contained in the Note, the Loan Agreement, this Agreement, or in any modification thereof, including without limitation, any release of any obligor from any liability with respect to the Secured Obligations, or any release or subordination of any property then held by Secured Party, as security for the performance of the Secured Obligations.

5.    <u>Remedies Upon Default</u>.

5.1.    In addition to any and all rights Secured Party shall have under the Transaction Documents (as defined in the Loan Agreement), this Agreement, or otherwise by law for a Default, Secured Party shall have the rights and remedies of a Secured Party under the UCC.

5.2.    Subject to applicable law, Secured Party's notice of the time and place of public sale of the Collateral, or the time on or after which a private sale or other disposition of the Collateral will be made, is reasonable if sent to Company in the manner for giving notice at least ten (10) business days before the public or private sale.

5.3.    Any assignment, sale, foreclosure, or levy made under this Section 5 shall divest Company of all right, title, and claim it may have in and to the Collateral.

6.    <u>Governing Law, Venue, Jurisdiction</u>.  This Agreement will be governed by and construed in accordance with the laws of the State of Delaware without giving effect to conflicts of laws principles.  For purposes of venue and jurisdiction, this Agreement will be deemed made and to be performed in Wilmington, Delaware, which will be the exclusive venue for judicial resolution of any dispute or matters arising from or related to this Agreement.  Each party authorizes and accepts service of process sufficient for personal jurisdiction in any action against him as contemplated by this Section by registered or certified mail, return receipt requested, postage prepaid, to his address for the giving of notices set forth in this Agreement.

7.    <u>Modification</u>.  This Agreement may be modified only by a writing executed by the party to this Agreement against whom enforcement of such modification is sought.

8.    <u>Prior Understandings</u>.  This Agreement and the Transaction Documents contain the entire agreement between the parties to this Agreement with respect to the subject matter of this Agreement, are intended as a final expression of such parties' agreement with respect to such terms as are included in this Agreement, are intended as a complete and exclusive statement of the terms of such agreement, and supersede all negotiations, stipulations, understandings, agreements, representations and warranties, if any, with respect to such subject matter, which precede or accompany the execution of this Agreement.

9.    <u>Interpretation</u>. The Section headings have been included only for convenience, and will not be deemed in any manner to modify or limit any of the provisions of this Agreement, nor

FINAL EXECUTION VERSION

be used in the interpretation of this Agreement. Each party to this Agreement has had the opportunity to review and revise this Agreement. The rule of construction that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement. Whenever the context requires in this Agreement, all words used in the singular will be construed to have been used in the plural (and vice versa).

10.   Partial Invalidity. Each provision of this Agreement will be valid and enforceable to the fullest extent permitted by law. If any provision of this Agreement or the application of such provision to any person or circumstance will, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, will not be affected by such invalidity or unenforceability, unless such provision or such application of such provision is essential to this Agreement.

11.   Notices. Each notice and other communication required or permitted to be given under this Agreement ("Notice") must be in writing and delivered to the address for such party as contained in the Loan Agreement. Notice is duly given to another party upon: (a) hand delivery to the other party, (b) receipt by the other party of an electronic message, (i.e. email or facsimile) (provided, however, that the Notice is not effective unless a duplicate copy of the electronic notice is promptly given by one of the other methods permitted under this Section), (c) three business days after the Notice has been deposited with the United States postal service as first class certified mail, return receipt requested, postage prepaid, and addressed to the party at the address set forth below the party's signature at the foot of this Agreement, or (d) the next business day after the Notice has been deposited with a reputable overnight delivery service, postage prepaid, addressed to the party at the address for such party set forth below the party's signature at the foot of this Agreement with next-business-day delivery guaranteed, provided that the sending party receives a confirmation of delivery from the delivery-service-provider. Each party shall make a reasonable, good faith effort to ensure that he will accept or receive Notices to him that are given in accordance with this Section.

12.   Attorney's Fees. The prevailing party in any litigation, arbitration, bankruptcy, insolvency or other proceeding ("Proceeding") relating to the enforcement or interpretation of this Agreement may recover from the other party all costs, expenses, and reasonable attorney's fees (including expert witness and other consultants' fees and costs) relating to or arising out of (a) the Proceeding (whether or not the Proceeding proceeds to judgment), and (b) any post-judgment or post-award proceeding including, without limitation, one to enforce or collect any judgment or award resulting from the Proceeding. All such judgments and awards will contain a specific provision for the recovery of all such subsequently incurred costs, expenses, and actual attorney's fees.

13.   Counterparts. This Agreement may be executed in counterparts, each of which is deemed an original and all of which together constitute one document.

FINAL EXECUTION VERSION

SIGNATURE PAGE TO SECURITY AGREEMENT

BORROWER:

SPECTRUM FIVE LLC

By: _____
    R. David Wilson, Member/Manager

SPECTRUM FIVE, NETHERLANDS B.V.

By: _____
    R. David Wilson, Member/Manager

LENDER:

BIU, LLC

By: _____
    Melton C. McGuire, Sole Manager

7

# ATTACHMENT G

EXECUTION COPY

**SECURITY AGREEMENT**

**THIS SECURITY AGREEMENT** (this "**Agreement**"), dated as of this 28th day of August, 2019, is made by and between SPECTRUM FIVE, LLC and SPECTRUM FIVE NETHERLANDS, B.V. (together, the "**Debtor**"), with an address at 251 Little Falls Drive, Wilmington, Delaware 19808 and BIU, LLC (the "**Secured Party**"), with an address at 8702 Jefferson Hwy, Suite B, Baton Rouge, Louisiana 70809.

Under the terms hereof, the Secured Party desires to obtain and the Debtor desires to grant the Secured Party security for all of the Obligations (as hereinafter defined).

**NOW, THEREFORE,** the Debtor and the Secured Party, intending to be legally bound, hereby agree as follows:

1. **Definitions.**

   (a) "**Collateral**" shall include the Debtor's rights to the proceeds from the sale, lease or other monetization of all satellite spectrum and priority rights pertaining to the 95.15' orbital slot and all additions and accessions thereto, substitutions therefor and replacements thereof.

   (b) "**Loan Agreement**" means the Amended and Restated Loan Agreement dated August 28, 2019 by and among the parties hereto.

   (c) "**Loan Documents**" means the Note (as hereafter defined), the Loan Agreement, this Agreement and all other documents and instruments evidencing, securing or executed in connection therewith.

   (d) "**Note**" means that certain Convertible Promissory Note, dated as of the date hereof, made by Debtor, for the benefit of Secured Party, in the principal amount of $10,433,660 and with an additional $1,500,000 to be lent by Secured Party to Debtor for a total secured amount of not to exceed $11,933,660.

   (e) "**Obligations**" shall include all debts, liabilities, obligations, covenants and duties owing from the Debtor to the Secured Party of any kind or nature, present or future (including any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to the Debtor, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether evidenced by or arising under the Note, the Loan Agreement, or this Agreement or, whether absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, and all costs and expenses of the Secured Party incurred in the enforcement, collection or otherwise in connection with any of the foregoing, including reasonable attorneys' fees and expenses.

   (f) "**UCC**" means the Uniform Commercial Code, as adopted and enacted and as in effect from time to time in the State of Delaware. Terms used herein which are defined in the UCC and not otherwise defined herein shall have the respective meanings ascribed to such terms in the UCC.

2. **Grant of Security Interest.** To secure the Obligations, each Debtor, as debtor, hereby assigns and grants to the Secured Party, as secured party, a continuing lien and security interest in the Collateral.

3. **Change in Name or Locations.** The Debtor hereby agrees that if any Debtor changes either of its names, form or jurisdiction of organization, or establishes a name in which it may do business, each Debtor will immediately notify the Secured Party in writing of the additions or changes. The Debtor's chief executive office is listed in the Notice section below.

4. **Representations and Warranties.** Each Debtor represents, warrants and covenants to the Secured Party that: (a) each Debtor has good, marketable and indefeasible title to the Collateral, has not made any prior sale, pledge, encumbrance, assignment or other disposition of any of the Collateral, and the Collateral is free from all encumbrances and rights of setoff of any kind except the lien in favor of the Secured Party created by this Agreement; (b) except as herein provided, no Debtor will hereafter without the Secured Party's prior written consent sell, pledge, encumber, assign or otherwise dispose of any of the Collateral or permit any right of setoff, lien or security

1

interest to exist thereon except to the Secured Party; and (c) each Debtor will defend the Collateral against all claims and demands of all persons at any time claiming the same or any interest therein.

5. **Debtor Covenants**. Each Debtor covenants that it shall:

(a) shall do, obtain, make, execute and deliver all such additional and further acts, things, deeds, assurances and instruments as the Secured Party may require to vest in and assure to the Secured Party its rights hereunder and in or to the Collateral, and the proceeds thereof;

(b) immediately notify the Secured Party of any event causing a material loss or decline in value of the Collateral, and the amount of such loss or decline; and

(c) abide, follow and adhere to all applicable federal, state, county and municipal laws and regulations; and

6. **Negative Pledge; No Transfer**. Other than liens subordinate to the lien created by the Loan Agreement and this Agreement, no Debtor will sell or offer to sell or otherwise transfer or grant or allow the imposition of a lien or security interest upon the Collateral or use any portion thereof in any manner inconsistent with this Agreement.

7. **Further Assurances**. Each Debtor hereby irrevocably authorizes Secured Party at any time and from time to time to file in any Uniform Commercial Code ("UCC") jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral, and (b) contain any other information required by Article 9 of the Delaware Uniform Commercial Code for the sufficiency or filing office acceptance of any financing statement or amendment, including, but not limited to any organization identification number issued to Debtor. Debtor agrees to furnish any such information to Secured Party promptly upon request.

8. **Secured Party Rights**. Secured Party shall have all rights allowed under the Note, the Loan Agreement and this Agreement as well as the UCC.

9. **Remedies**. Secured Party shall have all remedies allowed by the Note, the Loan Agreement and this Agreement and, in addition to any remedies provided herein or by any applicable law or in equity, all the remedies of a secured party under the UCC. The Secured Party's remedies include, but are not limited to, to the extent permitted by law, the right to (a) take possession of the Collateral without prior notice to the Debtor or the opportunity for a hearing, and (b) require the Debtor to make the Collateral available to the Secured Party at a place designated by the Secured Party.

10. **Designated Account/Pledge**. Each Debtor agrees that the Collateral shall be deposited in Secured Party's account. Debtor agree to give notice to any person or entity to deliver the Collateral to Secured Party's account to be held in pledge in accordance with the Loan Agreement and provide evidence of such notification reasonably satisfactory to Secured Party. Failure to provide evidence of such notice shall allow Secured Party to give direct notice to such person or entity.

11. **Notices**. All notices, demands, requests, consents, approvals and other communications required or permitted hereunder must be in writing and will be effective upon receipt. Such notices and other communications may be hand-delivered, sent by facsimile transmission with confirmation of delivery and a copy sent by first-class mail, or sent by nationally recognized overnight courier service, to a party's address set forth above or to such other address as any party may give to the other in writing for such purpose. For notice purpose the parties' addresses are as follows:

If to Debtor, to:

Spectrum Five LLC
2445 California Street NW
Washington, DC  20008
Attn: R. David Wilson
dwilson@spectrumfive.com

2

If to Secured Party to:

BIU, LLC
8702 Jefferson Hwy, Suite B
Baton Rouge, LA 70808
Attention: Melton C. McGuire

12. **Preservation of Rights.** No delay or omission on the Secured Party's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will the Secured Party's action or inaction impair any such right or power. The Secured Party's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which the Secured Party may have under other agreements, at law or in equity.

13. **Illegality.** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

14. **Changes in Writing.** No modification, amendment or waiver of any provision of this Agreement nor consent to any departure by any Debtor therefrom will be effective unless made in a writing signed by the Secured Party, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on any Debtor in any case will entitle such Debtor to any other or further notice or demand in the same, similar or other circumstance.

15. **Entire Agreement.** This Agreement (including the documents and instruments referred to herein) constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.

16. **Counterparts.** This Agreement may be signed in any number of counterpart copies and by the parties hereto on separate counterparts, but all such copies shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or electronic transmission shall be effective as delivery of a manually executed counterpart. Any party so executing this Agreement by facsimile transmission shall promptly deliver a manually executed counterpart, provided that any failure to do so shall not affect the validity of the counterpart executed by facsimile or electronic transmission.

17. **Successors and Assigns.** This Agreement will be binding upon and inure to the benefit of each Debtor and the Secured Party and their respective successors and assigns; provided, however, that no Party may assign this Agreement in whole or in part without the other party's prior written consent.

18. **Interpretation.** In this Agreement, unless the Secured Party and each Debtor otherwise agree in writing, the singular includes the plural and the plural the singular; words importing any gender include the other genders; references to statutes are to be construed as including all statutory provisions consolidating, amending or replacing the statute referred to; the word "or" shall be deemed to include "and/or", the words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; references to articles, sections (or subdivisions of sections) or exhibits are to those of this Agreement unless otherwise indicated. Section headings in this Agreement are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. If this Agreement is executed by more than one Debtor, the obligations of such persons or entities will be joint and several.

19. **Governing Law and Jurisdiction.** This Agreement has been delivered to and accepted by the Secured Party and will be deemed to be made in the State of Delaware. THIS AGREEMENT WILL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE PARTIES HERETO DETERMINED IN ACCORDANCE WITH THE LAWS OF the State OF DELAWARE. Each Debtor hereby irrevocably consents to the exclusive jurisdiction of any state or federal court in Delaware; provided that nothing contained in this Agreement will prevent the Secured Party from bringing any action, enforcing any award or judgment or exercising any rights against any Debtor individually, against

3

any security or against any property of the Debtor within any other county, state or other foreign or domestic jurisdiction. The Secured Party and each Debtor agrees that the venue provided above is the most convenient forum for both the Secured Party and each Debtor. Each Debtor waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Agreement.

20.  **WAIVER OF JURY TRIAL.** EACH DEBTOR AND THE SECURED PARTY IRREVOCABLY WAIVE ANY AND ALL RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS AGREEMENT, ANY DOCUMENTS EXECUTED IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS. EACH DEBTOR AND THE SECURED PARTY ACKNOWLEDGE THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.

**(EXECUTION PAGE FOLLOWS)**

4

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and date first above written.

WITNESS:
signed and delivered in the presence of:

DEBTOR:
**SPECTRUM FIVE, LLC:**

_____
R. David Wilson, Member/Manager

Print Name: Nona Neves-Wilson

**SPECTRUM FIVE, NETHERLANDS B.V.**

_____
R. David Wilson, Member/Manager

Print Name: R. Diane Rasberry

Print Name:_____

SECURED PARTY:
**BIU, LLC**

Print Name:_____

_____
Melton C. McGuire, Sole Manager

5

**IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and date first above written.**

WITNESS:
signed and delivered in the presence of:

DEBTOR:
**SPECTRUM FIVE, LLC:**

_____
R. David Wilson, Member/Manager

_____
Print Name:_____

**SPECTRUM FIVE, NETHERLANDS B.V.**

_____
Print Name:  _____

_____
R. David Wilson, Member/Manager

*Nona Neves-Wilson*
Print Name: Nona Neves-Wilson

*Diane Resberry*
Print Name: R. Diane Resberry

SECURED PARTY:
BIU, LLC

By: *(signature)*
_____
Melton C. McGuire, Sole Manager

5

# ATTACHMENT H

FINAL EXECUTION VERSION

## PLEDGE OF MEMBERSHIP INTEREST
### (Security Agreement)

THIS PLEDGE OF MEMBERSHIP INTEREST (SECURITY AGREEMENT) (the "Pledge") is made as of the ___ day of ____, 2018 by SPECTRUM FIVE LLC, a Delaware limited liability company ("Grantor"), to and in favor of BIU, LLC (together with its successors and assigns, referred to as "Lender").

## R E C I T A L S:

A.    Grantor and Spectrum Five, Netherlands B.V., LLC, a company formed under the laws of Netherland Antilles ("Spectrum BV") (Grantor and Spectrum BV, collectively as the "Borrower" or "Company") and Lender have entered into a Loan Agreement of even date herewith (the "Loan Agreement"). Any capitalized term used but not otherwise defined herein shall have the meaning ascribed to such term in the Loan Agreement.

B.    Under the provisions of the Loan Agreement, Lender agreed, subject to the terms and conditions contained therein, to make a loan ("Loan") to the Company.

C.    Grantor is the legal and beneficial owner of 100% of the Membership Interests ("Membership Interest") in Spectrum BV. In accordance with Article 3.1 of the Articles of Association of Spectrum BV, no share certificates shall be issued.

D.    As a condition precedent to Lender's making the Loan, Lender has further required that Grantor execute and deliver this Pledge to Lender to secure the prompt and complete performance of all of the obligations and payment of all of the indebtedness under the Loan Agreement (all such obligations and indebtedness are hereinafter referred to collectively as the "Liabilities").

NOW, THEREFORE, in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **Defined Terms.** As used in this Pledge, the following terms shall have the following meanings:

"**Code**" shall mean the Uniform Commercial Code as the same may from time to time be in effect in the State of Delaware.

"**Organizational Documents**" shall mean the Articles of Association of Spectrum BV provided to Lender by Spectrum BV and attached hereto as Exhibit A.

"**Pledge**" shall mean this Pledge of Membership Interest (Security Agreement), as the same may from time to time be amended or supplemented.

"**Proceeds**" shall mean "proceeds" as such term is defined in the Code and, in any event, shall include, but not be limited to, (i) any and all payments (in any form

1

whatsoever) made or due and payable to Grantor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Pledged Collateral (as hereinafter defined) by any governmental body, authority, bureau or agency (or any person acting under color of governmental authority), (ii) any and all amounts paid or payable to Grantor for or in connection with any sale or other disposition of Grantor' interests in Spectrum BV, and (iii) any and all other amounts from time to time paid or payable under or in connection with any of the Pledged Collateral (as defined below).

2. **Grant of Security Interest**. As security for the prompt and complete payment and performance when due of the Liabilities, Grantor hereby grants to Lender a security interest in and pledges to Lender all of the following (collectively, the "**Pledged Collateral**"):

(i)     all of such Grantor's right, title and interest as a member in Spectrum BV, including without limitation, all of such Grantor's right to receive distributions at any time or from time to time of cash and other property, real, personal or mixed, from Spectrum BV upon complete or partial liquidation or otherwise;

(ii)    all of such Grantor's right, title, and interest in specific Spectrum BV property;

(iii)   all of such Grantor's right, title and interest, if any, to participate in the management and voting of Spectrum BV;

(iv)    all of such Grantor's right, title and interest in and to:

(a) all rights, privileges, authority and power of such Grantor as a holder of the items specified in (i), (ii), and (iii) above, including but not limited to, all contract rights related thereto;

(b) all options and other agreements for the purchase or acquisition of any interests in Spectrum BV;

(c) any document or certificate representing or evidencing such Grantor's rights and interests in Spectrum BV; and

(d) to the extent not otherwise included, all Proceeds and products of any of the foregoing.

3. **Representations and Warranties**. Grantor represents and warrants for itself that:

(a) Grantor is the sole owner of each item of the Pledged Collateral, free and clear of any and all liens and claims whatsoever except for the security interest granted to Lender pursuant to this Pledge.

(b) No security agreement, financing statement, assignment, equivalent security or lien instrument or continuation statement covering all or any part of the Pledged

2

Collateral is on file or of record in any public office or at the records of Spectrum BV, except financing statements with respect to the Pledged Collateral filed by Lender pursuant to this Pledge.

(c) Upon the filing of all appropriate financing statements under the applicable Code or other applicable secured creditor law and the Lender obtaining control (as such term is used in the Code or applicable law) thereto, all steps necessary to create and perfect the security interest created by this Pledge as a valid and continuing first lien on and first perfected security interest in the Pledged Collateral in favor of Lender, prior to all other liens, security interests and other claims of any sort whatsoever will have been taken. This Pledge and the security interest created hereby are enforceable as such against creditors of and purchasers from Grantor except with respect to liens or other interests accorded a superior priority as a matter of law.

(d) Grantor's and Spectrum BVs principal place of business is c/o 2445 California Street NW, Washington, DC 20008.

(e) Grantor has not changed Grantor's name, or used, adopted or discontinued the use of any trade name, fictitious name or other trade name or trade style.

(f) Grantor interest in Spectrum BV consists of one hundred percent (100%) of the total Membership Interests in Spectrum BV, including the same percentage interests in all distributions by Spectrum BV to its members of cash or other property, whether in complete or partial liquidation or otherwise.

(g) Grantor has all power, statutory and otherwise, to execute and deliver this Pledge, to perform Grantor's obligations hereunder and to subject the Pledged Collateral to the security interest created hereby, all of which has been duly authorized by all necessary action.

(h) No amendments or supplements have been made to the Organizational Documents; such Organizational Documents remains in effect. The Organizational Documents shall not, without the prior written consent of Lender, be amended or modified if such amendment or modification could have a material adverse effect on Grantor's ability to perform its obligations under this Pledge, nor shall any member of Spectrum BV be released or discharged from its or his obligations under the Organizational Documents, nor shall there be any change in control (by way of transfers of membership interest or otherwise) in Spectrum BV. At all times prior to the repayment of the Spectrum BV Agreement, Grantor shall be the owner of 100% of the Membership Interests in Spectrum BV, and be sole manager or managing member of Spectrum BV.

(i) Grantor has the right (subject, however, to the Securities Act of 1933, as amended and/or other applicable laws regulating the sale generally of such interests) to transfer all or any part of the Pledged Collateral free of any lien or encumbrance (except Permitted Liens).

3

(j)  No authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body (other than the filing of all appropriate financing statements under the Code or applicable law) is required either (i) for Grantor's granting of a security interest in the Pledged Collateral pursuant to this Pledge by Grantor, or (ii) for the exercise by Lender of the rights provided for in this Pledge or the remedies in respect of the Pledged Collateral pursuant to this Pledge (except as may be required in connection with such disposition by laws affecting the offering and sale of securities generally).

(k)  Spectrum BV is a limited liability company in good standing and duly qualified to do business under the laws of the Netherland Antilles and is qualified to do business in each jurisdiction that it is required to be qualified.

(l)  Upon the transfer of the Pledged Collateral, or any portion thereof, to any party pursuant to Section 10 below, Spectrum BV shall continue in existence and the Organizational Documents provides for such continuation.

(m) As of the date hereof, there are no certificates, instruments or other documents evidencing any of the Pledged Collateral other than as have been provided to Lender.

(n)  All financial statements submitted to Lender relating to Grantor are true, correct and complete in all material respects.  The financial statements have been prepared in accordance with generally accepted accounting principles consistently applied and fairly present the financial condition of Grantor. The financial statements do not contain any untrue statement of fact or fail to state a fact material to such financing statement.  No material adverse change has occurred in the financial condition or operations of Grantor or Spectrum BV since the date of the most recent financial statements delivered to Lender.

4.  **Covenants**.  Grantor covenants and agrees that from and after the date of this Pledge and until the Liabilities are fully satisfied:

(a)  **Further Documentation; Pledge of Instruments**.  At any time and from time to time, upon the written request of Lender, and at the sole expense of Grantor, Grantor will promptly and duly execute and deliver any and all such further instruments and documents and take such further actions as Lender may reasonably deem desirable to obtain the full benefits of this Pledge and of the rights and powers herein granted, including, without limitation, the execution and filing of any financing or continuation statements under the Code or comparable law in effect in any jurisdiction with respect to the security interest granted hereby and, if otherwise required hereunder, transferring Pledged Collateral to the possession of Lender (if a security interest in such Pledged Collateral can be perfected by possession).  Grantor also hereby authorizes Lender to file any such financing or continuation statement without the signature of Grantor to the extent otherwise permitted by applicable law.  If any amount payable under or in connection with any of the Pledged Collateral shall be or become evidenced by any promissory note or other instrument (other than an instrument which constitutes chattel paper under the Code), such note or instrument shall be immediately pledged hereunder

4

and a security interest therein hereby granted to Lender and shall be duly endorsed without recourse or warranty in a manner satisfactory to Lender and delivered to Lender. If at any time Grantor's right or interest in any of the Pledged Collateral becomes an interest in real property, Grantor immediately shall execute, acknowledge and deliver to Lender such further documents as Lender deems necessary or advisable to create a first priority perfected mortgage lien in favor of Lender in such real property interest.

(b) **Priority of Liens**.  Grantor will defend the right, title and interest hereunder of Lender, as a first priority security interest in the Pledged Collateral, against the claims and demands of all persons whomsoever.

(c) **Further Identification of Pledged Collateral**.  Grantor will furnish to Lender from time to time such reports in connection with the Pledged Collateral as Lender may reasonably request.

(d) **Notices**.  Grantor will advise Lender promptly, in reasonable detail, (i) of any lien, security interest, encumbrance or claim made or asserted against any of the Pledged Collateral, (ii) of any distribution of cash or other property by Spectrum BV, whether in complete or partial liquidation or otherwise and of any other change in the composition of the Pledged Collateral, Grantor or Spectrum BV, and (iii) of the occurrence of any other event which would have an adverse effect on the aggregate value of the Pledged Collateral or on the security interest created hereunder (except such events as may be permitted under the other Spectrum BV Agreement.

(e) **Continuous Perfection**.  Grantor will not change Grantor's name, in any manner which might make any financing or continuation statement filed hereunder seriously misleading within the meaning of Section 9-402(7) of the Code (or any other then-applicable provision of the Code or comparable law governing the perfection of collateral in the jurisdiction governing the Pledged Collateral) unless Grantor shall have given Lender at least thirty (30) days prior written notice thereof and shall have taken all action (or made arrangements to take such action substantially simultaneously with such change if it is impossible to take such action in advance) necessary or reasonably requested by Lender to amend such financing statement or continuation statement so that it is not seriously misleading.

(f) **Place of Business**.  Grantor will not change Grantor's principal place of business unless Grantor has taken such action as is necessary to cause the security interest of Lender in the Pledged Collateral to continue to be perfected.  Grantor will not change Grantor's principal place of business without giving prior notice thereof to Lender.

(g) **Transfer of Assets**.  Grantor will not directly or indirectly sell, pledge, mortgage, assign, transfer, or otherwise dispose of or create or suffer to be created any lien, security interest, charging order, or encumbrance on any of the Pledged Collateral or the assets of Spectrum BV other than the liens relating to the Loan and the Loan Agreement or as otherwise expressly permitted in the Loan Agreement.

5

(h) **Performance of Obligations**.    Grantor will perform all of Grantor's obligations under the Organizational Documents prior to the time that any interest or penalty would attach against Grantor or any of the Pledged Collateral as a result of Grantor's failure to perform any of such obligations, and Grantor will do all things necessary to maintain Spectrum BV as a limited liability company under the laws of the jurisdiction of organization and to maintain Grantor's interest as the holder of the Membership Interest in Spectrum BV in full force and effect without diminution.

(i) **Organizational Documents**.    Grantor will not (x) suffer or permit any amendment or modification of the Organizational Documents other than compliance issues or non-material matters without the prior written consent of Lender, which consent shall not be unreasonably withheld, conditioned or delayed, or (y) waive, release, or compromise any rights or claims Grantor may have against any other party which arise under the Organizational Documents.

(j) **Stay or Extension Laws**.  Grantor will not at any time claim, take, insist upon or invoke the benefit or advantage of or from any law now or hereafter in force providing for the valuation or appraisement of the Pledged Collateral prior to any sale or sales thereof to be made pursuant to the provisions hereof or pursuant to the decree, judgment, or order of any court of competent jurisdiction; nor, after such sale or sales, claim or exercise any right under any statute now or hereafter made or enacted by any state to redeem the property so sold or any part thereof, and Grantor hereby expressly waives, on behalf of Grantor and each and every person claiming by, through and under Grantor, all benefit and advantage of any such law or laws, and covenants that Grantor will not invoke or utilize any such law or laws or otherwise hinder, delay or impede the execution of any power, right or remedy herein or hereby granted and delegated to Lender, but will authorize, allow and permit the execution of every such power, right or remedy as though no such law or laws had been made or enacted.

(k) **Delivery of Certificates**.  Grantor agrees (i) immediately to deliver to Lender, or Lender's designee, all certificates, instruments or other documents evidencing any of the Pledged Collateral which may at any time come into the possession of Grantor and (ii) to execute and deliver a notice of Lender's security interest in the Pledged Collateral (which notice shall be satisfactory to Lender in form and substance and which may request acknowledgment from the addressee) to any third party which either has possession of the Pledged Collateral or any certificates evidencing any of the Pledged Collateral or otherwise has the ability under applicable law or the terms of any agreement to record transfers or transfer ownership of any of the Pledged Collateral (whether at the direction of Grantor or otherwise). Grantor hereby appoints Lender as Grantor's attorney-in-fact, with authority at any time or times to take any of the foregoing actions on behalf of Grantor.  Grantor agrees that this Pledge or a photocopy of this Pledge shall be sufficient as a financing statement.

(l) **Spectrum BV's Records**.  Grantor shall cause Spectrum BV to make a notation on the records of Spectrum BV indicating the security interest granted hereby.

6

5. **Grantor's Powers.**

(a) Grantor shall not exercise any voting rights or powers, or consent to any action of Spectrum BV that would be in contravention of the provisions of, or constitute an Event of Default under, this Pledge or any of the other Loan Agreement.

(b) Until the Liabilities are satisfied in full, unless Lender agrees in writing to the Grantor to the contrary, all voting rights and powers and rights to distributions included in the Pledged Collateral shall be vested in Lender, and Lender shall thereafter have the sole and exclusive right and authority to exercise such voting rights and powers. Grantor shall execute such documents and instruments, including, but not limited to, statements that the Grantor no longer has the right to act as the member or otherwise relating to such change as Lender may request. Grantor agrees that Spectrum BV and any member, manager, officer or director of Spectrum BV may rely conclusively upon any notice from Lender that Lender has the right and authority to exercise all rights and powers of the applicable Grantor under the Organizational Documents. Grantor irrevocably waives any claim or cause of action against any such officer, director or member, or manager of Spectrum BV who deals directly with Lender following receipt of such notice from Lender.

6. **Lender's Appointment as Attorney-in-Fact.**

(a) Grantor hereby irrevocably constitutes and appoints Lender and each officer or agent of Lender with full power of substitution, as Grantor's true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of Grantor and in the name of Grantor or in such attorney-in-fact's own name, from time to time in the discretion of each such attorney-in-fact, for the purpose of carrying out the terms of this Pledge, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Pledge and, without limiting the generality of the foregoing, hereby gives each such attorney-in-fact the power and right, on behalf of Grantor, without notice to or assent by Grantor, to do the following:

(i)    to collect and otherwise take possession of and title to any and all distributions of cash or other property due or distributable at any time after the date hereof to Grantor as a member of Spectrum BV, whether in complete or partial liquidation or otherwise, and to prosecute or defend any action or proceeding in any court of law or equity or otherwise deemed appropriate by such attorney-in-fact for the purpose hereof;

(ii)    to ask, demand, collect, receive and give acceptances and receipts for any and all moneys due and to become due under any Pledged Collateral and, in the name of any Grantor or such attorney-in-fact's own name or otherwise, to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any Pledged Collateral and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by such attorney-in-fact for the

7

purpose of collecting any and all such moneys due under any Pledged Collateral whenever payable;

(iii)    to pay or discharge taxes, liens, security interests or other encumbrances levied or placed on or threatened against the Pledged Collateral, to effect any repairs or any insurance called for with respect to any of the Pledged Collateral by the terms of this Pledge and to pay all or any part of the premiums therefor and the costs thereof; and

(iv)    (A) to direct any party liable for any payment under any of the Pledged Collateral to make payment of any and all moneys due and to become due thereunder directly to Lender or as such attorney-in-fact shall direct; (B) to receive payment of and receipt for any and all moneys, claims and other amounts due and to become due at any time in respect of or arising out of any Pledged Collateral; (C) to commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Pledged Collateral or any portion thereof and to enforce any other right in respect of any Pledged Collateral; (D) to defend any suit, action or proceeding brought against Grantor with respect to any Pledged Collateral; (E) to settle, compromise or adjust any suit, action or proceeding described above and, in connection therewith, to give such discharges or releases as such attorney-in-fact may deem appropriate; and (F) generally to sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Pledged Collateral as fully and completely as though such attorney-in fact were the absolute owner thereof for all purposes, and to do, at the option of such attorney-in-fact at Grantor's expense, at any time, or from time to time, all acts and things which such attorney-in-fact reasonably deems necessary to protect, preserve or realize upon the Pledged Collateral and the security interest of Lender therein, in order to effect the intent of this Pledge, all as fully and effectively as Grantor might do.

Grantor hereby ratifies, to the extent permitted by law, all that said attorney shall lawfully do or cause to be done by virtue hereof. This power of attorney is a power coupled with an interest and shall be irrevocable.

(b) The powers conferred on each attorney-in-fact hereunder are solely to protect the interest in the Pledged Collateral of Lender and shall not impose any duty upon any such attorney-in-fact to exercise any such powers. Each such attorney-in-fact shall be accountable only for amounts that it actually receives as a result of the exercise of such powers and neither it nor any of its officers, directors, employees or agents shall not be responsible to either Grantor for any act or failure to act unless such action or failure to act constitutes gross negligence.

(c) Grantor also authorizes Lender and each officer or agent of Lender at any time and from time to time upon the occurrence of any Event of Default, to execute, in connection with the sale provided for in Section 10 of this Pledge, any endorsements, Pledges or other instruments of conveyance or transfer with respect to any of the Pledged Collateral.

8

7. **Distributions.** Until the Liabilities have been satisfied in full. Grantor hereby grants Lender full irrevocable power and authority to receive and hold at any such time cash and non-cash distributions by Spectrum BV on account of any of the Pledged Collateral (together with all interest, if any, earned thereon), which may be held free and clear of the liens created hereby, and to convert any such non-cash distributions to cash, and to apply any such cash distributions, interest or proceeds of conversion in the manner specified in <u>Section 10(d)</u> of this Pledge.

8. **Performance by Lender of Grantor's Obligations.** If any Grantor fails to perform or comply with any of Grantor's agreements contained herein and Lender as provided for by the terms of this Pledge shall itself perform or comply, or otherwise cause performance or compliance, with such agreement, the expenses of Lender incurred in connection with such performance or compliance, together with interest thereon at the rate following a default specified in the Note in effect from time to time shall be payable by such Grantor to Lender on demand and shall constitute Liabilities secured hereby.

9. **Events of Default.** An Event of Default under the Loan Agreement shall be an Event of Default hereunder.

10. **Remedies, Rights Upon Default.**

(a) Upon the occurrence of any Event of Default, Lender or Lender's designee may, at Lender's option, elect to become a substituted member in Spectrum BV with respect to the Pledged Collateral and Grantor shall execute or cause to be executed all documents necessary to evidence Lender so becoming substituted member. If any Event of Default shall occur, Lender or Lender's designee may exercise in addition to all other rights and remedies granted to them in this Pledge and in any other instrument or agreement securing, evidencing or relating to the Liabilities, all rights and remedies of a secured party under the Code. Without limiting the generality of the foregoing, Grantor expressly agrees that in any such event Lender, without demand of performance or other demand, advertisement or notice of any kind (except the notice specified below of time and place of public or private sale) to or upon Grantor or any other person (all and each of which demands, advertisements and/or notices are hereby expressly waived), may forthwith collect, receive, appropriate and realize upon the Pledged Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give option or options to purchase, or sell or otherwise dispose of and deliver said Pledged Collateral (or contract to do so), or any part thereof, in one or more parcels at public or private sale or sales, at any exchange or broker's board or at any of Lender's offices or elsewhere at such prices as it may deem best, for cash or on credit or for future delivery without the assumption of any credit risk. Grantor expressly acknowledges that private sales may be less favorable to a seller than public sales but that private sales shall nevertheless be deemed commercially reasonable and otherwise permitted hereunder. In view of the fact that federal and state securities laws and/or other applicable laws may impose certain restrictions on the method by which a sale of the Pledged Collateral may be effected, Grantor agrees that upon the occurrence of an Event of Default, Lender may, from time to time, attempt to sell all or any part of the Pledged Collateral by means of a private placement, restricting the prospective purchasers to those who will represent and agree that they are purchasing for investment only and not for distribution. In so doing, Lender may solicit offers to buy the

9

Pledged Collateral, or any part thereof, for cash, from a limited number of investors deemed by Lender in its judgment, to be financially responsible parties who might be interested in purchasing the Pledged Collateral, and if Lender solicits such offers, then the acceptance by Lender of the highest offer obtained therefrom shall be deemed to be a commercially reasonable method of disposing of the Pledged Collateral.

. Lender or Lender's designee shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of said Pledged Collateral so sold, free of any right or equity of redemption, which equity of redemption Grantor hereby releases. Grantor further agrees, at the request of Lender, to assemble the Pledged Collateral and make it available to Lender at places which Lender shall reasonably select, whether at the applicable Grantor's premises or elsewhere. Lender shall apply the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale as provided in Section 10(d) of this Pledge. Only after so paying over such net proceeds and after the payment by Lender of any other amount required by any provision of law, need Lender account for the surplus, if any, to the applicable Grantor. To the extent permitted by applicable law, Grantor waives all claims, damages, and demands against Lender arising out of the repossession, retention or sale of the Pledged Collateral except in each case such as arise out of the gross negligence or willful misconduct of Lender. Lender agrees to give such notice as required by the Code to all parties entitled to receive notices on behalf of Grantor pursuant to Section 12 hereof in the case of any public or private sale. Grantor agrees that Lender need not give more (but may not give less) than ten (10) days' notice (which notification shall be given in the manner provided for notice to Grantor in Section 12 hereof) of the time and place of any public sale or of the time after which a private sale may take place and that such notice is reasonable notification of such matters. Lender agrees that Grantor or any person or entity with an interest in Grantor may, prior to such sale occurring, cause the Pledged Collateral to be vested in the payor, by paying to Lender all (and not less than all) of the Liabilities not later than the date which is seven (7) days after the effective date of such notice.

(b) Grantor also agrees to pay all costs of Lender, including reasonable attorneys' fees and expenses, incurred with respect to the collection of any of the Liabilities or the enforcement of any of Lender's rights hereunder.

(c) Grantor hereby waives presentment, demand, or protest (to the extent permitted by applicable law) of any kind in connection with this Pledge or any Pledged Collateral. Except for notices provided for herein, Grantor hereby waives notice (to the extent permitted by applicable law) of any kind in connection with this Pledge.

(d) The proceeds of any sale, disposition or other realization upon all or any part of the Pledged Collateral shall be distributed by Lender in the following order of priorities:

first, to Lender in an amount sufficient to pay in full the expenses of Lender in connection with such sale, disposition or other realization, including all expenses,

10

liabilities and advances incurred or made by Lender in connection therewith, including reasonable attorneys' fees and expenses;

second, to Lender until the other Liabilities are paid in full; and

finally, upon payment in full of all of the Liabilities, to Grantor, or their representative or as a court of competent jurisdiction or Grantor may direct.

Grantor agrees to indemnify and hold harmless Lender, its directors, officers, employees, agents and parent, and subsidiary entities, and each of them, from and against any and all liabilities, obligations, claims, damages, or expenses incurred by any of them arising out of or by reason of entering into this Pledge or the consummation of the transactions contemplated by this Pledge and to pay or reimburse Lender for the fees and disbursements of counsel incurred in connection with any investigation, litigation or other proceedings (whether or not Lender is a party thereto) arising out of or by reason of any of the aforesaid. Lender will promptly give Grantor written notice of the assertion of any claim which it believes is subject to the indemnity set forth in this Section 10 and will upon the request of any Grantor promptly furnish such Grantor with all material in its possession relating to such claim or the defense thereof to the extent that Lender may do so without breach of duty to others. Any amounts properly due under this Section 10 shall be payable to Lender immediately upon demand.

11. **Limitation on Lender's Duty in Respect of Pledged Collateral**. Except as expressly provided in the Code, Lender shall have no duty as to any Pledged Collateral in its possession or control or in the possession or control of any agent or nominee of Lender or as to any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto.

12. **Notice**. Any notices, communications and waivers under this Pledge shall be in writing and shall be (i) delivered in person, (ii) mailed, postage prepaid, either by registered or certified mail, return receipt requested, or (iii) by overnight express carrier, addressed in each case as follows to the addresses for notice set forth in the Loan Agreement or to any other address as to any of the parties hereto, as such party shall designate in a written notice to the other party hereto. All notices sent pursuant to the terms of this Section shall be deemed received (i) if personally delivered, then on the date of delivery, (ii) if sent by overnight, express carrier, then on the next federal banking day immediately following the day sent, (iii) if sent by electronically, by email or facsimile on the date sent provided that a confirming copy of the notice is sent by one of the other means of delivery as set forth herein (iv) if sent by registered or certified mail, then on the earlier of the third federal banking day following the day sent or when actually received.

13. **Severability**. Any provision of this Pledge which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

14. **No Waiver; Cumulative Remedies**. Lender shall not, by any act, delay, omission or otherwise, be deemed to have waived any of its rights or remedies hereunder. No waiver

11

hereunder shall be valid except to the extent therein set forth. A waiver of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which Lender would otherwise have had on any future occasion. No failure to exercise nor any delay in exercising on the part of Lender any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or future exercise thereof or the exercise of any other right, power or privilege. Except to the extent that Lender has specifically and expressly waived such remedies in this Pledge or otherwise, the rights and remedies hereunder provided are cumulative and may be exercised singly or concurrently, and are not exclusive of any rights and remedies provided by law. Lender may resort to and realize on the Pledged Collateral simultaneously with any acts or proceedings initiated by Lender in its sole and conclusive discretion to resort to or realize upon any other sources of repayment of the Liabilities, including, but not limited to, collateral granted by other security agreements and the personal liability of any Grantor and any person or entity which has guaranteed repayment of the Liabilities. None of the terms or provisions of this Pledge may be waived, altered, modified or amended except by an instrument in writing, duly executed by Grantor and Lender.

15. **Successors and Assigns; Governing Law**. This Pledge and all obligations of Grantor hereunder shall be binding upon the successors and assigns of such Grantor, except that neither Grantor shall have the right to assign its rights hereunder or any interest herein without the prior written consent of Lender and shall, together with the rights and remedies of Lender hereunder, inure to the benefit of Lender and its respective successors and assigns. This Pledge shall be governed by, and be construed and interpreted in accordance with, the laws of the State of Delaware Neither this Pledge nor anything set forth herein is intended to, nor shall it, confer any rights on any person or entity other than the parties hereto and all third party rights are expressly negated.

16. **Termination**. This Pledge, pledges and security interests created or granted hereby, shall terminate when the Liabilities shall have been fully paid and satisfied, at which time Lender shall release and reassign (without recourse upon, or any warranty whatsoever by, Lender), and deliver to Grantor all Pledged Collateral and related documents then in the custody or possession of Lender, including termination statements under the Code, all without recourse upon, or warranty whatsoever, by Lender and at the cost and expense of Grantor.

17. **Injunctive Relief**. Grantor recognizes that in the event any Grantor fails to perform, observe or discharge any of Grantor's obligations hereunder, no remedy of law will provide adequate relief to Lender, and agrees that Lender shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages.

18. **Waiver of Subrogation**. Grantor shall have no rights of subrogation as to any of the Pledged Collateral until full and complete performance and payment of the Liabilities.

19. **Waiver of Jury Trial**. GRANTOR AND LENDER (BY ACCEPTANCE HEREOF), HAVING BEEN REPRESENTED BY COUNSEL EACH KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (a) UNDER THIS PLEDGE OR ANY RELATED AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT,

12

DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS PLEDGE, OR (b) ARISING FROM ANY BANKING RELATIONSHIP EXISTING IN CONNECTION WITH THIS PLEDGE OR THE LOAN AGREEMENT, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. GRANTOR AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST LENDER OR ANY OTHER PERSON INDEMNIFIED UNDER THIS AGREEMENT ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

20. <u>VENUE</u>.    TO INDUCE LENDER TO THIS PLEDGE, GRANTOR IRREVOCABLY AGREES THAT, SUBJECT TO LENDER'S SOLE AND ABSOLUTE ELECTION, ALL ACTIONS OR PROCEEDINGS IN ANY WAY ARISING OUT OF OR RELATED TO THIS PLEDGE OR THE LOAN AGREEMENT WILL BE LITIGATED IN COURTS HAVING SITUS IN WILMINGTON, DELAWARE.    SPECTRUM BV HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY COURT LOCATED WITHIN WILMINGTON, DELAWARE, WAIVES PERSONAL SERVICE OF PROCESS UPON GRANTOR, AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL DIRECTED TO GRANTOR AT THE ADDRESS STATED HEREIN AND SERVICE SO MADE WILL BE DEEMED TO BE COMPLETED UPON ACTUAL RECEIPT.

[SIGNATURE PAGE TO FOLLOW]

FINAL EXECUTION VERSION

IN WITNESS WHEREOF, Grantor has executed this Pledge as of the date first above written.

GRANTOR:

SPECTRUM FIVE, LLC

By: _____
R. David Wilson, Member/Manager

Signature Page

EXHIBIT A
COPY OF ARTICLES OF ASSOCIATION

# ATTACHMENT I

EXECUTION VERSION

**LETTER AGREEMENT**

This Letter Agreement (the **"Agreement"**) is entered into as of the 5th day of September, 2020 (the **"Effective Date"**), by and among **SPECTRUM FIVE LLC**, a Delaware limited liability company having its registered address at 251 Little Falls Drive, Wilmington, Delaware, 19808, and represented herein by its Member/Manager, R. David Wilson (**"Wilson"**) and **SPECTRUM FIVE, NETHERLANDS B.V.** and **SPECTRUM FIVE B.V.**, both companies formed under the laws of the Netherlands (collectively, the **"Borrower"** or the **"Company"**), and **BIU, LLC** (the **"Lender"**, and together with the Company, the **"Parties"**), a Delaware limited liability company having its registered address at 8702 Jefferson Hwy, Suite B, Baton Rouge, Louisiana, 70809, and represented herein by its Sole Manager, Melton C. McGuire (**"McGuire"**). Terms used herein and not otherwise defined shall have the meaning ascribed to such term in the Prior Loan Agreement (defined below).

**W I T N E S S E T H**

**WHEREAS**, the Company has rights for a satellite slot located at the 95.15° West Longitude Orbital Slot (the **"95.15° Slot"**) which must be perfected by moving, or "bringing into use", a satellite into that certain location (the **"BIU Project"**); and

**WHEREAS**, the Company required funding in amounts, as applied and to be applied, to complete the BIU Project; and

**WHEREAS**, the Company previously entered into that certain Loan Agreement dated September 6, 2018, as supplemented and amended by that certain Amended and Restated Loan Agreement dated August 28, 2019, as further supplemented and amended by that certain Second Amended and Restated Loan Agreement dated the 30th day of December, 2019, and as further supplemented and amended by that certain Third Amended and Restated Loan Agreement dated the 31st day of January, 2020 (collectively, the **"Prior Loan Agreement"** and together with this Agreement, the **"Loan Agreement"**) as well as, the Security Agreement dated September 6, 2018 (the **"Security Agreement"**); the UCC Security Agreement dated August 28, 2019 (the **"UCC Agreement"**), and Pledge Agreement dated September, 2018 (collectively referred to herein and, together with any additional documents related hereto, as the **"Loan Documents"**).

**WHEREAS**, the Parties desire to enter into this Agreement to further supplement and amend the Prior Loan Agreement to extend the due date of the BIU Loan from September 6, 2020, to March 1, 2021 (or sooner as set forth herein) and provide for other terms and conditions set forth herein.

**NOW, THEREFORE**, in consideration of the foregoing, and the covenants and agreements hereinafter set forth to be kept and performed by the Parties hereto, it is agreed by and among the Parties that:

**SECTION 1. Reservation of Rights.** As part of entering into this Agreement, the Lender reserves its rights to pursue all available remedies available through the Loan Agreement, and execution of this Agreement in no way serves as a waiver of any of Lender's rights or release of any existing obligations of the Borrower in favor of the Lender as of the date of this Agreement.

**SECTION 2. Borrower's Right to Seek Other Funding.** No provision of this Agreement shall be construed to prohibit or limit Borrower's ability to admit new members into or assume more debt by Borrower provided however that Lender shall remain the senior debt holder as set forth by the Loan Agreement and Loan Documents. Any funds not placed into the accounts of Lender shall not be entitled to a first ranking lien on the security which is held by Lender.

**SECTION 3. <u>Minimum Funding Requirement.</u>** Borrower represents that it has persons or entities willing to invest a minimum of One Million Two Hundred Fifty Thousand Dollars ($1,250,000) (the **"Minimum Funding Requirement"**) into Lender. The Parties agree that this Agreement does not represent a binding commitment by Lender to lend additional funds to Borrower in any amount, and further that (i) Lender makes no representation, express or implied, that it can or will raise sufficient funds to satisfy Borrower's operating capital requirements reflected in the Budget, and (ii) failure of Lender to raise such funds shall not constitute a breach of any of the terms of this Agreement of the Prior Loan Agreement by Lender.

**SECTION 4. <u>BIU Loan Due Date.</u>** The BIU Loan Due Date is extended to March 1, 2021.

**SECTION 5. <u>Reservation and Use of Funds.</u>** Lender and Borrower agree to the following use of contributions made to and deposited in the bank account of Lender.

    <u>a.</u> <u>Reserve.</u> Lender and Borrower agree that Lender must maintain a cash balance sufficient to cover its operating costs from 2020 through windup in 2021. This includes: government registration fees and permits, bank changes, tax preparation and attorney fees. Lender estimates these costs to be $50,000.

**\SECTION 5. <u>Loan Balance.</u>** Borrower acknowledges and agrees that as of September 6, 2020, the aggregate outstanding principal balance of the Loan is Fourteen Million Ninety-Two Thousand Four Hundred Three Dollars ($14,092,403) (the **"Principal Balance"**), and such Principal Balance has accrued Lender Return calculated pursuant to <u>Section 6</u> of the Loan Agreement (together, the Principal Balance together with Lender Return, the **"Indebtedness"**). Borrower acknowledges and agrees that the Principal Balance is outstanding, and that Borrower has no right of offset, defense, or counterclaim with respect to the Indebtedness or any other related obligations.

**SECTION 6. <u>Committee.</u>** In the event that Borrower does not pay to Lender the Indebtedness plus any additional amounts raised pursuant to this Agreement together with applicable Lender Return, then further monetization and/or disposition of the 95.15° Slot shall be strictly governed by a committee (the **"Committee"**) appointed as follows: Lender shall appoint four (4) members which shall include McGuire. Borrower shall appoint four (4) members which shall include Wilson. The Committee shall meet upon notice with deference given to the Committee members schedules. Priority shall be given to the repayment of all amounts due Lender. Committee members have no fiduciary duty to any Borrower or Lender but shall at all times act in good faith to maximize the ability to repay Lender in full. Borrower agrees to implement any Committee recommendation as soon as possible.

**SECTION 7. <u>Ratification; Additional Documentation.</u>** Borrower, as debtor, grantor, pledger, guarantor, assignor or in any other similar capacity in which such Borrower grants liens or security interests in its property or otherwise acts as an accommodation party or a guarantor, as the case may be, hereby ratifies and reaffirms (i) any and all of such Borrower's payment and performance obligations, contingent or otherwise, under the Loan Agreement and the other Loan Documents to which such Borrower is a party (after giving effect hereto), (ii) any and all grants of security interests and liens by each Borrower party in the Loan Agreement, the Security Agreement, the Pledge Agreement and/or any other Loan Documents and each Borrower party confirms and agrees that such security interests and liens hereafter secure all obligations due Lender. Borrower hereby consents to this Agreement and acknowledges that each of the Loan Documents remains in full force and effect and is hereby ratified and reaffirmed. Borrower further represents and warrants that the Pledge Agreement of membership interests executed in accordance with the Loan Documents still pertains to the correct entity that serves and will

2

serve as the contracting entity with the Netherlands with respect to all agreements related to the 95.15° Slot, and that Borrower and its principals or affiliated persons shall promptly deliver any additional pledge agreements required from any additional person or entity related to Borrower or its principals, directors, members or affiliated persons, that serves to transact and contract with the Netherlands with respect to the 95.15° Slot (KuFSS and Extended KuFSS only).

**SECTION 8. Waiver of Jury Trial. BORROWER AND LENDER EACH EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION ARISING UNDER THE LOAN AGREEMENT, THE SECURITY AGREEMENT, THE PLEDGE AGREEMENT OR ANY OTHER LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR INCIDENTAL TO THE DEALINGS OF THE PARTIES WITH RESPECT TO SUCH LOAN DOCUMENT OR ANY ADDITIONAL LOAN DOCUMENTS, WHETHER NOW EXISTING OR ARISING IN THE FUTURE, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. THE LOAN PARTIES EACH AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 8 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE WAIVER OF ITS RESPECTIVE RIGHT TO TRIAL BY JURY.**

**SECTION 9. Note.** Each Borrower, represents, warrants, acknowledges, and agrees that as a convenience to Borrower, Lender has previously advanced funds without increasing the amount of the Note. Each Borrower agrees to execute a new Note for the full amount of monies advanced when such revised Note is submitted for execution provided such Note accurately reflects the total principal amount advanced by Borrower. Notwithstanding the foregoing, Borrower remains obligated for the full repayment of all amounts advanced by Lender together with applicable Lender Return regardless of any lesser amount set forth in any Note.

**SECTION 10. Full Force and Effect.** Except as expressly modified by this Agreement, the Prior Loan Agreement, the Security Agreement, the UCC Agreement and the Pledge Agreement and the other Loan Documents remain in full force and effect. From and after the Effective Date, all references in the Prior Loan Agreement, the Security Agreement, the UCC Agreement, the Pledge Agreement and the other Loan Documents to the term "Loan Agreement" shall mean the Prior Loan Agreement, as modified by this Agreement. This Agreement constitutes a "Loan Document". Any breach or default of Borrower of any of its obligations under or any covenant, representation or warranty in this Agreement shall each constitute an immediate Event of Default under the Prior Loan Agreement, without further action or notice by or any behalf of Lender or any other person.

**SECTION 11. No Waiver.** Nothing contained herein shall be deemed to constitute a waiver of compliance with any term or condition contained in the Loan Agreement or any of the other Loan Documents or constitute a course of conduct or dealing among the parties. Except as expressly stated herein, Agent and Lenders reserve all rights, privileges and remedies under the Loan Agreement and the other Loan Documents. Except as amended or modified hereby, the Loan Agreement and other Loan Documents remain unmodified and in full force and effect.

**SECTION 12. Severability.** In case any provision of or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**SECTION 13. Headings.** Headings and captions used in this Agreement (including the Exhibits, Schedules, and Annexes hereto, if any) are included for convenience of reference only and shall not be given any substantive effect.

**SECTION 14. Governing Law.** This Agreement shall be governed by and construed in accordance with the choice of law provisions set forth in the Prior Loan Agreement and shall be subject to the notice provisions of the Prior Loan Agreement.

**SECTION 15. Counterparts.** This Agreement may be executed in counterparts, each of which will be deemed an original document, but all of which will constitute a single document. This document will not be binding on or constitute evidence of a contract between the parties until such time as a counterpart of this document has been executed by each of the Parties and a copy thereof delivered to each party under this Agreement. A facsimile or email (in .pdf format) of any Party's signature to this Agreement or on any other Loan Document shall be treated as an original signature for all purposes of this Agreement and shall be fully effective to bind such Party to the terms of this Agreement.

**SECTION 16. Entire Agreement.** This Agreement, the Prior Loan Agreement, the Note, the Security Agreement, the UCC Agreement, the Pledge Agreement and the other Loan Documents constitute the entire understanding of Borrower and Lender with respect to the subject matter hereof and thereof and supersede any other prior agreements, statements and correspondence. This Agreement may not be modified, altered, or amended except by agreement in writing signed by Borrower and Lender.

[Remainder of page intentionally left blank; signature pages follow]

**THUS DONE, EXECUTED AND SIGNED**, in multiple originals, effective as set forth herein.

BORROWER:
SPECTRUM FIVE LLC

By: _____
R. David Wilson, Member/Manager

SPECTRUM FIVE, NETHERLANDS B.V.

By: _____
R. David Wilson, Director

SPECTRUM FIVE B.V.

By: _____
R. David Wilson, Director

LENDER:
BIU, LLC

By: _____
Melton C. McGuire, Sole Manager

# ATTACHMENT J

EXECUTION VERSION

## LETTER AGREEMENT

This Letter Agreement (the "**Agreement**") is entered into as of the 15th day of February, 2021 (the "**Effective Date**"), by and among **SPECTRUM FIVE LLC**, a Delaware limited liability company having its registered address at 251 Little Falls Drive, Wilmington, Delaware, 19808, and represented herein by its Member/Manager, R. David Wilson ("**Wilson**") and **SPECTRUM FIVE, NETHERLANDS B.V.** and **SPECTRUM FIVE B.V.**, both companies formed under the laws of the Netherlands (collectively, the "**Borrower**" or the "**Company**"), and **BIU, LLC** (the "**Lender**", and together with the Company, the "**Parties**"), a Delaware limited liability company having its registered address at 8702 Jefferson Hwy, Suite B, Baton Rouge, Louisiana, 70809, and represented herein by its Sole Manager, Melton C. McGuire ("**McGuire**"). Terms used herein and not otherwise defined shall have the meaning ascribed to such term in the Prior Loan Agreement (defined below).

### WITNESSETH

**WHEREAS**, the Company has rights to a satellite slot, as well as a satellite that currently occupies the slot, at 95.15° West Longitude Orbital Slot (the "**95.15° Slot**") which it seeks to make use or sell (the "**BIU Project**"); and

**WHEREAS**, the Company required funding in amounts, as applied and to be applied, to complete the BIU Project; and

**WHEREAS**, the Company previously entered into that certain Loan Agreement dated September 6, 2018, as supplemented and amended by that certain Amended and Restated Loan Agreement dated August 28, 2019, as further supplemented and amended by that certain Second Amended and Restated Loan Agreement dated the 30th day of December, 2019, and as further supplemented and amended by that certain Third Amended and Restated Loan Agreement dated the 31st day of January, 2020 (collectively, the "**Prior Loan Agreement**" and together with this Agreement, the "**Loan Agreement**") as well as, the Security Agreement dated September 6, 2018 (the "**Security Agreement**"); the UCC Security Agreement dated August 28, 2019 (the "**UCC Agreement**"), and Pledge Agreement dated September, 2018 (collectively referred to herein and, together with any additional documents related hereto, as the "**Loan Documents**").

**WHEREAS**, the Parties desire to enter into this Agreement to further supplement and amend the Prior Loan Agreement to extend the due date of the BIU Loan from March 1, 2021, to August 1, 2021 (or sooner as set forth herein) and provide for other terms and conditions set forth herein.

**NOW, THEREFORE,** in consideration of the foregoing, and the covenants and agreements hereinafter set forth to be kept and performed by the Parties hereto, it is agreed by and among the Parties that:

**SECTION 1. Reservation of Rights.** As part of entering into this Agreement, the Lender reserves its rights to pursue all available remedies available through the Loan Agreement, and execution of this Agreement in no way serves as a waiver of any of Lender's rights or release of any existing obligations of the Borrower in favor of the Lender as of the date of this Agreement.

**SECTION 2. Borrower's Right to Seek Other Funding.** No provision of this Agreement shall be construed to prohibit or limit Borrower's ability to admit new members into or assume more debt by Borrower provided however that Lender shall remain the senior debt holder as set forth by the Loan Agreement and Loan Documents. Any funds not placed into the accounts of Lender shall not be entitled to a first ranking lien on the security which is held by Lender.

SECTION 3. **Minimum Funding Requirement.** Borrower represents that it has persons or entities willing to invest a minimum of One Million Two Hundred Fifty Thousand Dollars ($1,250,000) (the "**Minimum Funding Requirement**") into Lender. The Parties agree that this Agreement does not represent a binding commitment by Lender to lend additional funds to Borrower in any amount, and further that (i) Lender makes no representation, express or implied, that it can or will raise sufficient funds to satisfy Borrower's operating capital requirements reflected in the Budget, and (ii) failure of Lender to raise such funds shall not constitute a breach of any of the terms of this Agreement of the Prior Loan Agreement by Lender.

SECTION 4. **BIU Loan Due Date.** The BIU Loan Due Date is extended to August 1, 2021.

SECTION 5. **Reservation and Use of Funds**. Lender and Borrower agree to the following use of contributions made to and deposited in the bank account of Lender.

a. Reserve. Lender and Borrower agree that Lender must maintain a cash balance sufficient to cover its operating costs from 2021 through windup in 2022. This includes: government registration fees and permits, bank changes, tax preparation and attorney fees. Lender estimates these costs to be $50,000.

SECTION 5. **Loan Balance.** Borrower acknowledges and agrees that as of the Effective Date, the aggregate outstanding principal balance of the Loan exceeds Fourteen Million Dollars ($14,000,000) the exact amount to be calculated by a line-item accounting of all payments (the "**Principal Balance**"), and such Principal Balance has accrued Lender Return calculated pursuant to Section 6 of the Loan Agreement (together, the Principal Balance together with Lender Return, the "**Indebtedness**"). Borrower acknowledges and agrees that the Principal Balance is outstanding, and that Borrower has no right of offset, defense, or counterclaim with respect to the Indebtedness or any other related obligations.

SECTION 6. **Committee**. In the event that Borrower does not pay to Lender the Indebtedness plus any additional amounts raised pursuant to this Agreement together with applicable Lender Return, then further monetization and/or disposition of the 95.15° Slot shall be strictly governed by a committee (the "**Committee**") appointed as follows: Lender shall appoint four (4) members which shall include McGuire. Borrower shall appoint four (4) members which shall include Wilson. In the event of a tie, five (5) of the eight (8) shall appoint a ninth (9th) member to break any and all ties. The Committee shall meet upon notice with deference given to the Committee members' schedules. Priority shall be given to the repayment of all amounts due Lender. Committee members have no fiduciary duty to any Borrower or Lender but shall at all times act in good faith to maximize the ability to repay Lender in full. Borrower agrees to implement any Committee recommendation as soon as possible.

SECTION 7. **Ratification; Additional Documentation.** Borrower, as debtor, grantor, pledger, guarantor, assignor or in any other similar capacity in which such Borrower grants liens or security interests in its property or otherwise acts as an accommodation party or a guarantor, as the case may be, hereby ratifies and reaffirms (i) any and all of such Borrower's payment and performance obligations, contingent or otherwise, under the Loan Agreement and the other Loan Documents to which such Borrower is a party (after giving effect hereto), (ii) any and all grants of security interests and liens by each Borrower party in the Loan Agreement, the Security Agreement, the Pledge Agreement and/or any other Loan Documents and each Borrower party confirms and agrees that such security interests and liens hereafter secure all obligations due Lender. Borrower hereby consents to this Agreement and acknowledges that each of the Loan Documents remains in full force and effect and is hereby ratified and reaffirmed. Borrower further represents and warrants that the Pledge Agreement of membership interests

executed in accordance with the Loan Documents still pertains to the correct entity that serves and will serve as the contracting entity with the Netherlands with respect to all agreements related to the 95.15° Slot, and that Borrower and its principals or affiliated persons shall promptly deliver any additional pledge agreements required from any additional person or entity related to Borrower or its principals, directors, members or affiliated persons, that serves to transact and contract with the Netherlands with respect to the 95.15° Slot (KuFSS and Extended KuFSS only).

**SECTION 8. <u>Waiver of Jury Trial</u>. BORROWER AND LENDER EACH EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION ARISING UNDER THE LOAN AGREEMENT, THE SECURITY AGREEMENT, THE PLEDGE AGREEMENT OR ANY OTHER LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR INCIDENTAL TO THE DEALINGS OF THE PARTIES WITH RESPECT TO SUCH LOAN DOCUMENT OR ANY ADDITIONAL LOAN DOCUMENTS, WHETHER NOW EXISTING OR ARISING IN THE FUTURE, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. THE LOAN PARTIES EACH AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 8 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE WAIVER OF ITS RESPECTIVE RIGHT TO TRIAL BY JURY.**

**SECTION 9. <u>Note</u>.** Each Borrower, represents, warrants, acknowledges, and agrees that as a convenience to Borrower, Lender has previously advanced funds without increasing the amount of the Note. Each Borrower agrees to execute a new Note for the full amount of monies advanced when such revised Note is submitted for execution provided such Note accurately reflects the total principal amount advanced by Borrower. Notwithstanding the foregoing, Borrower remains obligated for the full repayment of all amounts advanced by Lender together with applicable Lender Return regardless of any lesser amount set forth in any Note.

**SECTION 10. <u>Full Force and Effect</u>.** Except as expressly modified by this Agreement, the Prior Loan Agreement, the Security Agreement, the UCC Agreement and the Pledge Agreement and the other Loan Documents remain in full force and effect. From and after the Effective Date, all references in the Prior Loan Agreement, the Security Agreement, the UCC Agreement, the Pledge Agreement and the other Loan Documents to the term "Loan Agreement" shall mean the Prior Loan Agreement, as modified by this Agreement. This Agreement constitutes a "Loan Document". Any breach or default of Borrower of any of its obligations under or any covenant, representation or warranty in this Agreement shall each constitute an immediate Event of Default under the Prior Loan Agreement, without further action or notice by or any behalf of Lender or any other person.

**SECTION 11. <u>No Waiver</u>.** Nothing contained herein shall be deemed to constitute a waiver of compliance with any term or condition contained in the Loan Agreement or any of the other Loan Documents or constitute a course of conduct or dealing among the parties. Except as expressly stated herein, Agent and Lenders reserve all rights, privileges and remedies under the Loan Agreement and the other Loan Documents. Except as amended or modified hereby, the Loan Agreement and other Loan Documents remain unmodified and in full force and effect.

**SECTION 12. <u>Severability</u>.** In case any provision of or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**SECTION 13. <u>Headings</u>**. Headings and captions used in this Agreement (including the Exhibits, Schedules, and Annexes hereto, if any) are included for convenience of reference only and shall not be given any substantive effect.

**SECTION 14. <u>Governing Law</u>**. This Agreement shall be governed by and construed in accordance with the choice of law provisions set forth in the Prior Loan Agreement and shall be subject to the notice provisions of the Prior Loan Agreement.

**SECTION 15. <u>Counterparts</u>**. This Agreement may be executed in counterparts, each of which will be deemed an original document, but all of which will constitute a single document. This document will not be binding on or constitute evidence of a contract between the parties until such time as a counterpart of this document has been executed by each of the Parties and a copy thereof delivered to each party under this Agreement. A facsimile or email (in .pdf format) of any Party's signature to this Agreement or on any other Loan Document shall be treated as an original signature for all purposes of this Agreement and shall be fully effective to bind such Party to the terms of this Agreement.

**SECTION 16. <u>Entire Agreement.</u>** This Agreement, the Prior Loan Agreement, the Note, the Security Agreement, the UCC Agreement, the Pledge Agreement and the other Loan Documents constitute the entire understanding of Borrower and Lender with respect to the subject matter hereof and thereof and supersede any other prior agreements, statements and correspondence. This Agreement may not be modified, altered, or amended except by agreement in writing signed by Borrower and Lender.

[Remainder of page intentionally left blank; signature pages follow]

**THUS DONE, EXECUTED AND SIGNED,** in multiple originals, effective as set forth herein.

**BORROWER:**
**SPECTRUM FIVE LLC**

By:      _____

R. David Wilson, Member/Manager

**SPECTRUM FIVE, NETHERLANDS B.V.**

By:      _____

R. David Wilson, Director

**SPECTRUM FIVE B.V.**

By:      _____

R. David Wilson, Director

**LENDER:**
**BIU, LLC**

By:      _____

Melton C. McGuire, Sole Manager

5



**THIS IS DONE, EXECUTED AND SIGNED** in multiple originals, effective as set forth interim.

**BORROWER:**
**SPECTRUM FIVE LLC**

By: _____
R. David Wilson, Member Manager

**SPECTRUM FIVE NETHERLANDS B.V.**

By: _____
R. David Wilson, Director

**SPECTRUM FIVE B.V.**

By: _____
R. David Wilson, Director

**LENDER:**
**BIU, LLC**

By: _____
McLeod G. McGuire, Sole Manager

# ATTACHMENT K

## **LETTER AGREEMENT**

This Letter Agreement (the "Agreement") is entered into as of the ___ day of October, 2021, by and among BIU, by and through Scott H. Crawford and Ronald T. LeMay, on one hand, and Spectrum Five, LLC, Spectrum Five, Netherlands B.V., and Spectrum Five B.V. (collectively, "Spectrum Five"), on the other, by and through R. David Wilson.

Reference is made to the May 2021 agreements between BIU and First Capital Strategies/Integrated Resource Management, LLC ("First Capital Strategies/IRM"), copies of which are annexed hereto and incorporated herein (the "Investment Agreements"). Spectrum Five and Mr. Wilson agree to ratify, approve, and support the Investment Agreements. In addition, Spectrum Five and Mr. Wilson agree that any comments or efforts he has with respect to lobbying efforts of First Capital Strategies/IRM will be presented to Mr. Crawford and will not be presented to First Capital Strategies/IRM or any of its representatives or employees. Further, Spectrum Five and Mr. Wilson agree that Mr. Wilson will not pursue any lobbying efforts on behalf of Spectrum Five until he is notified in writing by a Manager of BIU that he may do so.

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to its conflict of laws principles.

This Agreement and the Investment Agreements constitute the entire understanding of Mr. Wilson, BIU, and Spectrum Five with respect to the lobbying and legislative initiatives on behalf of Spectrum Five and supersede any prior written or oral agreements, statements, and correspondence on this subject matter. This Agreement may not be modified, altered, or amended except by agreement in writing signed by Spectrum Five, Mr. Wilson, and BIU.

This Agreement may be executed in counterparts, each of which will be deemed an original document, but all of which will constitute a single document.

**THUS DONE, EXECUTED AND SIGNED**, in multiple originals, effective as set forth herein.

**SPECTRUM FIVE LLC**

By: _____
R. David Wilson, Member/Manager

**SPECTRUM FIVE, NETHERLANDS B.V.**

By: _____
R. David Wilson, Director

**SPECTRUM FIVE B.V.**

By: _____
R. David Wilson, Director

1

BIU, LLC

By:   _____
      Scott H. Crawford, Manager

BIU, LLC

By:   _____
      Ronald T. LeMay, Manager

2

**BIU, LLC**

By: _____
Scott H. Crawford, Manager

**BIU, LLC**

By: _____
Ronald T. LeMay, Manager

2

# EXHIBIT A

## INVESTMENT AGREEMENT

This Investment Agreement (the "**Agreement**") is entered into on this 28th day of _May_, 2021, by and among **FIRST CAPITAL STRATEGIES, LLC** ("**Capital**"), a Delaware limited liability company having its registered address at 1675 South State Street, Dover, Delaware, 19901, and represented herein by its Member/Manager, Scott H. Crawford, whose business address is 8702 Jefferson Highway, Suite B, Baton Rouge, Louisiana 70809, and **INTEGRATED RESOURCE MANAGEMENT, LLC** ("**Investor**", and together with the Investor, the "**Parties**"), a Louisiana limited liability company having its registered address at 2007 Lake Hills Parkway, Baton Rouge, Louisiana 70808, and represented herein by its CEO, Mark A. Zelden.

### WITNESSETH

**WHEREAS**, Capital is investing in BIU, LLC, a Delaware limited liability company ("**BIU**"), and Investor desires, through Capital, to make further investments in BIU, connected with the monetization of 95 W.L.; and

**WHEREAS**, pursuant to a loan agreement between BIU and Spectrum Five, BIU has a security interest to all revenues generated by 95 W.L. which are to be deposited in the bank account of BIU; and

**WHEREAS**, Investor desires to enter into this Agreement with Capital to invest in Capital; and

**WHEREAS**, Investor seeks to assist Capital through the utilization of various forms of financing associated with the development of 95 W.L.; and

**WHEREAS**, Investor has certain skills, experience and training related to maximizing financial benefits for such ventures; and

**WHEREAS**, Capital desires that Investor participates as an investor.

**NOW, THEREFORE**, in consideration of this engagement and other good and valuable consideration, Capital and Investor hereby accept the terms and conditions of engagement hereinafter set forth:

1. **Administrative Incentives.** The Investor will assist in securing incentives to compensate BIU/Spectrum Five in the form of monetization of the interests at 95 W.L. ("**Financial Benefits**").

2. **Compensation.**

   (a) In the event Investor is successful in providing a Financial Benefit as a result of Investor's efforts described above, Investor will earn an investment in Capital. In

exchange for the services to be provided by Investor, in the event that Investor achieves Financial Benefits, Investor shall earn an investment in Capital, and would be entitled to a multiple of 7 to 1.

(b) The investment earned by the Investor shall be an initial investment amount equal to 0.01428572 times the Financial Benefits (the "Initial Investment").

(c) In the event an Initial Investment is earned by Investor, Capital will prepare and execute an Investment and Subscription Agreement in favor of Investor. The Initial Investment shall equal the amount as calculated above, and said Investor would be entitled to a 7 to 1 return on the Initial Investment.

(d) Notwithstanding anything contained herein to the contrary, no compensation shall be due to Investor unless and until actual monies representing the Financial Benefits had been received into the account of Capital. Investor and Capital acknowledge and agree that Capital would not enter into this Agreement without the foregoing.

(e) Mutual consent is required of the Parties in order to approve any offer or offers of any proposed Financial Benefits made hereunder.

3. **Separate Efforts.** In the event of separate efforts, unrelated to the efforts of Investor, (specifically the efforts of Spectrum Five to negotiate a sale of its rights to an unrelated third party) result in monetization of 95.15° W.L. no Financial Benefits will be deemed to have been secured thereby. Notwithstanding the foregoing, the parties agree that Capital shall not engage nor partner in any way with any other third party providing similar skills or services as Investor and during the term of this Agreement, Investor shall have the exclusive engagement and relationship regarding such services as an Investor to Capital. Further, Investor will take no action that delays, interrupts, or interferes with Spectrum Five's efforts to negotiate monetization of 95WL through the direct sale or lease with a third party vendor without the prior written permission of Capital.

4. **Non-Disclosure Agreement.** Investor agrees to keep the Capital informed as to all of its efforts and Investor and Capital both agree to enter into a non-disclosure agreement in exchange for sharing such information.

5. **Termination.**

   A. **Term of Agreement.** This Agreement shall commence on the Effective Date and shall be for a period of one (1) year. The Parties may renew or extend the Agreement at any time upon express written notice.

6. **Complete Agreement**

   This written Agreement is the final, complete and exclusive statement and expression of the agreement between Investor and Capital and of all the terms of this Agreement, and it cannot be varied, contradicted or supplemented by evidence of any prior or contemporaneous oral or written agreements. This written Agreement

may not be later modified except by a written instrument signed by a duly authorized officer of the Capital and Investor, and no term of this Agreement may be waived except by a written instrument signed by the party waiving the benefit of such term.

7.  **Severability Headings**

If any portion of this Agreement is held invalid or inoperative, the other portions of this Agreement shall be deemed valid and operative and, so far as is reasonable and possible, effect shall be given to the intent manifested by the portion held invalid or inoperative. The section headings herein are for reference purposes only and are not intended in any way to describe, interpret, define or limit the extent or intent of the Agreement or of any part hereof.

8.  **Counterparts**

This Agreement may be executed simultaneously in two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one and the same instrument.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement effective for all purposes as of the Effective Date set forth above.

FIRST CAPITAL STRATEGIES, LLC

By: _____

Scott H. Crawford, Member/Manager


INVESTOR

By: _____

Mark A. Zelden, CEO
Integrated Resource Management, LLC

# EXHIBIT B

## INVESTMENT AGREEMENT
### BY AND BETWEEN FIRST CAPITAL STRATEGIES, LLC AND BIU, LLC

This Investment Agreement (the "Agreement") is entered into on this 28th day of May, 2021, by and among **FIRST CAPITAL STRATEGIES, LLC** ("Investor"), a Delaware limited liability company having its registered address at 1675 South State Street, Dover, Delaware, 19901, and represented herein by its Member/Manager, Scott H. Crawford ("**Crawford**"), whose business address is 8702 Jefferson Highway, Suite B, Baton Rouge, Louisiana 70809, and BIU, LLC ("**BIU**", and together with the Investor, the "**Parties**"), a Delaware limited liability company, having its registered address at 1675 South State Street, Suite B, Dover, Delaware 19901, and represented herein by its Sole Manager, Melton C. McGuire ("**McGuire**").

### W I T N E S S E T H

**WHEREAS,** Investor and BIU entered into its original Agreement on November 9, 2020, and

**WHEREAS,** the Parties have made additional investments and desire to amend the original Agreement; and

**WHEREAS,** Spectrum Five, LLC, a Delaware limited liability company ("**Spectrum Five**") asserts that it has international rights for a satellite slot located at the 95.15° West Longitude Orbital Slot (the "**95.15°**")

**WHEREAS,** said rights may be further perfected and defined by employing a strategy know as "bring into use" which, in this case, entailed moving the Hellas Sat 2 satellite into 95.15° (the "**BIU Project**"); and

**WHEREAS,** BIU agreed to loan Spectrum Five monies required for Spectrum Five to execute the BIU Project; and

**WHEREAS,** BIU has a recorded, first position security interest in all revenues generated by the monetization of BIU Project regardless of the payor or method of monetization pursuant to a loan agreement between BIU and Spectrum Five; and

**WHEREAS,** Spectrum Five required funding in amounts, as applied and to be applied, to complete the BIU Project; and

**WHEREAS,** Spectrum Five previously entered into that certain Loan Agreement dated September 6, 2018, as supplemented and amended by that certain Amended and Restated Loan Agreement dated August 28, 2019, as further supplemented and amended by that certain Second Amended and Restated Loan Agreement dated the 30th day of December, 2019, and as further supplemented and amended by that certain Third Amended and Restated Loan Agreement dated the 31st day of January, 2020 (collectively, the "**Prior Loan Agreement**"), as well as, the Security Agreement dated September 6, 2018 (the "**Security Agreement**"); and

**WHEREAS,** BIU desires to enter into this Agreement with Investor to assist in realizing the monetization of 95 W.L.; and

**WHEREAS,** Spectrum Five is in the process of monetization of that certain set of frequency assignments at 95 W.L. ("**95 W.L.**"); and

WHEREAS, BIU seeks to assist Spectrum Five through the utilization of various forms of financing associated with the development of 95 W.L.; and

WHEREAS, Investor has certain skills, experience and training related to maximizing financial benefits for such ventures, specifically concerning financial incentives and compensation; and

WHEREAS, BIU desires that Investor participates as an investor in BIU through the monetization of 95 W.L.

NOW THEREFORE, in consideration of this engagement and other good and valuable consideration, BIU and Investor hereby accept the terms and conditions of engagement hereinafter set forth:

1. **Incentives.** The Investor will assist in securing incentives to motivate interested parties to compensate BIU/Spectrum Five in the form of monetization of the interests at 95 W.L. ("Financial Benefits") mutually agreed to be the Parties. The precise amount of Financial Benefits shall be the amounts deposited in the bank account of BIU. Financial Benefits shall not include offsets or claims by other parties.

2. **Compensation.**

   (a) In the event Investor is successful in providing Financial Benefits as a result of Investor's efforts described above, Investor will earn an investment in BIU.

   (b) The investment earned by the Investor shall be an initial investment amount equal to 0.0157 1429 times the Financial Benefits (the "Initial Investment").

   (c) In the event an Initial Investment is earned by Investor, BIU will prepare and execute an Investment and Subscription Agreement in favor of Investor. The Initial Investment shall equal the amount as calculated above, and said Investor would be entitled to a 7 to 1 return on the Initial Investment.

   (d) Notwithstanding anything contained herein to the contrary, no compensation shall be due to Investor unless and until actual monies representing the Financial Benefits had been received into the account of BIU. Investor and BIU acknowledge and agree that BIU would not enter into this Agreement without the foregoing.

3. **Separate Efforts.** It is acknowledged by BIU and Investor that Spectrum Five is pursuing a separate effort to monetize the BIU Project which is distinguishable from the efforts of Investor. In the event of separate efforts, unrelated to Investor's efforts, result in monetization of 95.15° W.L. no Financial Benefits will be deemed to have been secured.

4. **Non-Disclosure Agreement.** Investor agrees to keep the Sole Manager of BIU informed as to all of its efforts and Investor and Sole Manager both agree to enter into a non-disclosure agreement in exchange for sharing such information.

5. **Termination.**

   A. **Term of Agreement.** This Agreement shall commence on the Effective Date and shall be for a period of one (1) year. The Parties may renew or extend the

Agreement at any time upon express written notice.

6. **Complete Agreement.**

This Agreement supersedes any other agreements or understandings, written or oral, between BIU and Investor regarding the subject matter of this Agreement. This written Agreement is the final, complete and exclusive statement and expression of the agreement between BIU and Investor and of all the terms of this Agreement, and it cannot be varied, contradicted or supplemented by evidence of any prior or contemporaneous oral or written agreements. This written Agreement may not be later modified except by a written instrument signed by a duly authorized officer of BIU and Investor, and no term of this Agreement may be waived except by a written instrument signed by the party waiving the benefit of such term.

7. **Severability Headings.**

If any portion of this Agreement is held invalid or inoperative, the other portions of this Agreement shall be deemed valid and operative and, so far as is reasonable and possible, effect shall be given to the intent manifested by the portion held invalid or inoperative. The section headings herein are for reference purposes only and are not intended in any way to describe interpret, define or limit the extent or intent of the Agreement or of any part hereof.

8. **Counterparts.**
This Agreement may be executed simultaneously in two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one and the same instrument.

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement for all purposes as of the Effective Date set forth above.

INVESTOR

By: _____

Scott H. Crawford, Member/Manager
First Capital Strategies, LLC

BIU, LLC

By: _____

Melton C. McGuire, Sole Manager

4

# ATTACHMENT L

DocuSign Envelope ID: 8B6BA162-15C7-492E-8287-49FEFB4D2669

Before the
**FEDERAL COMMUNICATIONS COMMISSION**
Washington, D.C., 27554

In the Matter of                                )
                                                )
Intelsat 30 and 31:                             )        IB Docket No. 20-399
                                                )
Satellite Stations S2887 and S2924              )
                                                )
                                                )

## DECLARATION OF SCOTT CRAWFORD

I, Scott Crawford, declare as follows:

1.    Ron LeMay and I are the Managing Directors of BIU, LLC.  The facts stated herein are within my personal knowledge and, if called upon to testify, I can truthfully and competently do so as to all matters herein.

2.    On June 6, 2023, I learned that Spectrum Five, LLC ("Spectrum Five") had asked the Commission to withdraw the Petition for Enforcement of Operational Limits and for Expedited Proceedings to Revoke Satellite Licenses (the "Petition").  I also learned on that day that a staff-level order had accepted the withdrawal.

3.    Neither I nor Mr. LeMay were informed or aware that Spectrum Five had retained Jenner & Block to prosecute the Petition or that the Petition had been withdrawn.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 8, 2023.

DocuSigned by:

*Scott Crawford*
95EFC0D14AF24E0...

Scott Crawford

1

# ATTACHMENT M



Michael H. Strub Jr.
Direct Dial: (949) 383-2770
MStrub@GGTrialLaw.com

Amir A. Shakoorian
Direct Dial: (213) 334-7005
AShakoorian@GGTrialLaw.com

June 7, 2023

**VIA E-MAIL: SFeder@jenner.com**

Samuel L. Feder
Jenner & Block LLP
1099 New York Avenue
NW Suite 900
Washington, D.C. 20001-4412

> Re: **IB Docket No. 20-399, Spectrum Five LLC, Petition for Enforcement of Operational Limits and for Expedited Proceedings to Revoke Satellite Licenses**

Dear Mr. Feder:

We represent BIU, LLC ("BIU").

We just learned that you have been representing Spectrum Five LLC ("Spectrum Five") in connection with the above-referenced proceedings and that your firm, purportedly on behalf of Spectrum Five, withdrew the Petition of Spectrum Five for Enforcement of Operational Limits and for Expedited Proceedings to Revoke Satellite Licenses, Misc. Docket No. INBOX-1.41 (filed Nov. 6, 2020) (the "Petition"). Pursuant to that request, on April 24, 2023, the Federal Communications Commission ("FCC") dismissed the Petition with prejudice. Your firm was not authorized to do this, and unless you take immediate steps to correct this unauthorized dismissal, BIU may lose the ability to monetize Spectrum Five's rights for a satellite slot located at the 95.15° West Longitude Orbital Slot ("95 W.L."), and its investors will lose tens of millions of dollars.

We assume that you withdrew the Petition at the direction of R. David Wilson. Mr. Wilson failed to inform you that he has no right, power, or ability to withdraw the Petition. Spectrum Five and BIU are parties to that certain Loan Agreement dated September 6, 2018, as supplemented and amended by that certain Amended and Restated Loan Agreement dated August 28, 2019, as further supplemented and amended by that certain Second Amended and Restated Loan Agreement dated December 30, 2019, and as further supplemented and amended by that certain Third Amended and Restated Loan Agreement dated January 31, 2020 (the "Loan Agreement"); the Security Agreement dated September 6, 2018 (the "Security Agreement"); the UCC Security Agreement dated August 28, 2019 (the "UCC Agreement"); the Pledge Agreement dated September 2018 (the "Pledge Agreement"); the Letter Agreement entered into as of September 5, 2020; and the Letter Agreement entered into as of February 15, 2021 (the

**GᴄᴅG Greenberg Gross LLP**

Samuel L. Feder
June 7, 2023
Page 2

"2021 Letter Agreement") (collectively referred to herein and, together with any additional documents related hereto, as the "Loan Documents"). The Loan Documents reflect the agreements between BIU, as Lender, on one hand, and Spectrum Five, on the other, in connection with loans by BIU to Spectrum Five (the "BIU Loan"). Copies of these documents are attached for your reference.

As Mr. Wilson's former counsel, Joseph S. Hall, of Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C., has acknowledged, the BIU Loan was and is in default. Therefore, BIU is entitled to exercise all rights and remedies under the Loan Documents. Those rights include, without limitation, the rights under Section 3.4 of the Security Agreement and Section 6 of the Pledge Agreement, pursuant to which Spectrum Five has irrevocably designated, made, constituted, and appointed BIU as Spectrum Five's true and lawful attorney-in-fact. Therefore, ***BIU is the only party authorized to direct counsel to on behalf of Spectrum Five in connection with the Petition.***

Moreover, in October 2021, Mr. Wilson agreed not to interfere with lobbying efforts of BIU on behalf of Spectrum Five in connection with the monetization of Spectrum Five's rights for a satellite slot located at the 95 W.L. I have attached that agreement to this letter as well. Spectrum Five's Petition is integral to those efforts. Therefore, it must be reinstated for those efforts to proceed.

As I said at the outset, I trust that you were unaware of these facts when you withdrew the Petition, just as we were unaware that your firm was taking these steps purportedly on behalf of Spectrum Five. Please let me know when you are free to discuss this. Time is of the essence, as discussions with the legislative initiative have been suspended pending resolution of this issue.

Very truly yours,

Michael H. Strub Jr.
Amir A. Shakoorian

Attachments

**CERTIFICATE OF SERVICE**

I, Michael H. Strub, Jr., do hereby certify that I have, on this 9th day of June, 2023, caused a copy of the foregoing "June 9, 2023 Letter to the FCC" to be sent via electronic mail to:

R. David Wilson
Spectrum Five LLC
2445 California Street NW
Washington, D.C. 20008 r
dw@spectrumfive.com

Jennifer D. Hindin
Henry Gola
Sara M. Baxenberg
Garriott Boyd
Wiley Rein LLP
1776 K Street NW
Washington, D.C. 20006
JHindin@wiley.law
HGola@wiley.law
SBaxenberg@wiley.law
BGarriott@wiley.law
*Counsel for IntelSat*

Samuel L. Feder
Jenner & Block
1099 New York Avenue, NW, Suite 900
Washington, D.C. 20001-4412
SFeder@jenner.com
*Counsel for Spectrum Five, LLC*

Francisco R. Montero
Seth Williams
Fletcher Heald & Hildreth, PLC
1300 North 17th St., 11th Fl.
Arlington, VA 22209
montero@fhhlaw.com
williams@fhhlaw.com
*Counsel for Spectrum Five, LLC*

Michelle Bryan
Susan H. Crandall
Cynthia J. Grady
Intelsat US LLC
7900 Tysons One Place
McLean, VA 22102
michellebryan@intelsat.com
susan.crandall@intelsat.com
cynthia.grady@intelsat.com
*General Counsel*

Michael H. Strub, Jr.